1  John Doe
2  Address Withheld
   Phone Number Withheld
3  Email Withheld
   Plaintiff <u>Pro Se</u>
4          IN THE UNITED STATES DISRTICT COURT FOR THE
5                    DISTRICT OF COI

6  JOHN DOE,                          | Case

7          Plaintiff,

8  vs.                                COMPLAINT

9
10 AMERICAN UNIVERSITY

11         Defendant

12 Defendant Address
   4400 Massachusetts Avenue NW
13 Washington, D.C. 20016

Case: 1:25-cv-03866
Assigned To : Unassigned
Assign. Date : 11/5/2025
Description: Pro Se Gen. Civ, (F-DECK)

14                    **<u>COMPLAINT</u>**

15     John Doe, as Plaintiff <u>Pro Se</u>, files this complaint against American University ("the

16 University") for breach of contract, breach of the implied covenant of good faith and fair dealing,

17 gender-based discrimination in violation of 20 U.S.C. § 1681 ("Title IX"), and negligence. In

18 support of his complaint, Plaintiff alleges the following:

19
20
21
22
23
24
25
26
27
28

RECEIVED
NOV 0 5 2025
Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

# TABLE OF CONTENTS

**Parties, Jurisdiction, and Venue**                                                                        **1**

**Statement of Facts**                                                                                       **1**

   I.     The Dear Colleague Letter and its Enforcer                                    1

   II.    Roe's Problematic Behavior                                                       3

   III.   ██████████ 2021                                                                   8

   IV.   Roe's Emotional Abuse and Doe's Posttraumatic Stress Disorder                      9

   V.    Contemporary Pressures to Discriminate Against Men During the Investigation       14

   VI.   Doe's Mental Health Before and During the Investigation                          16

   VII.   The Investigation                                                                17

   VIII.  Failure to Bring a Complaint                                                        23

   IX.   Contemporary Pressures to Discriminate Against Men During the Decision-Making

         and Appellate Processes                                                          23

   X.    The Hearing, Determination, and False Statements                                 26

   XI.   Negligence in Determinations                                                     31

   XII.   The Appellate Process and Ms. Annexstein's Coverup                               32

   XIII.  The University's Conduct Case                                                       37

**Causes of Action**                                                                                         **39**

   I.     Breaches of Contract (the Policy)                                                39

   II.    Breach of Contract (the Code)                                                    44

   III.   Breach of Implied Covenant of Good Faith and Fair Dealing                        45

   IV.   Violation of Title IX (20 U.S.C. § 1681)                                         54

   V.    DCHRA Violation of Real Property Transaction                                     59

   VI.   Negligence in Training                                                           55

**Prayer for Relief**                                                                                        **58**

## SUBJECT MATTER JURISDICTION

1.    The United States District Court for the District of Columbia ("this Court") has jurisdiction over this case because it meets the criteria of diversity jurisdiction (28 U.S.C. § 1332) and federal question jurisdiction (28 U.S.C. § 1331). First, John Doe is a citizen of Maryland and American University, operates out of and do business under the laws of the District of Columbia. The violation of local statutes resulted in damages that exceeded $75,000. Secondly, the University violated federal law under 20 U.S.C. § 1681.

## VENUE

2.    This Court is the appropriate venue for this case as the Defendant is primarily physically located in and operate out of the District of Columbia, both currently and when the acts in this complaint occurred. The Defendant's actions are the reason for this case.

## PARTIES

3.    The Plaintiff, John Doe, is a citizen of Maryland. He was an undergraduate student at American University from August 2021 until February 2024, when he was suspended through May 15, 2025, following the conclusion of the Formal Complaint process under American University's Title IX Sexual Harassment Policy ("the Policy") in which he was a complainant-respondent.

4.    The Defendants, American University, a private university is located primarily in and operating out of the District of Columbia. The University receives federal funds, including through unsubsidized federal student loans which Plaintiff received.

## STATEMENT OF FACTS

### I.    The Dear Colleague Letter and its Enforcer

5.      In 2011, the now-rescinded Dear Colleague Letter (DCL) was published by the Department of Education's Office of Civil Rights (OCR).[1] This letter spurred on investigations into how schools and districts enforced Title IX, including how they addressed claims of sexual assault. On its face, that does not seem discriminatory but what was being said by those who were in charge of OCR was far more concerning.

6.      Assistant Secretary Catherine Lhamon was Assistant Secretary of Education for Civil Rights from August 2013 until December 2016 and again from November 2021 until January 2025. The University's Title IX investigation occurred during Ms. Lhamon's second term. However, during her first term she made clear that her concerns were for women who suffered sexual violence, not anyone else. In an interview with the LA Times, she said that "We don't treat rape and sexual assault as seriously as we should,' [Lhamon] said, citing surveys that found on-in-five women say they were victims of sexual assault or unwanted sexual contact."[2] She made clear that the people who she wanted to be taken seriously were women who alleged to be victims of sexual assault. That same article describes Ms. Lhamon as bringing "the style of an aggressive litigator."[3]

7.      One of the tools that Ms. Lhamon, and OCR as a whole, had was stopping federal funds to institutions. In an interview with USA Today, she stated that she had levied that

---

[1] https://www.ed.gov/media/document/colleague-201104pdf-35042.pdf.
[2] David G. Savage and Timothy M. Phelps. (2015, August 17). "How a little-known education office has forced far-reaching changes to campus sex assault investigations." https://www.latimes.com/nation/la-na-campus-sexual-assault-20150817-story.html. (Accessed June 2, 2025).
[3] *Id.*

threat four times in her first ten months in office.[4] These actions show the real risk that the University faced for not believing women, regardless of the factual basis.

## II. Roe's Problematic Behavior

8.      Plaintiff and Jane Roe, also an undergraduate student at the University, met in the first weeks of their first semester in Fall of 2021. They both lived on the same floor of their freshman year dormitory. For the next few weeks, until early October, they had a casual, sexual relationship which entailed consensual kissing, touching, oral sex, and digital penetration of the vagina. In early October 2021, Ms. Roe asked, and Plaintiff agreed, to return to a non-sexual relationship. About two weeks later, Plaintiff returned to the dormitory after a weekend away. Within a couple days, Ms. Roe began cuddling with Plaintiff and from there, the casual, sexual relationship was restarted. There was no explanation for the pause. During the two-week break, Ms. Roe began another casual, sexual relationship with Student W, who lived on the same dormitory floor as well, and that continued in parallel with Plaintiff and Ms. Roe's relationship into early 2022.

9.      The day that Ms. Roe and Plaintiff had gotten back together, Plaintiff mentioned that Ms. Roe's eyes shared the same effervescent blue that the Hubble *Pillars of Creation* image had. At some point in the following week, Plaintiff used a similar complement on one of their mutual friends, Student R, while Plaintiff, Ms. Roe, and Student R were all together in the dormitory floor's common space. Shortly thereafter, Ms. Roe invited Plaintiff back to her dorm room. They began kissing for a few seconds and then Ms. Roe expressed displeasure at that same line being used on someone else, cupped Plaintiff's face and open palm

---

[4] Rachel Axon. (July 14, 2014). "Feds press colleges on handling of sexual assault complaints." https://www.usatoday.com/story/sports/ncaaf/2014/07/14/college-sexual-assaults-dartmouth-summit/12654521/. (Accessed June 2, 2025).

4

slapped him. She kissed Plaintiff again and then slapped him again, saying she did it "because [Plaintiff] liked it." Immediately afterwards, Ms. Roe dismissed Plaintiff from her room.

10. Two weeks later began "Halloweekend," a four-day stint from Thursday until Halloween, which fell on a Sunday that year. Halloweekend included drugs and alcohol. Thursday, October 28, 2021, marks the beginning of Ms.Roe's problematic behavior when she is intoxicated. Ms. Roe and friends intended to go out clubbing at roughly 10-11 p.m. Many of them, Ms. Roe included, got very intoxicated. They got on the WMATA metro at Tenleytown station and only made it two stops to the Woodley Park-Zoo/Adams Morgan metro stop because one of the friends had become seriously ill from alcohol. Ms. Roe asked Plaintiff to come meet them and Plaintiff did. Plaintiff helped Ms. Roe and two others return back to the dormitory that night, which involved getting back on the metro to Tenleytown and then walking back in the cold, late autumnal midnight temperatures because there were no shuttle buses. At this point it was approximately 1:00 a.m. on October 29, 2021.

11. As they return, Plaintiff and his roommate, Student C, coordinated who was sleeping where that night, as Plaintiff's and Ms. Roe's roommates are in a romantic relationship. During that text exchange, it is established that Plaintiff and Ms. Roe were going to stay in Plaintiff's room that night. It also established that Student C was aware that Ms. Roe got sexually aggressive when she was drunk. This was laid out in a one-word message, "resist." Plaintiff's roommate also made a point to make sure to say, "don't touch her." By this point, Ms. Roe was basically, if not already, completely sober, but Plaintiff's roommate was still concerned. Because there were no signs of intoxication, let alone incapacitation, this erroneously convinced Plaintiff that people could be incapacitated while appearing completely normal, making

decisions, walking for miles, having normal conversations. Nothing sexual happened that night but Ms. Roe made clear that it was disappointing.

12.     A couple of nights later, there was a party in Plaintiff's dorm room. Alcohol was the intoxicant of choice. That night, Plaintiff began drinking for the first time, taking several shots, but Ms. Roe drank even more. Ms. Roe was intoxicated. Later that evening, Plaintiff escapes the party to hang out with other friends on the dorm floor. Ms. Roe goes and finds him for 'help getting the cheese' from her fridge from a wine and cheese night. Plaintiff followed Ms. Roe and Plaintiff entered first. Ms. Roe closed the door behind them, stopped Plaintiff from getting the aforementioned cheese and the two began kissing. Ms. Roe told Plaintiff that she wanted to have sex and Plaintiff rejected, citing the intoxication. Ms. Roe told Plaintiff that not having sex while intoxicated was just a "silly [Ms. Roe's roommate] rule" and that they did not need to follow it.

13.     Ms. Roe's roommate, Student J, knocked on the door within a couple minutes of the door being shut, the door was then opened. Student J made clear that both Plaintiff and Ms. Roe needed to leave that room. Minutes later, Student J and Student C, told Plaintiff to stay out of Ms. Roe's room that night. At that same time, no one could find Ms. Roe. Student J contacted Student W's roommate, Student A, to check to see if Ms. Roe and Student W were in the same room together. Plaintiff was informed a few minutes later that Ms. Roe had been told to stay in her room because of her behavior by Student J. While Ms. Roe and Plaintiff were separated, Ms. Roe sent messages on snapchat telling Plaintiff to come over. Plaintiff was told by Students J and C not to respond to her messages.

14.     Later that evening, after Ms. Roe had showered, she sent Plaintiff another message asking for him to come over just to cuddle since she had sobered up. However, Plaintiff

6

was not checking his phone at this time because he had put it away after being told not to respond. What followed was a string of angry messages from Ms. Roe to Plaintiff ranging from "Fuck you" to "[Ms. Roe] thought [Plaintiff] cared about [her]". All of those messages no longer exist. Ms. Roe's use of snapchat messages allowed her to be abusive and have all the evidence disappear the next day, except for select messages. She would use this tool throughout the next four months to manipulate what was and was not saved, allowing her to manipulate evidence.

15.    The following morning, Ms. Roe apologized for her conduct. Plaintiff and Ms. Roe, at some point between that morning and November 2nd, 2021, discussed having sex in the near future. Late in the evening of November 2nd, 2021, Plaintiff and Ms. Roe had sex for the first time. Ms. Roe and Plaintiff were watching a film for one of Ms. Roe's classes in Plaintiff's Room. After Ms. Roe felt she had taken sufficient notes, she thought the last 30 minutes of the movie were best viewed after intoxication. Ms. Roe went back to her room, allegedly used her "weed pen," an electronic device that vaporizes tetrahydrocannabinol ("THC"), and then returned a few minutes later to Plaintiff's room. The movie finished after about 30 minutes. Ms. Roe and Plaintiff then began kissing and eventually got undressed. Ms. Roe straddled Plaintiff, sitting on his legs, immediately below the genitalia, while facing Plaintiff. After informing Plaintiff that she wanted to have sex Plaintiff rejected her advances because of the aforementioned THC usage. Ms. Roe rejected that as a legitimate excuse, instead pressing Plaintiff to give in, saying: "[Ms. Roe] already told Student C that it was happening;" "[Ms. Roe] wanted to have sex;" "[Ms. Roe] thought [Plaintiff] wanted [her] to be happy;" and that "[Ms. Roe] thought that [Plaintiff] cared about her," among other statements. Plaintiff could not escape as he was pinned down and after being worn down, eventually gave in. Ms. Roe mounted Plaintiff's penis and penetration occurred. After that, Ms. Roe got cleaned up and dressed.

Before leaving, Ms. Roe told Plaintiff not to tell anyone for a reason that Ms. Roe alleged Plaintiff knew but would not further elaborate on.

16.    Over the next five weeks, Plaintiff felt that he could no longer say no to sexual advances, only postponing them at best. While penetration did not occur after intoxication, Plaintiff had to promise sex for the following night on at least two occasions, which was met with disappointment both times.

17.    During that interim period, mutual romantic feelings became involved. They were not spoken about to maintain the illusion that the relationship was casual. Additionally, the involvement of Student W, as well as a previous partner from Ms. Roe's past, created more confusion. After Thanksgiving break of 2021, Plaintiff and Ms. Roe returned to the dormitory from their respective homes. On Monday or Tuesday of the week following Thanksgiving, Ms. Roe sent Plaintiff a message asking to make the relationship no longer sexual. Ms. Roe did not clarify what she meant by that. Kissing and touching still happened. Plaintiff assumed it had something to do with Ms. Roe's old boyfriend coming to stay with her the following weekend. On the afternoon of that Wednesday, December 1, 2021, Student C asked Plaintiff if they could spend the night with their respective sexual partners. Plaintiff thought that it would not work given that Ms. Roe usually had her writing class at 8:10 a.m. on Mondays and Thursdays. While Ms. Roe was commuting home from work on that day, Ms. Roe called Plaintiff and said it would work because Ms. Roe's class was cancelled the next morning.

18.    Ms. Roe and Plaintiff spent the night in Doe's room and on Thursday morning, December 2, 2021, Ms. Roe and Plaintiff were kissing and then Ms. Roe shoved Plaintiff's hand into her pants and told Plaintiff to digitally penetrate her. Plaintiff responded surprised, saying that he thought they weren't doing anything sexual, Ms. Roe responded that

they were doing sexual things now. At some point between December 2ⁿᵈ and December 5ᵗʰ, oral sex also occurred.

### III. ███████, 2021

19.     On ███████ 2021, sexual contact occurred between Plaintiff and Ms. Roe. Ms. Roe and Plaintiff had a public, verbal fight during the 8 o'clock hour of that evening. At around 9:00 p.m., Ms. Roe invited Plaintiff over to discuss the status of their relationship. Ms. Roe told Plaintiff that he was not showing her enough attention, disregarded Plaintiff's explanation, leading Plaintiff to apologize for not showing her enough attention, and then they began to make up. Plaintiff hugged Ms. Roe from behind and Ms. Roe began rubbing her buttocks against his crotch telling him that there was "a really hot girl on his floor that liked him," referring to herself. She was also flirting with him by telling him how she did not have any underwear on. During this time, consensual sexual touching and kissing occurred.

20.     At about 9:33 p.m., Ms. Roe inhaled two breaths from her weed pen. In the following half hour (now ~10:00 p.m.), the flirtatious and sexual behavior had continued with no visual signs of impairment from Ms. Roe, Plaintiff applied light pressure to one of her shoulders and asked if she wanted to perform oral sex on him. She said no and decided, along with Plaintiff, to just cuddle in bed.

21.     After getting into a lofted bed, both parties continued cuddling, kissing, and there was some sexual touching. After getting in bed, Ms. Roe lifted up her necklace and asked Plaintiff to remove it, telling him to reclasp it so it did not get tangled and where to put it. For the next couple of hours, Ms. Roe and Plaintiff kissed, cuddled, and engaged in petting. After an unknown amount of time, some sort of digital penetration of Ms. Roe's vagina may have occurred.

22.     At approximately 11:40 p.m., Ms. Roe instructed Plaintiff to get on top of her in a plank position and then unbuckled his belt buckle. She instructed him to take off his pants and then his underwear. Ms. Roe took off her own pants and told Plaintiff to penetrate her vagina with his penis, which he rejected with hesitation. Ms. Roe said that they were both naked, a decision made by her so they could have sex. Plaintiff continued to deny and avoid the situation by returning to kissing with her. Then, seconds later, Ms. Roe inserted Plaintiff's penis into her vagina. Plaintiff withdrew his penis and, seconds later, Ms. Roe reinserted it and locked her limbs around him, again without consent. Sexual intercourse followed, with Plaintiff stopping multiple times due to pain and Ms. Roe instructing him to continue. After ejaculation, Ms. Roe requested more sex but allowed the Plaintiff to reject it. Then she directed Plaintiff to where a washcloth was to clean up. The night ended at around 12:00 a.m. on December 8, 2021.

**IV. Roe's Emotional Abuse and Doe's Posttraumatic Stress Disorder**

23.     In the days following, Plaintiff and Ms. Roe spoke about the night. Ms. Roe made it clear through vague, conclusory statements that she played an active role in sexual contact on the Night. She took responsibility for the penetration. She also did not blame Plaintiff. Plaintiff felt guilty about that night because it was now the second time when he felt that he was too weak to stop her. Plaintiff and Ms. Roe messaged over Snapchat about the Night. One conversation was partially recorded in which Plaintiff states that he believed it was his fault because Roe had used her weed pen earlier that night. No other facts, including Plaintiff's lack of consent or Ms. Roe's actual mental state, were considered. Ms. Roe's messages in that conversation no longer exist, instead Ms. Roe only saved parts of Plaintiff's messages.

24.     At this same time, Plaintiff confides in a friend, Student S, about what occurred on the night. The details were limited as it was difficult to talk about, but Plaintiff

focused on what was bothering him, the penetration. Plaintiff told Student S that he felt like a rapist because he did not force Ms. Roe to stop. Student S texted Plaintiff later that evening, saying that they thought Ms. Roe did something wrong and that the facts did not match the statements made. Given that conversation and message, Plaintiff was not sure what to feel, and as such stopped assigning blame to himself when speaking with others. Plaintiff confided in his roommate, Student C, a few days later. Plaintiff told Student C the same recollection without the assignment of guilt and Student C drew the conclusion that Ms. Roe raped Plaintiff.

25.    Ms. Roe ended the relationship with Plaintiff a few days before winter break began in mid-December 2021. They agreed to continue being friends. Shortly thereafter, both Plaintiff and Ms. Roe had gone to their respective homes for winter break, and Plaintiff and Ms. Roe continued to message over Snapchat. One conversation that occurred early on in winter break was Plaintiff telling Ms. Roe that he thought that they should not get back together because he did not feel that he could successfully reject Ms. Roe. Ms. Roe again only saved select messages from Plaintiff, and none of Ms. Roe's were saved.

26.    Upon returning from winter break in early January 2022, COVID-19 was again spreading, as such the University delayed in person classes until the end of the month, meaning that fewer people were on campus, including Students C and J, Plaintiff's and Ms. Roe's respective roommates. Plaintiff continued to suffer from the trauma of the Night. As a result of that, Plaintiff felt that he needed to talk to someone. He spoke with a friend, Student G, about that night and another friend, Student R, was also present. That recollection mirrored what Plaintiff had told Students S and C, focusing on the penetration and how it felt like he could not get Roe to accept no. With Students S's and C's conclusion on fault, Plaintiff did not say that he was responsible for rape.

27.     During that time Plaintiff and Ms. Roe were engaging as friends, but Ms. Roe wanted more again. Ms. Roe began drunkenly knocking on doors and sending messages to Plaintiff about wanting him, ranging from emotional to sexual, depending on the level of intoxication. That culminated in mid-January 2022 when Plaintiff told Ms. Roe to stop, that it was confusing and that he would prefer to remain friends. A few nights later, Student W, Ms. Roe and Plaintiff were sitting in the floor common area watching a movie. Ms. Roe and Plaintiff were on separate sides of a couch and Student W in an adjacent armchair. Ms. Roe and Plaintiff both had separate blankets. Student W made a comment about being cold, so Ms. Roe tossed Student W her blanket and got under Plaintiff's blanket, beginning to cuddle with him by grabbing his hand and putting it on her thigh. Ms. Roe had previously been told by Plaintiff, in aforementioned messages, that he found it difficult to successfully reject Ms. Roe. Ms. Roe also knew that Plaintiff did not want to be more than friends from their previous conversations. Ms. Roe chose to ignore all of that and instead began one, positioning herself to exploit the trauma she caused in the past three months to protect herself.

28.     What occurred in that later half of January 2022 was nothing short of horrific. It led to two plans for suicide being developed. It made Plaintiff unable to discern between what was real and not. In the beginning, while Ms. Roe and Plaintiff were cuddling, Ms. Roe began talking about the Night but began blaming Plaintiff because she felt that due to him being physically stronger, he could have forced Ms. Roe to stop. Ms. Roe then began making unfounded allegations about Plaintiff lying. Ms. Roe would ask Plaintiff about parts of the night and then tell him he was lying or that certain actions, which did not constitute incapacitation, made him a rapist. Ms. Roe once asked Plaintiff about the conversation prior to penetration where Plaintiff rejected penetration and Ms. Roe said that that was not true, that Plaintiff actually

just said "are you sure" prior to penetration. Another example of this is when Ms. Roe told Plaintiff that by not forcing sex to not occur, it was all his fault because he had not used the weed pen. Even to this day, Plaintiff has difficulty with memory recall and placement because of the extreme pain caused during this period.

29.    Plaintiff began to believe Ms. Roe over himself, since Ms. Roe would point out lost and fragmented memories, delayed recall, avoidance behaviors, and other effects of trauma. She would then characterize them as lies. She would, and did during the Title IX process, cite the lack of memory as evidence of alleged lying. Plaintiff, at that time, could not explain why he could not remember as he was not trauma informed.

30.    A key component of PTSD is avoidance. Those who suffer from PTSD reexperience the trauma in painful recollections. Ms. Roe routinely and consistently forced Plaintiff to reexperience his trauma by continuously bringing it up and trying to argue with him. Plaintiff engaged in avoidance behaviors to stop the pain by taking responsibility for whatever Ms. Roe alleged and doing whatever she wanted. Plaintiff's brain learned that taking the aforementioned avoidance behaviors stopped Ms. Roe from continuing to force painful recollections. This strengthened an anxiety and avoidance cycle where Plaintiff was further incentivized to continue avoidance behaviors because it was proven to cause short-term relief.

31.    This culminated in late January 2022, when Ms. Roe initiated a conversation after Plaintiff ended the relationship. Ms. Roe alleged that she recorded that conversation. In that conversation Ms. Roe forced Plaintiff to relive getting raped, then told Plaintiff he was lying. Plaintiff attempted to use avoidance behaviors, but they did not provide substantial relief because Ms. Roe did not stop or leave Plaintiff's room. Ms. Roe only left after Plaintiff had agreed to her demands to tell everyone that he was a liar and a rapist. Continuing

13

the avoidance behaviors, Plaintiff executed her demands. During the conversation with Ms. Roe, Plaintiff had difficulty sitting up, speaking, thinking, was unable to make objective decisions, and was scared.

32.     Over the next few weeks, Plaintiff was suicidal and unable to differentiate between what was real and what was not. Plaintiff had three plans for suicide. The first was to put the blade of his Leatherman through his neck. The second was jumping in front of WMATA's 33 bus going downtown near the fire station where he believed it was quick enough to kill him. A third plan was also developed, which was jumping off the top of the parking garage at Bender Arena. Students J and C were both concerned about Plaintiff's mental health at that point and later reported suicidal ideations during the investigation. Luckily, Plaintiff caught COVID during February 2022 and was forced to quarantine offsite, which prevented him from executing any of the suicidal plans. Plaintiff also got an appointment with the University's counseling center. The distance from the trauma and the help from the counseling center temporarily stopped the downward mental health spiral.

33.     At the same time, Ms. Roe and Plaintiff went from not talking to cordial. Ms. Roe began reengaging with Plaintiff. Ms. Roe used Plaintiff as a witness for a university no-contact order and afterwards became considerably friendlier. One night in February 2022, Ms. Roe, Plaintiff, and several others were watching a movie in the floor common area. Towards the end people were leaving and as a spot on the couch next to Plaintiff opened up, Ms. Roe sat there and got under a blanket with Plaintiff. Student J entered the lounge for a moment, told Ms. Roe to leave and then yelled profanities at Plaintiff. At the end of the month, Ms. Roe called Plaintiff near midnight telling him he had to come clean up his dishes as a new rule was put in place by the dorm floor. After doing so, Ms. Roe begged Plaintiff to stay up with her and another friend.

He obliged. The next morning, Ms. Roe asked Plaintiff how therapy was going and that led to Plaintiff telling Ms. Roe that her slapping him in October 2021 was wrong. Ms. Roe responded saying that she was only trying to do it in a sexual way but not apologizing. That was the last time Ms. Roe and Plaintiff were friendly.

34.    In mid-April 2022, Plaintiff had been in therapy for several weeks and felt that he needed to address the first time Ms. Roe and Plaintiff had sex in November 2021, when he felt coerced into sex. A discussion occurred and then about two weeks later, right before final exams, posters appeared on Plaintiff's dorm floor that posted his full name, a picture of him, a photo of a snapchat message from Plaintiff to Ms. Roe, calling him a rapist. However, on that poster it said that Ms. Roe was able to consent at a point between using THC and vaginal penetration.

35.    In the following days, Plaintiff was intent on filing a formal complaint. Students C, J, S, and unidentified students all successfully pressured Plaintiff to not file one through threats of a retaliatory filing, telling him he would not be believed because of the things that Ms. Roe got him to say, and being generally hostile to the idea. The unidentified students were alleged students, not from Plaintiff's dorm floor who came looking for Plaintiff and his location in the middle of the night because they alleged that he raped their friend. Plaintiff feared for his safety, was traumatized, barely ate, had to request that his in-person exam be moved online, lost his future living situation for the next academic year, and lost his closest friends due to the posters.

**V. Contemporary Pressures to Discriminate Against Men During the Investigation**

15

36.     Plaintiff returned to the University in Fall 2022 for the next academic year, suffering from yet to be diagnosed posttraumatic stress disorder (PTSD). In the early morning of October 31st, an individual entered Leonard Hall, illegally entered two dorm rooms and attempted to commit non-consensual sexual acts.[5] This sparked a wave of public protests and pressure against the University.[6] ████████████ were influential in this movement and often cited in articles relating to sexual violence on campus. The original incident, protests, and the University's failures in responding became publicized in national media as well.[9]

37.     ██████ article in *American Agora* became one of the most read articles in their publication's catalogue. In that article she lamented that, in a previous Title IX case, that the University was strongly opposed to moving the date of the live hearing to accommodate for her vacation.[10] She then went on to detail a restraining order she got against another person through the court system, where she says that "[she] left triumphant…" and that "[t]he court gave [her] proper the proper channel to seek justice, and rewarded [her] for [her] participation."[11]

---

[5] https://www.theeagleonline.com/article/2024/06/breaking-former-au-student-pleads-guilty-to-leonard-hall-sex-abuse-burglary. (June 14, 2024).

[6] https://www.theeagleonline.com/article/2022/11/students-walk-out-to-protest-universitys-response-to-sexual-violence. (November 14, 2022).

[7] https://web.archive.org/web/20250115052954/https://www.americanagora.org/single-post/shocking-failure-of-title-ix-at-american-university/. (Nov 13, 2022). No longer available at https://www.americanagora.org/single-post/shocking-failure-of-title-ix-at-american-university/.

[8] https://www.theeagleonline.com/article/2023/03/undergraduate-senate-passes-sexual-assault-survivors-bill-of-rights. (March 31, 2023).

[9] https://www.thenation.com/article/activism/american-university-walkout-sexual-assault-dorm-break-in/. (December 7, 2022); https://www.washingtonpost.com/education/2022/11/02/american-university-sexual-assault-investigation/. (November 2, 2022).

[10] https://web.archive.org/web/20250115052954/https://www.americanagora.org/single-post/shocking-failure-of-title-ix-at-american-university/. (Nov 13, 2022). No longer available at https://www.americanagora.org/single-post/shocking-failure-of-title-ix-at-american-university/.

[11] *Id.*

38.    In the following paragraph of that article she said "[the Title IX office does] not seek justice; they do not protect victims; they resolve the cases with the lowest possible sanctions to protect the university from legal ramifications from either party."[12] Serious legal ramifications only exist from errors that change the outcome of cases, but ▮▮▮▮▮ does not allege that in this article. She never outlined or alleged any procedural violations that would have changed the outcome, only that she did not get what she wanted. As of June 5, 2025, nearly 1200 people have viewed that story. ▮▮▮▮▮ was helping to drive a campus-wide movement to effect change on a Title IX process where her only discernable gripes were that the University wanted her to attend a virtual hearing while she was on vacation and that she did not get what she wanted. This told the University that if they did not give her what she wanted, they would receive more negative press.

39.    Not only did these protests get national media attention, but they also drew sizeable crowds of students on the University's main quad. Protests drawing attention to sexual violence on campus and blaming the University for not responding can affect enrollment as these topics are inherently off-putting and concerning. A few days before ▮▮▮▮▮ posted her article, there was the first of multiple campus-wide protests against the University's handling of sexual violence on campus. This attracted significant attention from parents on campus tours with prospective students, including from "Jen Curley, a parent who stumbled upon the walkout with her daughters while her son participated in a campus tour, said she feels "reluctant" to enroll any of her children in the University after hearing the concerns voiced by students."[13] That reluctance generated by these protests directly threatened the University's financial wellbeing.

---

[12] *Id.*

[13] https://www.theeagleonline.com/article/2022/11/students-walk-out-to-protest-universitys-response-to-sexual-violence. (November 14, 2022).

40.    These protests were not going to stop anytime soon because, as one leader put it, "Ruin their reputation, make a scene, be annoying, be loud and hold these motherf*****s accountable."[14] With ▓▓▓▓▓ and her allies pouring gasoline on this fire for not giving her what she wanted, the University had an interest in appeasing them to protect their reputation and financial wellbeing.

41.    As the now-nascent Title IX investigation was proceeding, there was another protest on February 22, 2023. One of the protesters identified the gender gap in the protest, as "[h]e also shared that he felt that men on campus needed to step up their support for this issue" and that "the few men that are [enrolled at American] aren't speaking up about it."[15] In those two sentences, the stage was set for discriminating against men in the Title IX process because they "aren't speaking up about it."

**VI. Plaintiff's Mental Health Before and During the Investigation**

42.    Plaintiff was already suffering before October 31st, afterwards it became much more severe. Plaintiff experienced more regular panic attacks, had difficulty sleep, felt afraid people were going to come looking for him, woke up several times due to fears that posters would once again go up on his dorm hall falsely alleging that he was a rapist, and occasionally woke himself up begging not to be raped due to nightmares. The worst however was not waking up at all. Plaintiff did not wake up from a nightmare while it was happening and instead woke up fearful, anxious, and so tense that his entire body was sore and shaking. It made him scared to fall asleep. Ms. Roe strengthened these fears by posting on her Instagram that she would name her alleged rapist to people that asked.

---

[14] *Id.*
[15] *Id.*

43.    That suffering encouraged Plaintiff to go to the Office of Equity and Title IX ("the Office") and start the formal complaint process. However, the final decision to actually meet with the Office was solidified by ████████████████████████████████ ████████████████████████████████████████████████████ ████████████████    ████████████    she had underwear on, proving that she had capacity to get up and get dressed before going to bed. That, combined with the posters in April 2022 which said that she was able to consent at a time closer to intoxication, made Plaintiff certain that the University would find Ms. Roe's statements conflicting and therefore false.

44.    When Plaintiff met with the Office in November 2022, he asked for the complaint to include the following charges:

1.    Stalking – Ms. Roe had repeatedly tried to contact Plaintiff's family members and friends, which caused him to suffer substantial emotional distress.

2.    Sexual Harassment – Including the behavior of the aforementioned stalking as well as Ms. Roe's conduct in defaming Plaintiff.

3.    Sexual Coercion – Plaintiff was under the erroneous impression that the University and the Office on Women's Health shared the same definition.[17] Specifically, Plaintiff sought the charge for November 2nd,

---

[16] https://web.archive.org/web/20250115052954/https://www.americanagora.org/single-post/shocking-failure-of-title-ix-at-american-university/. (Nov 13, 2022). No longer available at https://www.americanagora.org/single-post/shocking-failure-of-title-ix-at-american-university/.
        [17] https://womenshealth.gov/relationships-and-safety/other-types/sexual-coercion. (February 15, 2021).

2021, event since consent was the result of badgering and emotional manipulation.

    4.   Rape – As brought in the January 2023 formal complaint.

    5.   Dating Violence – As brought in the January 2023 formal complaint.

The University declined to bring all but points 4 and 5. The Office employee told Plaintiff he would be assigned an investigator "soon." Plaintiff was informed later, after reaching out to the Office, that one would be assigned in January 2023.

**VII. The Investigation**

    45.    From the very beginning, the investigation was problematic. The investigator, Nicole Fauster, was new to the University and investigating. In order to start the investigation, a Notice of Allegations needs to be issued. After the preliminary Notice had been written up for Plaintiff's review, there were two words that needed to be changed before it could be issued. Additionally, Plaintiff sought assurances that conclusory statements, which were both contradictory to the facts and the result of emotional duress and trauma, were not going to be considered evidence of lying, prohibiting him from succeeding in his claims. Finally, Plaintiff asked that he be allowed to talk about November 2nd, 2021, since it was both integral to his thinking about consent and that others were going to use it to claim he was inconsistent. Plaintiff was given verbal confirmation that those statements would not be held against him and that he would be allowed to discuss November 2nd, 2021. Plaintiff was also given verbal confirmation that both of the incorrect words would be changed after the meeting but before the Notice was sent. Only one was. Plaintiff only authorized the issuance of the Notice of Allegations conditioned on the aforementioned points.

46.    The Investigator also asked Plaintiff to submit the witnesses and evidence that he wished to present. Under Section (IV)(H)(8), both parties were supposed to "be given equal opportunities to be heard, to present relevant inculpatory and exculpatory evidence, and to identify relevant fact and expert witnesses" (The Policy at 16).  The Investigator did not meet with all the witnesses that Plaintiff presented, notably Student M who Student E also identified as being one of three individuals who were all told stories by Ms. Roe that conflicted with Ms. Roe's statements. Section (IV)(H)(9) specifically mandates that "[t]he Investigator **will notify and seek to meet** [emphasis added] separately with…any third-party witnesses" (The Policy at 16). The Investigator was contractually obligated to meet with all presented third-party witnesses and instead chose to break that contract.

47.    The Investigator did not meet with all the witnesses that Plaintiff presented but contrastingly she did meet with all the witnesses that Ms. Roe presented. The University Investigator is supposed to conduct "a prompt, thorough, fair and impartial investigation" (The Policy at 14). Instead, the Investigator picked and chose which witnesses to interview. This was just one aspect that demonstrated the Investigator's partiality.

48.    When the Investigator did interview Ms. Roe or Pro-Ms. Roe witnesses, there was still a lot of information missing. The principle inexcusable failures were in the statements alleging incapacitation and consistency. No witness, including Ms. Roe, ever established how Ms. Roe alleged that she became incapacitated without additional intoxication. Most of those witnesses did not state that they knew that Ms. Roe decided against oral sex after getting high. Ms. Roe plainly says that in the short time after inhalation of THC, she was capable of consent, and no one says how she allegedly became more intoxicated. Ms. Roe's story to the Investigator was also much different than those told to others. The Investigator did not ascertain

21

from all witnesses; when they thought Ms. Roe was incapacitated, what role Ms. Roe played in sexual act where she alleged incapacitation, what Ms. Roe alleged to remember, or how Ms. Roe was both alleging that Plaintiff was lying while also alleging to not remember anything and be incapacitated. The Investigator also did not establish why Ms. Roe deleted or let messages expire in the saved Snapchat messages. These are important questions that needed to be answered. Given the conflicting accounts made by witnesses, who all alleged that they were consistent, it stands to reason that there is additional significant evidence that Ms. Roe was omitting or making explicitly false characterizations to others about what happened on ███████ 2021.

49.    The Investigator also relied heavily on hearsay evidence and chose not to corroborate evidence with first person accounts. Students R, A, and S gave conflicting accounts of what Plaintiff said in the aftermath of the April 2022 posters. None of their stories overlapped yet they were all in the same room at the same time when Plaintiff was talking about his recollection. The Investigator did not thoroughly investigate it, making Plaintiff erroneously appear inconsistent. When Plaintiff raised questions in his response to the preliminary report that needed answering by the witnesses, they were not requestioned.

50.    The Investigator was supposed to conduct a "thorough" investigation, but those questions were never asked. This led to a huge knowledge gap which invited, and was exploited by, biases in the written determination which cited consistency as the sole factor for credibility.

51.    Ms. Roe also submitted a list of people and things that she wished to enter into evidence. Among that evidence was a secret audio recording. Plaintiff was not informed of its existence or allowed to hear them until a single meeting in April 2023. Plaintiff should have been allowed to listen to them for the entire duration of the investigation, like Ms. Roe was able

to, according to Section (IV)(H)(1) which states that both of them were to be "provided equitable opportunities, including…to review and present evidence" (The Policy at 14). Instead of having adequate time to prepare for the traumatizing evidence and comment, Plaintiff was only allowed to hear it once, during one meeting. Plaintiff struggled to maintain consciousness, was unable to form complete sentences, struggled to lift his head off the table, was nauseous, as well as slurred words and kept repeating partial phrases as he struggled to form a sentence. Ms. Roe, contrastingly, had access and complete control over the evidence for the complete duration of the proceedings, meaning she had more than an additional year to review that evidence during the formal complaint process.

52.    That control extended for the entire formal complaint process. That is because rather than obtaining an audio file from Ms. Roe, the Investigator simply printed a PDF of the email sent by Ms. Roe and included it in evidence. The link in that pdf did not work for Plaintiff at any time. What Plaintiff noticed most, however, was that when he tried to click on the audio file, he almost fell out of his chair and had to collapse because he was struggling to breathe and became lightheaded.

53.    During that April 2023 listening opportunity, the Investigator alleged that Plaintiff said that he was responsible for digital penetration and that it occurred. However, when Plaintiff denied saying it and corrected the record to what he actually said, that digital penetration was no longer impossible due to new information provided, the Investigator changed her report. Contrastingly, when individuals like Student J tried to change their statements and the Investigator had reason to believe that that was not what Student J originally said, the Investigator rejected the changes. This shows investigatory partiality biased against Plaintiff as the Investigator did not have grounds to draw that conclusion.

54.    Plaintiff was not the only party to complain about the Investigator. While ▮▮▮▮ thought the Investigator "treated her better than any other employee in the Office,"[18] Student G felt that the Investigator made his statements inaccurate.

55.    Student G had to amend his statements for two reasons, one because he felt his statements were no longer accurate and the other because the Investigator mischaracterized statements made by him. However, rather than allowing him to go through the same, documented editing request process that every other witness had to go through, Student G went through a live-edit with the Investigator. The Investigator did not establish why Student G no longer believed his statements to be accurate nor were Student G's original statements put into evidence like the rest of the witnesses.

**VIII. Failure to Bring Complaint**

56.    While this investigation was occurring, Plaintiff was targeted by Student C in an act of retaliation. On Plaintiff's way to class, Student C intercepted him on the Friedheim Quadrangle and yelled "F*** you, you f***ing rapist." This caused Plaintiff significant emotional distress causing him to not feel safe to go to class. Plaintiff asked for supportive measures for missing classes that day and for a retaliation case to be opened against Student C. The Office denied that request. However, when Plaintiff repeated the aforementioned phrase to the investigator, she became uncomfortable. During the March 2023 meeting with Ms. Annexstein, she told Plaintiff that she had authorized the investigator to terminate any meeting if Plaintiff used curse words again. Retaliation, according to the Policy, must be "sufficiently serious to discourage a reasonable person from further reporting, participating, or opposing

---

[18] https://www.theeagleonline.com/article/2024/11/student-say-experiences-with-american-universitys-office-of-equity-title-ix-exposes-severe-flaws. (November 14, 2024).

participation" (The Policy at 3). Ms. Annexstein felt that the harassment was too severe to be repeated secondhand to the Investigator, a woman, to allow the investigator to continue participating, but not severe enough to stop Plaintiff, a man, from participating.

### IX. Contemporary Pressures to Discriminate Against Men During the Decision-Making and Appellate Processes

57.    Public pressure on the University significantly increased during the decision-making and appellate periods. On October 26, 2023, ███████████████ ███████████ hosted a town hall in which she questioned Ms. Annexstein.[19] The town hall format also allowed for anonymous questions to be asked and notably, "[m]any students began by questioning the effectiveness of the Office's efforts in supporting survivors of sexual assault."[20] After students finished lambasting the Office and other University officials, a student turned to ask "how [the Office's] staff plan to regain the trust of students who feel 'betrayed and let down by the Office."[21] While all the questions were anonymous, ███████████ ███████████ as well as one of the most vocal voice in the news, ██████ both had significant interests in their "trust" being regained through the upcoming decision on the formal complaint which had just held the live hearing a week and a half earlier.

58.    On November 12, 2023, just days before the decision was handed down by the University, ██████ was an organizer and speaker at a rally on campus for a one-year anniversary protest against the University's response to sexual violence since the Lenoard Hall

---

[19] https://www.theeagleonline.com/article/2023/11/student-government-and-office-of-equity-and-title-ix-host-open-forum. (November 6, 2023).
[20] *Id.*
[21] *Id.*

Incident.[22] ███████ was once again both pictured and written about in the article. She was pressing for policy changes but also "giving survivors the chance to talk about why these policies would impact them, talk about systems that have failed them and bring attention to that."[23] While ███████ say she was trying to elevate "survivors," from the pronoun usage in the article, it does not seem that any of those being elevated at the protests were men.

59.    A final confirmation that the pressure on the University was not coming from men came just before what was supposed to have been the second appellate period. On December 8, 2023, an opinion piece was put out in the student newspaper admonishing the University's alleged lackluster responses to sexual violence incidents on campus and pushing for change. In that article, the author describes a "painful reality," that awful reality was that "59 percent of undergraduate women and 23 percent of undergraduate gender non-conforming people experience sexual misconduct or violence while enrolled in university, and those are only the reported cases."[24] Once again, sexual violence against men was not even mentioned. The group of students driving this public pressure campaign were solely focused on sexual violence against anyone but men.

60.    The only times that men even got a notable mention in reporting done by the student newspaper in November 2024. That reporting confirmed what Plaintiff had already learned a year earlier, that when a man, in this case William Wade, worked with the Office "[he] was essentially told that [his] story was fake."[25] He went on to say that "[he knows] other male

---

[22] https://www.theeagleonline.com/article/2023/11/students-stage-anniversary-protest-against-university-inaction-on-sexual-violence. (November 15, 2023).

[23] *Id.*

[24] https://www.theeagleonline.com/article/2023/12/opinion-one-year-later-survivors-are-still-waiting. (December 8, 2023).

[25] https://www.theeagleonline.com/article/2024/11/no-more-its-on-us-host-survivor-rally-and-art-exhibition. (November 26, 2024).

victims who have been told a very similar thing, or, never even were contacted back by [the Office]."[26] Ethan Glucroft, another undergraduate student, noted similar behaviors from the Office, where after a mandated reporter made a report, he was notified that the conduct met the standards of the Policy or the University's Non-Title IX policy, but once Ms. Selena Benitez-Cuffee, the Office's case manager, met with Ms. Annexstein, he was informed that what happened to him no longer met the standard.[27] Plaintiff experience, as it turns out, is not unique but rather part of a pattern of the University's discrimination.

## X. The Hearing, Determination, and False Statements

61.     In October 2023, the University conducted a live hearing. The hearing chair was John O'Malley. The other hearing panel members were Katerina Kulagina and Seth Mancini. During that hearing, Plaintiff was under significant duress. In the recording footage, he can be seen scraping his face with a piece of plastic attempting to soothe himself. Plaintiff's PTSD made it difficult for him to engage with the material, prepare for the hearing, and participate in the hearing. He could not even think about viewing the materials for more than a few minutes without causing himself to hyperventilate, feel nauseous, feel lightheaded and dizzy, and feel like he was about to pass out. All of these difficulties meant that the hearing panel needed to rely on the facts presented, like they were mandated to by federal regulation which states that the grievance process must "require an objective evaluation of all relevant evidence."[28]

62.     The panel's objectivity was immediately questionable. Chairman O'Malley allowed Students J and A talk about the sexual event on November 2, 2021, as if it

---

[26] *Id.*
[27] *Id.*
[28] 34 C.F.R. § 106.45 (b)(1)(ii) (2023)

were what happened on ██████ 2021. This was effectively using past "consent" to prove

consent for ██████ 2021. Yet when Plaintiff had asked earlier to speak about sexual events

that were not ██████ 2021, he was denied that ability. Section (IV)(I)(18) specifically

authorizes questions related to prior sexual behavior if they "concern specific incidents of the

Complainant's prior sexual behavior with respect to the respondent and are offered to prove

consent." (The Policy at 20).

63.    Panel member Mancini had specific focus on when certain students

remember Plaintiff saying that he had been hit. The written determination specifically cites that

"[Plaintiff] did not mention to anyone that [Ms. Roe] slapped him until after the events of

██████ 2021." In her statements to the investigator, Ms. Roe only began describing

penetration as forced after Student J attempted and failed to amend her statement from "put" to

"shoved," something that the investigator described as a "substantive change." This change was

one of many which the panel members overlooked when they made their false statement that

"[Ms. Roe] gave consistent statements regarding the events of ██████ 2021, and were

credible.

64.    On ██████ 2023, the Written Determinations were handed down.

The hearing panel had the requirement to objectively evaluate all evidence. After allegedly doing

so, they chose to make false statements to support their outcome. The gravest was the

aforementioned consistency conclusion. The hearing panel alleged that Ms. Roe was completely,

100 percent, consistent. Not just mostly consistent, but consistent.

65.    Ms. Roe offered pretty minimal detail originally, building on only when

asked about Plaintiff's allegation. The clearest and starkest example of inconsistency comes from

her alleged memory of penetration. She alleged that she remembered Plaintiff's penis pushing up

28

against a shaving cut on her labia and that because of that pain she pushed Plaintiff's penis "over," so it was less painful and alleged that Plaintiff's penis entered her vagina but then blacked out. Later on, when being interviewed for her response to Plaintiff's allegation, which is the next sentence in the report, Ms. Roe alleged complete memory of the entire sexual event. She alleged that she did not force Plaintiff's penis into her vagina, denied Plaintiff's "hesitation," and denied making any of the comments that Plaintiff said he heard during intercourse. These two statements were literally right next to each other, and the hearing panel said they were consistent. This was not Ms. Roe saying she did not remember, this was her explicitly alleging that it did not happen. One story is of her alleging to "black out" and the other is one in which she has total memory.

66.    On top of that, in her original allegation, she says that Plaintiff's penis "enter[ed] her vagina," not that Plaintiff put or forced it in, just that it somehow enters right after she put her hand down to move it. Someone has to be responsible for that penetration, yet Ms. Roe would not name who despite alleging to remember everything that happened later. She also only denied "forcing" Plaintiff's penis in, not putting it in her vagina.

67.    Ms. Roe also alleged that she had a cut on her labia which caused her pain under penetration. Ms. Roe alleged that pressure on that cut caused pain. However, Ms. Roe did not allege any pain or suffering during the alleged digital penetration. Ms. Roe, placing the blame on Plaintiff for the alleged pain, places her story more in line with Plaintiff's than her own. If there was actually a cut, then that implies that any alleged prior penetration did not cause pain. This is the only time Ms. Roe alleges pain; despite also saying she remembers the entire course of sexual events. Plaintiff had told the investigator that Ms. Roe was responsible for penetration. This one-off pain allegedly came right before the alleged final sexual penetration,

which Ms. Roe noted she moved the penis from where the pain was before penetration. This all fits into Plaintiff's story, that Ms. Roe was responsible for all penetration and that Plaintiff did not have strong control over his penis during withdraw, but that it remained close to Ms. Roe's body. Plaintiff did not mention any possible role she might have had in digital penetration because he did and still does not have any memory of that event. While Plaintiff did not remember any alleged digital penetration, Ms. Roe did allege that it occurred yet did not offer any reason as to why that alleged penetration did not cause pain.

68.     The first time Plaintiff remembers hearing anything about blood in the underwear was when ███████████████████████████████████. In the investigation, there was no proof of blood, nor did any of the surfaces that someone would expect to have blood, like the sheets or on Plaintiff, actually have blood on them.

69.     Ms. Roe claimed to have blacked out multiple times. Blacking out does not occur from inhaled THC. This means that Ms. Roe's allegation of blacking out both could not have been true, and she knew it was not true as the blacking out could not have occurred. Student J alleged Ms. Roe was disoriented and did not know where she was at approximately three hours after inhalation. At that time, the effectiveness of THC would have been wearing off for at least an hour, not increasing. The written determinations alleged that Ms. Roe experienced intermittent consciousness and was therefore incapacitated. Intermittent consciousness does not occur as a result of THC inhalation. These facts are corroborated by an assessment from an expert witness.

70.     Since there was sufficient evidence to identify both that Ms. Roe's claims were contradictory and that her allegations of intoxication were not credible, the University instead found another way to blame Plaintiff. They used his feelings of guilt, inability to judge

responsibility, and PTSD as evidence for his guilt. The Decisionmaker's training on trauma did tell them that "[v]ictim-blaming (by self or others)" as well as "guilt, anxiety, distrust, or depression" were all possible from sexual trauma. Notably, the training did not mention that those who suffer sexual trauma may experience avoidance behaviors.

71.    Plaintiff's feelings of guilt, among other causes, clouded his judgement. He felt that it was his fault because he did not stop Ms. Roe from raping him, who later alleged that she did not want to have sexual contact that night. Ms. Roe understood this as well. Ms. Roe understood her responsibility to the point that she had to delete or not save crucial messages. In December 2021 there were three messages, two between Plaintiff and Ms. Roe and one between Student S and Plaintiff, where it is consistent and clear that Plaintiff's feelings of guilt are that he was too weak to stop Ms. Roe after she had used THC. Ms. Roe contrastingly tried to say that Plaintiff admitted to lying in December 2021, yet offered no proof while Plaintiff offered three pieces of proof showing that was not the case.

72.    Only later in January 2022, after sustained pressure for Ms. Roe, did Plaintiff begin to say he was lying. This was the result of two different aspects of mental illness, one was avoidance behaviors, and the other was Plaintiff's rapidly declining ability to distinguish reality from falsehoods. Ms. Roe also pressured Plaintiff by alleging that he was hurting her by not saying he was a liar and a rapist. Ms. Roe completely rejected even the notion that Plaintiff would not have wanted to have sex with her.

73.    Ms. Roe specifically highlighted that Plaintiff was having memory problems. While Ms. Roe used it as evidence of the alleged "lying," lying itself requires intent and false statements. Ms. Roe explicitly pointed to Plaintiff's fragmented memories and susceptibility to pressure and contrasted it with her alleged yet blatantly untrue claims of

consistency. Ms. Roe herself said that the conversation that she alleged to record took place because she had heard from another witness that Plaintiff was saying that he did not want to have his penis penetrate her vagina that night. Ms. Roe implicitly admitted that Plaintiff's alleged admittances to lying and being a rapist were only because of her pressure.

74.    The written determination alleged statements made by Plaintiff about lying were credible. The University did not establish an evidentiary basis for this claim. There was not an apparent and sufficient difference to support those claims. Ms. Roe did not allege any visible signs of intoxication. Ms. Roe's original testimony said that she did not remember any penetration and did not assign blame to Plaintiff. Both Plaintiff and her agreed that there were no signs of intoxication. Occasionally, Plaintiff gave her the benefit of the doubt when it came to intoxication. Since there were no external signs of intoxication, there was no way he could have judged when it ended. This is recorded in the written determination as Plaintiff originally saying that she was not intoxicated and then later saying she was intoxicated, but there was no change in the supporting facts to support that determination. It is clear that the hearing panel did not evaluate the evidence which those claims are predicated on as the only significant changes were in the conclusions drawn, not the underlying facts.

### XI. Negligence in Determinations

75.    34 C.F.R. § 106.45 (b)(1)(ii) (2023) required, and still requires, an "objective evaluation of all relevant evidence." The University had to present truthful, factual findings in its written determination as mandated by its Policy and 34 C.F.R. § 106.45 (b)(7)(ii)(C). The University was and still is mandated by its Policy and 34 C.F.R. § 106.45 (b)(1)(iii) to "ensure that...Decisionmakers...receive training on the definition of sexual harassment in § 106.30."

76.     Ms. Roe stated multiple times that she had blacked out. Blackouts do not occur from inhaled THC. The University training did not inform Decisionmakers that inhaled THC does not cause blacking out.

77.     The definition that the University used was intermittent consciousness. That does not occur from THC inhalation. The University did not put that fact in their training. The training makes no distinction between alcohol and THC or ingestion through inhalation compared to inhalation.

78.     Plaintiff meets all criteria necessary for PTSD, except that the underlying event is not established as fact, and therefore criterion A can't be met. The University's trauma training does not establish triggers for trauma-related stress. An expert witness established that "[Plaintiff]'s profile demonstrates above average internalized distress, cognitive complaints, dissociation, social avoidance[,] and a history of suicidal ideations". The University trauma training does not educate on the effects on executive dysfunction, dissociative amnesia, or avoidance behaviors. The training really only claims that "sexual assault may impact memory."

79.     The Decisionmakers ruled that Plaintiff did not suffer emotional distress caused by Ms. Roe and that it did not affect his decision making. They made these decisions without proper knowledge as they were not sufficiently trained despite the University claiming to be trauma informed. An expert witness says that Plaintiff demonstrated factors like cognitive complaints and social avoidance. Those factors are important when it comes to understanding decision making. The Decisionmakers filed a report to the Dean of Students alleging that Plaintiff was at risk of suicide.

**XII. The Appellate Process and Ms. Annexstein's Coverup**

33

80.     On ████████ 2023, the University handed down their determinations. That started the clock on the next phases of the process as well as effectively uncoupled the two complaints. For the complaint where Plaintiff was the complainant, the appellate stage was supposed to begin, and for the complaint where Plaintiff was the respondent, the sanctioning stage was supposed to begin. However, the evidence was not provided to him. At this point Plaintiff also retained an attorney.

81.     On November 16, 2023, Plaintiff emailed the Office asking for his then-attorney, Chris Muha, to be designated as his advisor and be given access to the evidence. Later that day, Ms. Annexstein responded to Plaintiff stating that "[t]he next step pursuant to the policy is that a sanctioning panel will be convened". Ms. Annexstein completely ignored the fact that there was an allegedly ongoing appellate period occurring. Ms. Annexstein knew that Plaintiff was allowed to have access to the evidence during appellate periods as she stated later in the email that "[o]nce the sanctions have been issued, [Plaintiff] will have the opportunity to appeal. Should [Plaintiff] decide to appeal, [Plaintiff] may request the materials at that time for review." Ms. Annexstein was aware that Plaintiff should have access to the documents and decided not to allow him to access them.

82.     Ms. Annexstein's original position was reiterated explicitly in another round of emails which she responded to on Monday, November 20, 2023, where she stated that "[n]o documents will be provided to either party for review until the appeal period begins, assuming that there is a party that wishes to appeal and requests the information to review." However, Section (IV)(H)(1) states that both of them were to be "provided equitable opportunities, including…to review and present evidence" (The Policy at 14). The respondent that was found not responsible has no interest in evidence being available for an appeal.

Additionally, the respondent found responsible has significant interest in having access to the evidence during a sanctioning period, especially considering that the complainant's statements about how these events affected them are only accessible to the respondent from the evidence. Ms. Annexstein favored the female complainant-respondent in both situations.

83.    Furthermore, "excessive sanctions" (The Policy at 24) is a ground for appeal, a stage at which both parties would have access to the evidence. It makes no sense to deny access to evidence when that evidence would be used in an appeal.

84.    The next morning, Tuesday, November 21, 2023, Mr. Muha sent Ms. Annexstein and the University's General Counsel, Ms. Byrd, an email to escalate the problem to press for access to evidence. Nearly a week later on Monday, November 27, 2023, Plaintiff was given access to some of the evidence, the alleged recordings were still not included, and the recording of the hearing panel was prohibitively stored at the Office's physical location, which was only accessible during business hours, when Plaintiff had other business to attend to.

85.    Plaintiff did not receive an explanation as to why he was not provided with access to the evidence, however, Mr. Muha did receive an attempt at an explanation. Ms. Annexstein blamed it on Plaintiff's decision to change advisors, which Ms. Annexstein said confused her. She did not elaborate on how an experienced Title IX coordinator became confused by a simple change of advisors. Ms. Annexstein's explanation did not hold water since, if it were accurate, that would have meant that Plaintiff should have had access to the evidence from ███████ until November 16 when he attempted to make Mr. Muha his advisor. Plaintiff did not have access to the evidence at that time.

86.    Due to Ms. Annexstein refusal to allow access to the evidence until much later, she effectively shortened the appellate period to under two days, down from seven.

87. Due to the nature of a cross-complaint, Plaintiff had to prioritize where he was spending his time, whether he was going to focus on limiting the damage from the University's erroneous decision saying he was a rapist or if he was going to try and focus on the other erroneous decision saying that his rapist did not rape him. Given the drastic consequences of possible expulsion or suspension, Plaintiff focused on his sanctioning statement but combined with only having a day and a half to write an appeal, no appeal was able to be submitted. Ms. Roe was protected from being found responsible on appeal.

89. In December 2023, The University decided to punish Plaintiff by suspending him through May 15, 2025, and ban him from all campus dormitories permanently.

90. During the second appellate period, Plaintiff requested an extension so the period would not conflict with final exams. Plaintiff received a slight extension, short of his request, so the University would "be in a position to complete the appeal process prior to the start of the spring semester."

91. Additionally, during this time, Plaintiff had to resign from his position as a Resident Assistant due to the impending sanctions. Plaintiff lost housing, enjoyment of life, and future compensation.

92. During the second appellate period, Plaintiff appealed on three grounds. The first was that the Hearing Panel's decision that Ms. Roe was incapacitated was irregular because it was contrary to the facts. The second was that the Investigator omitted the events of November 2, 2021. The third was that the sanctions were disproportionately harsh.

93. Dr. Raymond Lu Ming Ou, the Vice President of Student Affairs, was the appeal reviewer. The Policy states that "[i]f the Respondent is a student, then the Vice President of Campus Life or designee will review the appeal" (The Policy at 25).

94.     In response to the first point, Dr. Ou stated that "the panel followed standard procedures and utilized a definition of incapacitation that is consistent with the Policy." Dr. Ou did not assess if the evidence was consistent with the definition of incapacitation that was used. Dr. Ou did not cite any expert witness, evidence within the report, or other relevant documents to support the University's claim that Ms. Roe was incapacitated.

95.     In response to the second point, Dr. Ou stated that Plaintiff's mention of November 2, 2021, in his response to the preliminary report was sufficient for assessing credibility. This makes no sense because if mentioning November 2, 2021 had been permitted, the Hearing Panel Chair and Investigator would not have blocked evidence about it from being introduced. Additionally, the Decisionmakers made no ruling on whether or not Ms. Roe and Students A and C were referring to November 2, 2021, or ███████ 2021. There is no indication that Dr. Ou's claims of sufficiency are true.

96.     Dr. Ou did not address the fact that the Hearing Panel could only see Plaintiff bringing this information after another witness brought it up. The Hearing Panel specifically cited the timing of statements, specifically being mentioned after something negative was said about Plaintiff, as a reason for not believing that Plaintiff was a victim of dating violence.

97.     Dr. Ou did not assess the differences between the original statement given to the investigator compared to the mention that Plaintiff was allegedly allowed to provide in his response to the preliminary report. Since Plaintiff was not allowed to present the full factual picture in the preliminary report, his alleged response would have been limited to respect the University's ruling. Without the full statement of facts, the Hearing Panel could not match the

statements given to the investigator with statements made by other witnesses who alleged the facts of November 2, 2021, were about ███████, 2021. This affected credibility.

98.     In response to the third point, Dr. Ou said that the sanctions were in line with other cases alleging similar types of misconduct. Dr. Ou alleges implicitly that there are several cases where individuals suffered from PTSD, lost their home for the next year, and had people come hunt for them, all while having no sign whatsoever of alleged incapacitation during the sexual act. There is no evidence to support this claim.

99.     Plaintiff's suspension went into effect on ███████ 2024.

100.     Given the expectation that Plaintiff's appeal would be finished before the beginning of the spring semester, Plaintiff paid tuition to not lose his scholarship. Should he have been suspended, he still would have been within the window for a full refund. Given that the appeal took more than a month longer than expected, Plaintiff requested a full refund on February 28, 2024.

101.     On March 5, 2024, Plaintiff's academic advisor, Mr. Jesse Nelson, responded to him saying that they had looked into the matter and submitted the information to the relevant review committee. The University refunded part of Plaintiff's tuition but kept some of his unsubsidized federal loan in April 2024.

**XIII. The University's Conduct Case**

102.     On March 18, 2024, Plaintiff received an email from the University saying that on March 18, 2024, at 8:29 AM the Office told the Office of Student Accountability and Restorative Practices that Plaintiff intentionally filed a false report against another student and that Plaintiff knew it was false. The Office alleged that case materials supported that conclusion.

103.    The University's Student Conduct Code ("the Code") sets a 30-calendar day statute of limitations on reporting or requires a waiver from the director of Student Accountability and Restorative Practices. The Office's report was outside of that window and Plaintiff was not notified of any waiver.

104.    Plaintiff responded to allegation by emailing the Office asking why the allegation was made given the investigator's assurances that the statements Plaintiff made did not meet that standard. Ms. Annexstein responded, saying that no staff member in her office could or would opine on a determination about false and frivolous charges. She did not deny that the promise had been made.

105.    A complaint was filed in April 2024 with the Department of Education's Office of Civil Rights by Plaintiff against the University for mishandling the process, therefore violating Plaintiff's civil rights. Mediation failed and the investigation officially began on June 26, 2024. The investigation is still ongoing.

106.    As Plaintiff's suspension was finishing up in spring 2025, Plaintiff requested that the allegations against him be dropped, primarily for the following three reasons. The University has a financial interest in ruling against Plaintiff's argument that the underlying findings are untrue because they are directly related to the written determination which Plaintiff could not appeal. The University would be breaking federal and local anti-discrimination laws if they relied on the investigative report and decisions from the previous formal complaint process. The University could not provide a fair process because too much information was lost, and witnesses had moved on. Additionally, the conduct panel members were not trained as appeal reviewers or decision makers so they could not substitute for the missing appellate period.

107.    In a series of phone calls and emails between Plaintiff, Mr. Muha, and Ms. Katie Porras, the director of Student Accountability, Ms. Porras repeatedly refused to dismiss the complaint. She stated that she could only dismiss the complaint when there was no possibility that the respondent could have done the alleged actions. She refused to rule on or consider the legality and contractual obligations that Plaintiff raised in emails to her surrounding the complaint.

108.    Ms. Porras then directed Plaintiff to contact Ms. Laura Buchs, the new Title IX Coordinator. On June 30, 2025, Plaintiff emailed Ms. Buchs asking her to withdraw the complaint of lying. Plaintiff outlined that the underlying findings were the result of procedural irregularities and discrimination and that he was denied an appellate period that was compliant with federal regulations. Ms. Buch's responded two and a half weeks later on July 16, 2025, and only stated the time period of the appellate period and that no appeal was filed. She did not address any concerns about legality, nor did she address the fact that Plaintiff did not have access to the evidence for nearly the entirety of the first appellate period.

109.    Plaintiff responded 32 minutes later, on July 16, 2025, demanding an answer as to whether or not Ms. Buchs understood that the evidence was not accessible to Plaintiff during the first appellate period. Plaintiff again raised the issue in early October 2025. Ms. Buchs has still not responded.

110.    Plaintiff has been and is currently being harmed economically due to a continuous delay in his graduation. The University estimates that their graduates should earn about $62,000 a year after graduation.

## Claims

**Count 1 – Breach of Contract – The Policy**

111.    Plaintiff incorporates by reference all preceding paragraphs of this complaint as though fully set forth herein.

112.    At all times relevant hereto, a contractual relationship existed between the University and Plaintiff. The Policy was covered under that contractual relationship. It contained the University's obligations in conducting the formal complaint process. This included how the University conducted its investigations, adjudicated its complaints, and handled the process of appealing.

113.    The University breached this contract with Plaintiff by failing to meet their obligations in at least the ways described here.

**Count 1.1 – Section (IV)(H)(1) Equitable Opportunities**

114.    Plaintiff incorporates by reference all preceding paragraphs of this complaint as though fully set forth herein.

115.    The University failed to keep its promise when it did not "[provide] equitable opportunities…to review and present information and evidence." They did this by not making the audio recordings accessible in evidence prior to or after they were presented during the investigation.

116.    The recording issue created an unfair advantage for Ms. Roe in at least two ways. Ms. Roe was allowed to listen to the audio recordings prior to giving a statement to the Investigator. The conversation occurred over a year prior, and Plaintiff had difficulty remembering which conversations contained which specific details, this was noted in the final report and damaged his credibility.

117.    The shocking nature of being forced to relive a moment that drove Plaintiff to plan his suicide meant that Plaintiff was not able to meaningfully engage with the

41

contents of the recordings. Only being allowed to listen to them once meant that Plaintiff could not meaningfully prepare a response or request further information and investigation from the Investigator. Given that Plaintiff was never provided with the actual recordings, this generally harmed his ability to mount a defense and expose Ms. Roe's inconsistencies and incredibleness.

**Count 1.2 – Section (IV)(H)(3) Investigator**

118.    Plaintiff incorporates by reference all preceding paragraphs of this complaint as though fully set forth herein.

119.    The University, through the actions of its Investigator, broke its promise to "conduct a prompt, thorough, fair and impartial investigation." The Investigator did not interview all witnesses listed by Plaintiff. The Investigator did not attempt to corroborate witness statements when other witnesses were said to have been present for an event.

120.    The Investigator did not obtain the potency of the THC that Ms. Roe used that evening. The Investigator did not identify or obtain how Ms. Roe believed penetration occurred or when Ms. Roe alleged to be incapacitated. The Investigator did not ask relevant follow-up questions when Ms. Roe made directly contradictory statements, like her contradicting recollections of ████████ 2021.

121.    The Investigator, from statements made by Student G and Plaintiff, mischaracterized their recollections in ways that were detrimental to Plaintiff. She attempted to say that Plaintiff said digital penetration occurred during interviews and stated certainty where Plaintiff was uncertain. She also alleged that Student G made statements which had to be retracted because Student G did not say them. Furthermore, she allowed Student G to edit his statements from what he said were ones that the Investigator misconstrued to the ones in the final report, yet the Investigator did not include the original statements like she did for all the others.

122.    All of these actions, and other unlisted ones, damaged Plaintiff's credibility and supported the credibility of otherwise incredible witnesses.

**Count 1.3 – Section (IV)(H)(8) Equal Opportunity to Present Evidence**

123.    Plaintiff incorporates by reference all preceding paragraphs of this complaint as though fully set forth herein.

124.    Several individuals, including Students A and J, referenced Plaintiff eventually consenting under pressure. This was Plaintiff's recollection of November 2, 2021, not ▮▮▮▮▮▮ 2021. The University did not provide Plaintiff with "[an equal opportunity] to…present relevant inculpatory and exculpatory evidence, and to identify relevant fact…" (The Policy at 16). The Investigator disregarded all testimony that Plaintiff gave about that night. The Hearing Panel Chair explicitly denied Plaintiff's ability to discuss anything besides ▮▮▮▮ 2021, while letting others talk about November 2, 2021. This harmed Plaintiff's credibility.

**Count 1.4 – Section (IV)(H)(9) Notice of Participation**

125.    Plaintiff incorporates by reference all preceding paragraphs of this complaint as though fully set forth herein.

126.    Both parties in a complaint are entitled to call witnesses as provided for under federal regulations and the Policy. The Investigator asked Plaintiff to submit a list of people to be interviewed and evidence to be submitted. The University, by the actions of the Investigator, broke its promise and did not "meet separately with…any third-party witnesses" (The Policy at 16). One of the witnesses who was not met with, Student M, was explicitly noted by Student E as having been told a story contradictory to any of the stories being presented by Ms. Roe concerning when intoxication occurred.

127.    These failures generally aided Ms. Roe's credibility, shielded her from more serious cross-examination, and meant that statements could not be corroborated by multiple witnesses.

**Count 1.5 – Section (IV)(I)(6) Hearing Panel**

128.    Plaintiff incorporates by reference all preceding paragraphs of this complaint as though fully set forth herein.

129.    Federal regulations require and the Policy explicitly state that "[t]he Hearing Panel must be impartial and free from bias…" (The Policy at 18). The Hearing Panel was biased as demonstrated through their application of the consistency standard between Plaintiff and Ms. Roe. The Hearing Panel, also known as the Decisionmakers, stated that Ms. Roe's statements were consistent and credible. That statement is false. Some of the things that make this statement false include Ms. Roe alternating between remembering and not remembering what happened during the sexual acts on ███████ 2021. She also kept changing her story about how the penis entered her vagina. These examples, along with others that are unlisted, reveal that the Decisionmakers favored Ms. Roe over Plaintiff by using a standard for consistency so far below the preponderance of evidence that it actually contradicted reality.

**Count 1.6 – Section (IV)(K)(7) Appeal Decision**

130.    Plaintiff incorporates by reference all preceding paragraphs of this complaint as though fully set forth herein.

131.    The University failed to make "[a]ll written materials considered by the appropriate university administrator…subject to inspection by the appealing party/parties" (The Policy at 25). Ms. Annexstein affirmed that section as accurate during a November 2023 email

exchange. Ms. Annexstein repeatedly denied Plaintiff's right to review those materials. Those materials were not made available for the majority of the duration of the first appellate period or at the time that Plaintiff attempted to look at the evidence during the second appellate period. Ms. Annexstein explicitly knew that Plaintiff was supposed to have access to the materials during the appellate phases. This harmed Plaintiff's ability to adequately prepare for the appeal.

**Count 2 – Breach of Contract – Student Conduct Code**

132.    Plaintiff incorporates by reference all preceding paragraphs of this complaint as though fully set forth herein.

133.    The University and Plaintiff entered into a contractual relationship through its enrollment agreement, Student Conduct Code, Title IX policies, and other written and implied promises made during the admissions and disciplinary process.

134.    Section XIII(A) "Procedures for Case Resolution" of the Code, which was active during March 2024, explicitly states that "A written complaint must be filed with the director of Student Accountability and Restorative Practices within 30-calendar days of the occurrence or discovery of the alleged infraction(s)."

135.    The alleged infractions of the Code stemmed from the complaint in which Plaintiff was a complainant. According to the University, that was finished on November 27, 2023.

136.    The allegation was not submitted to the Office of Student Accountability and Restorative Practices until March 2024, well outside of the 30-day window.

137.    The allegation was only made after Plaintiff submitted a refund request from the University after Ms. Annexstein made a promise to finish the appeal by a certain date, which she did not keep.

138.     The University had no reason to delay the reporting as the appeal in which Plaintiff was a respondent had no bearing on the outcome of the case in which he was a complainant. The appeal reviewer is not empowered to reopen other cases. Furthermore, the facts being disputed in that appeal were not about statements submitted by Plaintiff in that final, formal complaint.

139.     This allegation has been and is currently preventing Plaintiff from obtaining a letter of good standing.

**Count 3 – Breach of Implied Covenant of Good Faith and Fair Dealing**

140.     Plaintiff incorporates by reference all preceding paragraphs of this complaint as though fully set forth herein.

141.     The University and Plaintiff entered into a contractual relationship through its enrollment agreement, Student Conduct Code, Title IX policies, and other written and implied promises made during the admissions and disciplinary process.

142.     Under District of Columbia law, every contract includes an implied covenant of good faith and fair dealing, which obligates each party to act honestly and fairly in performing and enforcing the contract, in addition to refraining from actions that would deprive the other party of the benefits of the contract.

143.     Plaintiff reasonably expected that the University would administer its disciplinary process in a fair, impartial, and procedurally sound manner, consistent with the University's policies and representations.

144.     The University breached the implied covenant of good faith and fair dealing by, among other things:

- Conducting a biased and one-sided investigation that credited the female complainant-respondent and discredited the male complainant-respondent;

- Failing to provide Plaintiff with equal access to evidence and procedural protections that were given to Ms. Roe;

- Denying Plaintiff a meaningful opportunity to appeal the finding of Ms. Roe's lack of responsibility and subsequently bringing claims against him for allegedly submitting a false allegation in that complaint;

- Acting in a manner that favored appeasing public pressures and scrutiny rather than fairly adjudicating the facts of the case.

145.    Combined, these actions deprived Plaintiff of the benefit of his contractual relationship with the University, mainly a fair, impartial, and equitable disciplinary process. Additionally, these actions were inconsistent with the University's duty to act in good faith.

146.    By breaching this covenant, Plaintiff lost economic gains, educational opportunities, and suffered significant emotional damages, along with damage to his reputation.

**Count 4 – Violations of 20 U.S.C. § 1681 (Title IX)**

147.    Plaintiff incorporates by reference all preceding paragraphs of this complaint as though fully set forth herein.

148.    The University is a recipient of federal funding for educational activities.

149.    The statute specifically prohibits sex discrimination against any person by "any education program or activity receiving Federal financial assistance" (20 U.S.C. § 1681(a)). The University received federal assistance through federal student loans, grants, and other contracts with the federal government.

150.    From just shy of two months before Plaintiff filed a complaint with the Office up to the present day, the University has been under significant, contemporaneous pressure from OCR and its students to give significant preference to non-male students. At that point, Ms. Lhamon had reclaimed her post atop OCR and was once again in charge of pressuring universities across the country to follow her interpretation of federal laws and regulations. She made clear her priority was that women who reported being raped were not being failed, implicitly telling universities that men were not to be treated equally, as they were not of notable concern for her. While this view was shared and amplified by the student newspaper, it was far from the only pressures being applied to the University by students.

151.    Several campus-wide protests, including walkouts which significantly interrupted educational activities, started in Fall 2022. From the reporting on those protests we know three key facts; the protests were led by women and non-binary people, that men were not speaking up, and that the protests threatened the University's financial health by threatening enrollment. These factors, along with others previously discussed, strongly encouraged the University to show preference women, in this case to Ms. Roe.

152.    Under this pressure, the University discriminated on the basis of sex by creating erroneous outcomes which had no basis in or were directly contrary to reality. Additionally, The University's conduct, supported by claims made by other male students at the University, reflect conduct so egregious and lopsidedly unfair against Plaintiff that it can only be construed as retaliation for a man filing a complaint against a woman.

**Count 4.1 – Violation of Title IX through an Erroneous Outcome, Application of Consistency and Credibility Standards**

153.    Plaintiff incorporates by reference all preceding paragraphs of this complaint as though fully set forth herein.

154.    The University is prohibited from excluding anyone from participation on the basis of sex. The University did so by finding the Plaintiff responsible for Rape and implementing sanctions based on that finding.

155.    The University relied on the "facts" listed in the Written Determinations which included the declaration that Ms. Roe made consistent statements and therefore credible. That claim is false. Ms. Roe alternated between claiming not to remember what happened and being able to remember everything in order to deny Plaintiff's allegations. The statement alleging Ms. Roe's consistency covered all statements generally and not just those she gave to the Investigator.

156.    Student E also stated that Ms. Roe told three witnesses that she was too high before Plaintiff entered the room, yet Ms. Roe also told some others that THC was only used later after Plaintiff and her spoke.

157.    Ms. Roe claimed not to be competent enough to judge and consent but also claimed to be able to judge consent from Plaintiff.

158.    Ms. Roe originally claimed that she moved Plaintiff 's penis prior to penetration and only disputed "forcing" penetration, not causing penetration. Later Ms. Roe alleged Plaintiff forced his penis inside of her. When Student J tried to change her statements, in the same manner, surrounding how Ms. Roe described penetration from Plaintiff putting the penis inside of Ms. Roe, to Plaintiff forcing the penis inside of Ms. Roe, the Investigator rejected that change as it was too substantially different.

159.    Statements made by Plaintiff and Ms. Roe were the primary pieces of evidence used. Fairly assessing credibility and consistency would have changed the outcome because neither Plaintiff nor Ms. Roe alleged visible evidence of incapacitation. The Decisionmakers clearly used two different standards for judging credibility, both not based in fact, but with one preferential to the female complainant-respondent and one harmful to the male complainant-respondent.

160.    Had the Decisionmakers not discriminated against Plaintiff, Ms. Roe would have been seen as uncredible. This would have changed the outcome in both parts of the cross-complaint. Ms. Roe did not allege sufficient facts in her original interviews or in her response to Plaintiff's complaint to say that Plaintiff was responsible for penetration. Her statements that she moved the penis and then it entered her and her not denying putting the penis inside her vagina when responding Plaintiff's claims mean that her claims of Rape do not meet the standards in the Policy as Ms. Roe was responsible for penetration. She also does not allege to have been incapacitated in her interviews with the Investigator, which means that she did not meet the standards for incapacitation, as she did not allege to be incapacitated. Her allegation of digital penetration allegedly comes from a recording, which is not in evidence, and therefore relies exclusively on the credibility of the parties causing it to not meet the preponderance of evidence. Additionally, she does not allege in either her original interviews with the Investigator or her response to Plaintiff to have obtained Plaintiff's consent to inserting his penis into her vagina.

161.    These discrepancies are not the result of a pro-complainant bias as both Plaintiff and Ms. Roe were Complainant-Respondents. The only difference in characteristic between Plaintiff and Ms. Roe was their sex.

**Count 4.2 – Violation of Title IX by Erroneous Outcome, Egregious Misapplication of Incapacitation**

162. Plaintiff incorporates by reference all preceding paragraphs of this complaint as though fully set forth herein.

163. Even with insufficient training, the facts available to the Decisionmakers still did not warrant an outcome of intermittent consciousness and incapacitation. The Decisionmakers came to a conclusion of incapacitation without providing evidence for incapacitation. They pointed to statements made by Plaintiff; but repeated, explicit evidence showed that Plaintiff's erroneous conclusion explicitly described a situation where Ms. Roe had complete capacity and even described Plaintiff being raped, such as statements made in texts from Student S. Ms. Roe herself even made it implicitly clear that there were no external signs of intoxication, and none of incapacitation. As such, no statements from Plaintiff could have meant that he observed incapacitation, since there were no signs of it.

164. Ms. Roe only alleged evidence of incapacitation was blacking out. Notwithstanding that such events were not possible given the nature of inhaled THC, she also contradicted that story by repeatedly denying allegations made by Plaintiff, which occurred during a time she claimed not to have memory of or having blacked out during. The starkest and clearest example of this occurs in the final couple sentences of her recollection and the first couple sentences of her response to Plaintiff's allegations. Literally sentences away, she originally claims not to remember penetration or really anything else going on besides a few physical feelings and then goes on to deny forcing penetration, saying anything Plaintiff alleges she said, or hearing him hesitate. Ms. Roe provides direct evidence of capacity, including that of judgement and memory, at and around the time of penetration.

51

165.     Between Ms. Roe's inconsistency, her implicit confirmation that Plaintiff's statements could not have reflected an observation of incapacitation, and her explicit proof of capacity, the Decisionmakers were aware that her claims were not credible and that therefore she was not incapacitated as she alleged. Furthermore, they were aware that she deviated from her story almost exclusively to deny allegations from Plaintiff, meaning that her claims of incapacitation were not only false, but fraudulent in order to protect herself from a rape claim. Had the Decisionmakers apply capacity in a fair and balanced manner, even from the insufficient training they received, they would not have believed that Ms. Roe was incapacitated.

166.     There is no plausible, fair justification for the determination of incapacity. There is no identifiable difference between Plaintiff and Ms. Roe for the Decisionmakers except for sex. This unjustifiable determination meant that Plaintiff was found responsible for rape and sanctioned, and it meant that Ms. Roe was found not responsible for rape and not sanctioned.

**Count 4.3 – Violation of Title IX by Retaliation for Filing a Formal Complaint as a Male**

167.     Plaintiff incorporates by reference all preceding paragraphs of this complaint as though fully set forth herein.

168.     Filing a formal complaint is a protected activity. Almost immediately after contacting the Office, Plaintiff began encountering roadblocks. The first issue came when they delayed his case by only assigning an investigator almost two months later, in early January.

169.     Once the process began, Plaintiff was retaliated against by Student C, as he harassed Plaintiff on the main quad by calling him a rapist and yelling profanities at him. When Plaintiff reported this to the Investigator, she told him it was not retaliation, and they

could not give him supportive measures. Plaintiff could not attend classes due to the fear and psychological strain presented by this action.

170.    In March 2024, Plaintiff met with Ms. Annexstein. He inquired as to why that was not considered retaliation and Ms. Annexstein told him it was not severe enough. This retaliation was so severe that if he repeated the words to the Investigator, Ms. Annexstein told Plaintiff that the Investigator was authorized to end the meeting. Plaintiff was only asking to be excused from classes for that day. That harmed his attendance and overall grade in multiple classes, it specifically affected SISU-230 which was borderline at the end of the semester.

171.    That retaliation made it impossible for Plaintiff to attend class. Without being enrolled in educational activities, a complaint cannot proceed. The retaliation threatened Plaintiff's ability to continue with his complaint. Ms. Annexstein thought that the exact phrase, in private and not directed at the Investigator, who is a woman, threatened her ability to do her job, but not Plaintiff's ability to proceed with his complaint.

172.    In that meeting, Plaintiff wanted to address the Investigator's disclosure of a retaliation claim against Student W by another student and to confirm the Investigator's assurances of the inclusion of November 2, 2021. Ms. Annexstein would not even let him speak about it because "that was not what the meeting was about." She said that, despite Plaintiff having arranged the meeting by originally emailing the address provided in the Notice of Allegations. In response Ms. Annexstein responded with extreme hostility, accusing Plaintiff of approving an erroneous allegation despite his original objections and telling him not to use the email which he was told to use.

173.    At the same time as Ms. Annexstein's hostility was showing, the Investigator's was developing covertly. The Investigator had not only decided not to interview

all of Plaintiff's witnesses, but she had also decided not to share any recordings with Plaintiff despite contractual obligations to give both parties "equitable opportunities to…review evidence." She was knowingly allowing Ms. Roe to review evidence but not Plaintiff before meeting to speak about it.

174.    The Investigator continued to punish Plaintiff by not effectively interviewing multiple witnesses that could possibly harm the credibility of witnesses that were hostile to Plaintiff. She did not interview any witnesses that Student E said were told a different story by Ms. Roe, including one that Plaintiff requested. She did not corroborate any statements made by Plaintiff's, now hostile, former friends who were all saying he said things harmful to his case but none of them were asked to corroborate the others' stories. She did not even ask any of the witnesses how Ms. Roe alleged to be incapacitated.

175.    She was treating Plaintiff even more unfairly as she blatantly inserted false statements which she could not support, specifically saying that Plaintiff had said that he digitally penetrated Ms. Roe when he did not say that.

176.    The Investigator then provided Plaintiff with no access to the recordings. They also conducted final review period, which was also scheduled during a time when the University was aware that he would be too busy, move-in weekend, due to his position as a Resident Assistant. Additionally, they also gave him an empty Box, meaning he could not review it during the precious few hours that he did have free.

177.    Then there were the aforementioned, and incorporated, issues with the written determination and its false statements. That was followed by the aforementioned, and incorporated, appellate debacle where Ms. Annexstein repeatedly denied Plaintiff access to the

evidence and an advisor which stopped him from submitting one appeal and harmed his ability to prepare for sanctioning and the second appeal.

178.    During that entire process, Ms. Annexstein was making false promises to Plaintiff about the timeline for completing the review of his appeal, which almost cost him ~$25,000 dollars. He was only saved from that loss by another panel at the University which granted an irregular refund. Mere days after Plaintiff requested the refund, the Office accused him of lying. There was no reason provided for the submission well outside of the statute of limitations. The University continued to refuse to let him be in good standing after he pointed out that their claims against him were the result of illegal actions.

179.    As it turns out, Plaintiff was not the only male complainant who was allegedly being discriminated against. A student told the student newspaper that he was effectively told that he was lying by the Office and that multiple other male students had a similar experience. Another student was in the process of receiving supportive measures from the case manager when Ms. Annexstein decided to terminate them. Ms. Annexstein's assessment directly contradicted that of others in the Office about whether or not men were sexually assaulted.

180.    The University had so many procedural errors and knowingly denied Plaintiff of so many of his rights that it was nearly inexplicable how it happened. Every decision was made to benefit Ms. Roe and so many times throughout and after the process, the University egregiously denied Plaintiff his rights. The scale and brazenness of the University's actions only became explicable when put in the context of an anti-male bias which was spread across Ms. Annexstein and those who she supervised.

181.    As soon as Plaintiff filed, he began being treated as a second-class complainant, with less rights than his female counterpart. But it turns out he was not alone. The University's deterrence against male students from filing formal complaints was allegedly felt by several other students, but only Plaintiff seems to have gotten far enough to face the stiffest punishments, including: the University's refusal to seriously investigate Plaintiff's claims, disciplining Plaintiff when the conduct did not warrant it, denying him access to resources and an appeal, deviating from procedure, and other acts unlisted here.

### Count 5 – D.C. Human Rights Act § 2-1402.21 Removal from Campus Housing

182.    Plaintiff incorporates by reference all preceding paragraphs of this complaint as though fully set forth herein.

183.    As shown in count 4 and its children, the outcome which resulted in Plaintiff being sanctioned were the result of sex discrimination.

184.    The University used the outcome, which was the result of sex discrimination, as cause for sanctions which included removal from campus housing and a permanent ban on entry. That ban reflects the University's arbitrary decision to interrupt and fail to initiate a transaction in real property which, as an undergraduate student and someone who was currently living in Duber Hall, would have otherwise been available to Plaintiff.

### Count 6 – Failure to Exercise Reasonable Care in Training the Decisionmakers

185.    The University had a special duty of care in this situation given the dependence of the Plaintiff on the University to respond to sexual violence. The University has control over the Plaintiff's ability to continue their education.

186.    The University is aware that they are making determinations about who is responsible for acts of sexual violence, demonstrated through their Policy and training. They are

aware that Decisionmakers need to be trained on the signs of incapacitation to assess if a person in order to accurately assess if incapacitation occurred. They are also aware that Decisionmakers need to be trained on the effects of trauma in order to assess if a person's behavior or statements are the result of trauma. They show this awareness by training their decisionmakers.

**Count 6.1 – Failure to Adequately Train Decisionmakers on Incapacitation**

187.    Plaintiff incorporates by reference all preceding paragraphs of this complaint as though fully set forth herein.

188.    The University's training slide did not differentiate between signs of intoxication and incapacitation for inhaled THC and other intoxicants. The University training did not make any mention that blacking out does not occur from inhaling THC. The University training did not mention the typical periods in which THC intoxication is most effective. The University training did not notify trainees that intermittent consciousness does not occur from inhaled THC.

189.    The Decisionmakers, trained through the aforementioned training, found that Ms. Roe was intermittently unconscious. They also found that Ms. Roe's stories were credible despite alleging to have blacked out multiple times. It is the professional opinion of an expert witness that no reasonable person would have concluded that Ms. Roe claims of "blacking out" were credible or that Ms. Roe was intermittently unconscious, should they have been fully informed of the characteristics and effects of inhaled THC on users.

190.    Those findings were explicitly cited to claim that Plaintiff was responsible for rape and that Ms. Roe was not responsible for rape. From those findings, Plaintiff was suspended for a year and a half, Ms. Roe was protected from accountability through a fair

process, and Plaintiff continues to suffer as those claims enabled the University to allege Plaintiff violated the Code and did not provide a letter of good standing.

191.    Plaintiff had no role or responsibility in training any University employee; therefore, he did not contribute to the University's negligence. The cross-examination and appellate processes do not waive the University's duty to reasonably train their employees on the effects and characteristics of inhaled THC.

**Count 6.2 – Failure to Adequately Train Decisionmakers on Trauma**

192.    Plaintiff incorporates by reference all preceding paragraphs of this complaint as though fully set forth herein. This incorporation is specifically relevant to, but not limited to, paragraphs 78 and 79.

193.    The University's training on trauma is insufficient as it does not include information or even acknowledge important signs of posttraumatic stress disorder, specifically avoidance behaviors, negatively affected cognition and mood, and alterations in arousal and reactivity. Sexual violence is one of the possible causes of PTSD, as defined under criterion A of the DSM-5 Diagnostic Criteria for PTSD.

194.    An expert witness, a forensic psychiatrist, found that Plaintiff meets all the criteria for PTSD, with the exception of Criterion A because it is still in dispute. Should it no longer be contested that Plaintiff was raped or a judicial declaration clarify it, Plaintiff would meet all criteria for PTSD. This means that the University's training on the signs and effects of PTSD is directly relevant in this case.

195.    Plaintiff demonstrated the signs of PTSD and some of those were corroborated by others. Notably avoiding discussing the situation with Ms. Roe and suicidal ideations immediately following being raped and the end of Plaintiff and Ms. Roe's relationship.

Ms. Roe specifically pointed out that Plaintiff had difficulty remembering events during the December 2021 – January 2022 time period. Plaintiff also demonstrated other signs like guilt, self-blaming, and other self-destructive behaviors.

196.    The Decisionmakers were not trained on Criteria B or E, as well as several key sub-points of Criteria C and D. These are all directly relevant in assessing whether statements made by Plaintiff were the result of duress. By not adequately training employees on the signs and effects of trauma, it led the Decisionmakers to erroneously conclude that Plaintiff's statement was not the result of duress or coercion. Additionally, they erroneously concluded that Plaintiff's statements were credible. Not being able to identify the applicability of using even their minimal information about trauma harmed Plaintiff as they specifically used those conclusions to support their erroneous outcome which caused sanctions to be placed against Plaintiff.

197.    Plaintiff had no role or responsibility in training any University employee; therefore, he did not contribute to the University's negligence. The cross-examination and appellate processes do not waive the University's duty to reasonably train their employees on the signs and effects of trauma, specifically PTSD. The training does not require that a party be diagnosed with a trauma-related disorder.

## **Prayer For Relief**

Wherefore, Plaintiff respectfully requests that this Court enter judgment in favor of Plaintiff and grant the following relief:

A.    That this Court issue permanent injunctive relief by: (1) ordering the University to vacate and expunge its finding of responsibility against Plaintiff; (2) ordering the University to vacate and expunge its finding of not responsible for Ms. Roe on the allegation of Rape; (3)

restraining the University from reflecting, in any manner whatsoever, in Plaintiff's records or elsewhere, the findings or sanctions imposed upon Plaintiff based on its adjudication of Ms. Roe's complaint; and (4) ordering the University to vacate any disciplinary action against Plaintiff relating to Plaintiff's complaint or Ms. Roe's complaint and prohibit the University from bringing any future complaints originating from, partially or in its entirety, the complaints brought by Plaintiff and/or Ms. Roe.

B.     That the University be ordered to pay compensatory damages as appropriate to compensate Plaintiff for his losses caused by its misconduct, including but not limited to:

i.     Lost wages and benefits from Plaintiff's employment contract with the University.

ii.     Medical expenses, incurred and future, where the University's misconduct contributed to or caused Plaintiff suffering.

iii.     Lost future wages to be reasonably expected from graduating in Spring of 2024.

iv.     Lost value of scholarships

v.     Costs associated to transferring to another university

C.     That the University be ordered to pay non-economic damages, for reasons including but not limited to:

i.     Loss of enjoyment of life incurred since the written determination

ii.     Severe emotional distress and PTSD incurred since the written determination

iii.     Severe emotional distress and PTSD incurred since the student conduct allegations were brought against Plaintiff

iv.    Reputational harm and distress caused by false statements made by the University in the course of their misconduct

D.    That the University be ordered to pay punitive damages.

E.    That this Court award Plaintiff his costs and expenses incurred in this action.

F.    That the Court make the following declaratory judgments:

i.    Based on the information provided and the preponderance of evidence standard, Plaintiff did not commit the acts which he is accused of by Ms. Roe.

ii.    Ms. Roe's allegations could not have occurred as she alleges.

iii.    The Decisionmakers' determination of intermittent consciousness could not have occurred given the nature of the intoxicant and the method of intoxication.

G.    That the Court require the University to uphold its contracts and enforce its anti-fraud and anti-lying statutes against Ms. Roe.

H.    That the Court orders any other relief as it deems just and proper.

Plaintiff requests a bench trial.

1
2      Dated this 5th of November, 2025.
3
4
5                                        Plaintiff Pro Per
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28