John Doe
Address Withheld
Phone Number Withheld
Email Withheld
Plaintiff Pro Se

## IN THE UNITED STATES DISTRICT COURT FOR THE

## DISTRICT OF COLUMBIA

JOHN DOE,

          Plaintiff,

vs.

American University,

          Defendant

Case No.: 1:25-cv-03866-UNA

SUPPORTING MEMORANDUM FOR PRELIMINARY INJUNCTION

Defendant Address
4400 Massachusetts Ave NW
Washington, D.C. 20016

## MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES……………………………………………………………………...ii

INDEX OF EXHIBITS……………………………………………………………………...iv

INTRODUCTION  ………………………………………………………………………………1

FACTUAL BACKGROUND……………………………………………………………………….2

LEGAL STANDARD………………………………………………………………………12

ARGUMENT……………………………………………………………..………………13

I. Plaintiff is Likely to Succeed on the Merits of His Claims…………………………………13

       A. Breach of Contract of the University's Title IX Policy………………………………13

           1. The Hearing Panel was Biased………..……………………………………14

           2. Failure to Provide Access to Evidence for an Appeal………………………...16

       B. Title IX, Erroneous Outcome ……………………………………………………...17

II. Plaintiff Will Suffer Irreparable Harm Without Preliminary Relief………...……………….23

III. The Balance of Equities Favors Preliminary Relief………………………………………25

IV. The Public Interest Favors Relief…………………………………………………………27

i

# TABLE OF AUTHORITIES

Alf v. Donley, 666 F. Supp. 2d 60 (D.D.C. 2009)……………………………………………….24

Basch v. George Washington Univ., 370 A.2d 1364 (D.C. 1976)………………………………13

Bostock v. Clayton County, 590 U.S. 644, 140 S. Ct. 1731, 207 L. Ed. 2d 218..……………..21

Chaplaincy of Fill Gospel Churches v. England, 454 F.3d 290 (D.C. Cir. 2006)……………..23

Chenari v. George Washington University, 172 F. Supp. 3d 38 (D.D.C. 2016)………..……..…13

CSX Transp., Inc v. Williams, 406 F.3d 667 (D.C. Cir. 2005)……………………….………....25

Danielson v. Local 275, 479 F.2d 1033 (2d Cir. 1973)……………………………………….25

*Doe v. American University, 1:19-cv-03097, (D.D.C. Sep 18, 2020) ECF No. 30….….……14, 18

*Doe v. Brandeis Univ., 177 F. Supp. 3d 561 (D. Mass. 2016)………………………………1, 24

*Doe v. Columbia University, 831 F.3d 46 (2d Cir. 2016)………………………………….18, 19

Doe v. Marymount Univ., 297 F. Supp 3d 573 (E.D. Va 2018)…………………………………20

Doe v. Miami Univ., 882 F.3d 579 (6th Cir. 2018)……….…………………….…………………20

Doe v. Princeton University, 3:24-cv-07125, (D.N.J. Apr 28, 2025) ECF No. 24………………21

*Doe v. Purdue University, 928 F.3d 652 (7th Cir. 2019)………………………………………20

Doe v. The Rector and Visitors of George Mason Univ., 149 F. Supp. 3d. 602 (E.D. Va. 2016). 1

Doe v. The Rector and Visitors of George Mason Univ., 179 F. Supp. 3d 583 (E.D. Va 2016)..27

Jones v. Board of Governors of University of North Carolina, 704 F.2d 713 (4th Cir. 1983)…..26

League of Women Voters of United States v. Newby, 838 F.3d 1 (D.C. Cir. 2016)………….…12

Manago v. District of Columbia, 934 A.2d 925 (D.C. 2007)…………………………………13

*Pride v. Howard Univ., 384 A.2d 31 (D.C. 1978)……….…………….…….………13, 14, 16

Pursuing Am.'s Greatness v. FEC, 831 F.3d 500 (D.C. Cir. 2016)………….……….………12

Serono Labs Inc v. Ferring Pharm. Inc., 158 F.3d 1313 (D.C. Cir. 1998)………………..……13

Wisconsin v. Constantineau, 400 U.S. 433, 1971…………………………………………………………1

*Yusuf v. Vassar College, 35 F.3d 709 (2d Cir. 1994)………………………………………………17

**INDEX OF EXHIBITS**

Exhibit 1 – Declaration of John Doe

Exhibit 2 – Selected redacted portions of the Roe-Doe Written Determination

Exhibit 3 – Dr. Margaret Gedde, MD, PhD, Expert Report on THC Effects

Exhibit 4 – Dr. Margaret Gedde's CV

Exhibit 5 – *The Eagle*'s coverage of the November 10, 2022, Student Walkout

Exhibit 6 – *The Nation*'s coverage of the Fall 2022 events at American University

Exhibit 7 – *The Washington Post*'s coverage of the Fall 2022 events at American University

Exhibit 8 – *The Eagle*'s coverage of the February 2023 protest

Exhibit 9 – *The Eagle*'s coverage of the Student Government's passage of a resolution

supporting a Survivors' Bill of Rights

Exhibit 10 – *The Eagle*'s coverage of a townhall with the then-Title IX Coordinator

Exhibit 11 – *The Eagle*'s coverage of the 2023 anniversary protest of the 2022 Walkout

Exhibit 12 – Opinion piece in *The Eagle* focusing on violence against non-male students

Exhibit 13 – *The Eagle* piece marking the second anniversary of the student walkout.

Exhibit 14 – Selected portions of the University's Title IX Policy (revision 10.26.2021)

Exhibit 15 – Interim Title IX Coordinator refusal to address lack of access to evidence in 2025.

Exhibit 16 – Tranche 1 of Emails with Title IX Coordinator denying access to evidence

Exhibit 17 – Tranche 2 of Emails with Title IX Coordinator denying access to evidence

Exhibit 18 – Transcript Notation Policy at Rutgers University

**INTRODUCTION**

Plaintiff has long sought relief from American University ("the University")'s erroneous conclusion and sanctions in the underlying Title IX complaints. The lawsuit brought by Plaintiff in this matter is the last option after direct negotiations with the University failed and an ongoing investigation by the Education Department's Office of Civil Rights that seems to have no end in sight after almost two years. Plaintiff is still suffering the same irreparable harm that he has been suffering for the past two years. The University's actions have effectively denied Plaintiff access to a college education. Plaintiff brings this Preliminary Injunction now because there are only two windows to transfer to another college each year, including one that ends on June 1, 2026.

Plaintiff is asking for a preliminary injunction to prevent *more* irreparable harm from occurring due to lost educational opportunities. The notation on his transcript "plainly calls into question plaintiffs 'good name, reputation, honor, or integrity." Doe v. The Rector and Visitors of George Mason Univ., 149 F. Supp. 3d. 602, 613 (E.D. Va. 2016), (quoting Wisconsin v. Constantineau, 400 U.S. 433, 437, 1971). However, Plaintiff cannot even reach the stage at which another university may consider his "integrity," since the University's pending conduct charge against Plaintiff makes him ineligible to transfer to many institutions, including the one of his choice, since he is not in good standing with the University.

Plaintiff has suffered two long years since those "found responsible for sexual misconduct will likely face substantial social and personal repercussions." Doe v. Brandeis Univ., 177 F. Supp. 3d 561, 602 (D. Mass. 2016). Plaintiff can attest to this as he is afraid of making new social contacts, given that they may ask about his college experience or what he hopes to do in the future. He also fears his extended family, who casually ask when he is going back to school and what he plans to do. See Ex. 1 at ¶15. Plaintiff should suffer no longer.

## FACTUAL BACKGROUND

### A. The Investigation of Ms. Roe's Complaint

From day one, Ms. Roe maintained two parallel, but contradictory, stories. One was deployed when she recounted her own story of what happened on the underlying night in question. This was put in media publications, generally shared as gossip, and given in her original statements to the University Investigator during the investigation. It generally consisted of three points, that she inhaled THC, her and Mr. Doe established boundaries about what was going to happen that night, they got in bed, and then, over two hours later, she began blacking out and generally being intermittently conscious, which is when sex occurred. See Ex. 1 at ¶8-9. There was no mention of who was responsible for penetration, just that sex occurred. Id.

Her other story starts the same way but ends very differently. That was the story deployed when she needed to contest Mr. Doe's recollection. That story was mostly used in private, far away from cross-examination. Notably, she used it when she was telling Mr. Doe he was lying about his recollection and when she was asked to respond to Mr. Doe's allegations during the investigation. See Ex. 1 at ¶9. The story begins to diverge significantly after they get in bed. Mr. Doe highlighted key moments, including that he remembered: Ms. Roe being responsible for penetration by her placing his penis inside of her vagina, that she continuously told him to keep having sex with her, even after he stopped due to the pain, and that he rejected her demands for sex. See Ex. 1 at ¶9. Despite previously claiming lack of memory, Ms. Roe declared unequivocally that she did not "force" Mr. Doe's penis into her vagina, that she never said anything Mr. Doe recalled her saying, and that Mr. Doe did not "hesitate." See Ex. 1 at ¶8-9.

It is unclear as to why the Investigator did not ask Ms. Roe about the inconsistencies, but what is clear is that there are several, irreconcilable alleged facts. Ms. Roe could not have both

2

been "blacking out" and remembering every word she said. The Investigator did not even seem to ask Ms. Roe how Mr. Doe's penis entered her vagina, only if she "forced" it. The investigator did not ask if Mr. Doe consented to sex that evening, only about his "hesitation." See Ex. 1 at ¶9. The Investigator not asking those questions seemingly left an inference in the report that assumed consent by and responsibility of Mr. Doe.

What is perfectly clear is that Ms. Roe's allegation is false and frivolous because it is contrary to science and reality. Relying solely on the story which she originally told the Investigator, she has three key problems: (1) she says that she was not incapacitated shortly after intoxication, but then became incapacitated later, (2) she says that she "blacked out," and (3) she effectively reported that she was intermittently conscious, and the University interpreted her statements as such. See Ex. 1 at ¶8-9, Ex. 2 at 1.

### 1. Intoxication Patterns by Inhaled THC Over Time

From the investigative report, Ms. Roe alleged that she used Delta-9-Tetrahydrocannabinol (THC) via inhalation. The Investigator did not obtain the potency or concentration of the cartridge. See Ex. 1 at ¶8. Ms. Roe's story of being fine early on and "blacking out" later is problematic because "[f]or all users, the time course of THC effects after inhaled dosing is well-described. Inhaled THC effects reach their maximum by 10-15 minutes after the last inhalation." Ex. 3 at 4. It progressively and continuously drops off with a decline of roughly 20% an hour from their peak. See Ex. 3 at 4-5. At the time of sexual contact, it was approximately 2-3 hours later, meaning that Ms. Roe should have been experiencing somewhere between 40-60% of her peak intoxication, not more. Since "[i]nhaled THC effects do not fluctuate or recur," that means that "[a]fter THC inhalation, its effects are always less at 90 minutes compared to 30 minutes." Ex. 3 at 5. Ms. Roe's allegation of incapacitation at the time

3

of sexual contact is factually impossible. However, the University credited it as "credible." Ex. 2 at 1.

### 2. Anterograde Amnesia is Not Associated with THC

Ms. Roe alleged to have "blacked out," the popular name for anterograde amnesia, during the night in question due to THC inhalation. See Ex. 1 at ¶8. Ms. Roe's claims of "blacking out," are not just inconsistent, but they are also plainly false. THC impacts working memory and episodic short term memory, but it is drugs like alcohol and benzodiazepines that are the ones most associated with profound memory loss. See Ex. 3 at 6. Simply put, "there are no reports of anterograde amnesia ('blacking out') from THC intoxication." Id. Ms. Roe's allegations that she "blacked out" is plainly false and contrary to reality. However, the University credited it as "credible." Ex. 2 at 1.

### 3. THC Does Not Have Intermittent Effects

Ms. Roe implied, and the University interpreted, that she was in a "state of intermittent consciousness" when sexual contact was occurring. Ex. 2 at 1. This is not a realistic outcome since "THC effects are not intermittent; they do not fluctuate. Once they subside, they do not recur if no more THC is used." Ex. 3 at 6. To have intermittency, fluctuations are required. The other problematic half of that statement is the consciousness aspect. THC only causes fainting due to a drop in blood pressure but recovers almost immediately once a person gets blood back into their brain. See Ex. 3 at 5. Ms. Roe was lying down when the University claims she was intermittently conscious, so realistically she would not have lost consciousness even if she had taken enough to trigger a significant drop in blood pressure. See Ex. 1 at ¶8. The reason that THC does not cause fainting like alcohol and benzodiazepines is that those drugs "cause changes in consciousness by stimulating central nervous system GABA receptors. Overstimulation of

4

GABA receptors can cause sedation, unconsciousness, and death." Ex. 3 at 5. THC does not affect those receptors. Id. The University's claims of intermittency could not have occurred. The University's claims that Ms. Roe lost consciousness could not have happened. However, the University said both the Ms. Roe was in a "state of intermittent consciousness" and that she was "credible." Ex. 2 at 1.

### B. Pressures Against the University

Pressures against the University started after a break-in and sexual abuse in the Leonard Hall dormitory on October 31, 2022, less than two months before Plaintiff went to the Title IX office to file his complaint. This included a large, campus-wide walkout. An article by a student newspaper covered that event. The opening photo of the article displays hundreds of individuals gathering in support of the walkout. See Ex. 5 at 1. Among those who spoke at the protest was "Amna Asad who described the incident as 'a violation of every single woman that night." Ex. 5 at 5. From the very beginning, the pressure brought by the news and protests was focused on helping women, not victims of sexual violence.

Given the pro-women tilt of this protest, it added two extra dimensions of pressure to discriminate against men. The first was to the University's need to quell the protests entirely because it threatened enrollment. In the same article, a prospective student's parent, Jen Curley, was interviewed and she said the "she feels 'reluctant' to enroll any of her children in the University after hearing the concerns voiced by students." Ex. 5 at 10. The second dimension was a national one. The break-in, protest, and University response also gained nationwide attention in publications by *The Nation* and *The Washington Post*. *The Nation* interviewed protest leaders, a witness to the October 2022 break-in, and participants in the University's newly formed Community Working Group on Preventing Sexual Harassment and Violence ("the

Working Group"), all of which criticized the University's response and accused the University of delay tactics, inferring that they were doing it to avoid having to make any change. See Ex. 6 at 4 and 6. The University was under immense pressure to make changes to appease their critics. At the same time, a story from *The Washington Post* went out about the break-in and the University's response to it. That story explicitly cited Lillian Frame, a student protest leader, saying that "[w]e want a restructuring of what Title IX looks like on campus." Ex. 7 at 2.

The following semester in spring 2023 was when Mr. Doe brought his complaint and Ms. Roe subsequently brought her counter-complaint. In February 2023, there was another protest where students continued to pressure the University, but in the course of reporting on it, *The Eagle* collected a quote by Ethan Gaskill that said, "it's rare to see men sort of stick their necks out for it to try to stop sexual violence." Ex. 8 at 9. He further elaborated that "[i]t doesn't surprise [him] that this campus is mostly women and nonbinary people, and we still have a huge sexual assault problem, and the few men that are here aren't speaking up about it." Id. The public perception of men at the University was that of perpetrators and not victims of sexual violence. That article also told the University who they had to appease.

That same semester, the University's Student Government "unanimously passed…a resolution encouraging AU to adopt a survivors' bill of rights as University policy." Ex. 9 at 2. Lillian Frame again pressured the University, accusing them of "continu[ing] to retraumatize survivors" further saying that "[the University has] put all of their energy into stifling student voices instead of actually helping survivors and giving them what they want." Ex. 9 at 4-5. The University was facing that pressure while also investigating Ms. Roe's and Mr. Doe's claims.

The pressure continued, and in fact increased, during the fall 2023 semester, when the University held the live hearing, ruled on the claims and subsequently issued sanctions. Days

6

before the ruling was handed down, there was a town hall between the student body and the Title IX Coordinator at the time, Ms. Leslie Annexstein. Questions covered a broad range of topics from interim measures to asking how "staff plan to regain the trust of students who feel 'betrayed and let down by the office." Ex. 10 at 5. The incoming Vice President of Student Affairs Raymond Ou expressed support for the movement and some of its goals like the survivors' bill of rights. See Ex. 10 at 5-6. Dr. Ou would also review Mr. Doe's future appeal.

Days before the University handed down their determination, there was another protest on the anniversary of the protest from 2022. It again pushed the University to give in to their demands, including entering into a long-term training contract with an organization that protest leaders got to deem "reputable." See Ex. 11 at 3. The protestors wanted control of how people were trained, a tool that would have meant that they could have further encouraged discrimination in the Title IX process.

Shortly thereafter, in December of 2023, an opinion piece in *The Eagle* was published, and its second-to-last paragraph highlights the campus perception of men quite clearly:

> It is a painful reality that 59 percent of undergraduate women and 23 percent of undergraduate gender non-conforming people experience sexual misconduct or violence while enrolled in university, and those are only the reported cases. The fact remains that sexual violence has a certain level of inevitability on college campuses. The AU administration has both a moral and pragmatic obligation to take the necessary steps implored to protect those students.
>
> Ex. 12 at 3.

Not only were the statistics cited only interested in sexual violence against women and gender nonconforming individuals, but the author also inferred they were an undercount given that there could be unreported cases. She further went on to say the University needs to "protect those students," calling for the protection of women and gender nonconforming individuals, but not men.

We know this pressure campaign worked since Ms. Roe described a change in behavior of employees at the Office of Equity and Title IX ("the Office").

**C. The University Had Previously Not Treated Male Complainants Fairly**

In an article in November 2024, *The Eagle* published a piece that, among other testimonies, laid out an instance in which a male student was told that his experience was considered to meet the definition of sexual assault by an Office employee, Selena Benitez-Cuffee. However, once Ms. Annexstein became involved that was revised to say his allegations did not meet the definition. See Ex. 13 at 6. Mr. Doe was not the only one who had his experience written off as false, but he was the one who got the furthest.

**D. University Conduct During the Investigation**

The University was messing up the investigation right away, consistently in favor of Ms. Roe. For starters, it is not clear if Ms. Roe ever alleged that Mr. Doe was the one responsible for penetration considering she claimed not to remember it. They operated under such an assumption and then failed to question her during her initial statements. See Ex. 1 at ¶8. When she allegedly submitted audio recordings to the Investigator, Mr. Doe was only allowed to listen to them once during an investigatory interview. See Ex. 1 at ¶5. They were not shared as they were supposed to be according to the Policy Section (IV)(H)(1), where "both [parties] are provided equitable opportunities, including the opportunity to ... review and present information and evidence." Ex.

14 at 1. Ms. Roe got to hear it before she had to comment on it, whereas Mr. Doe had to do it in that moment. Additionally, it was never put into evidence, only a pdf of the email it was sent in was entered into evidence, but not the audio file. Ms. Roe had significantly more time to prepare her statements on the audio, not to mention that Mr. Doe was suffering from trauma related to the sexual assault. See Ex 1 at ¶5. When Ms. Roe was cross-examined on Mr. Doe's statement, the Investigator did not ask about inconsistencies between Ms. Roe's response and her original statement like she noted with Mr. Doe. When Ms. Roe only contested not forcing Mr. Doe to put his penis in her, the Investigator never clarified if that meant Ms. Roe put it in herself or if Mr. Doe did.

The Investigator went as far to simply make up alleged statements by Mr. Doe. When Mr. Doe originally thought any digital penetration was impossible but later revised it to being possible due to a circumstance which he cannot remember currently. See Ex. 1 at ¶5-6. The Investigator recorded that as Mr. Doe admitting he did commit an act that Ms. Roe alleged occurred rather than Mr. Doe's true statement simply no longer objecting to the possibility of the situation.

The Investigator also did not interview all the witnesses that Mr. Doe asked for, while Ms. Roe had all of hers questioned. See Ex. 1 at ¶4. At least one interviewed witness said that the interviewed witness had heard a story from Ms. Roe, along with two others who were not requested to be interviewed, where Ms. Roe inhaled THC before Mr. Doe even entered the room. This would have given Ms. Roe a third competing and contradictory story to defend, as well as stretching her alleged timeline of THC inhalation by another 30 minutes between inhalation and sexual activity.

**E. The Hearing and Appeal**

9

During the hearing, at least two other students were allowed to discuss Mr. Doe's recollection of a night in early November 2021, implicitly because they believed that it was Mr. Doe's recollection of the night in the underlying complaint. When Mr. Doe asked to be allowed to speak on that issue, he was not allowed to. See Ex. 1 at ¶11.

Due to the nature of Ms. Roe being found not responsible and Mr. Doe being found responsible, the timeline of the complaints split. For the complaint where Ms. Roe was found not responsible, the appellate period began. For the complaint where Mr. Doe was found responsible, the sanctioning period began. Mr. Doe had two tasks, first to write a sanctioning statement, and the second was to write an appeal for the outcome of Ms. Roe being not responsible.

According to the Title IX Policy under section (IV)(K)(7), "[a]ll written materials considered by the appropriate university administrator will be subject to inspection by the appealing party/parties." Ex. 14 at 1. More generally, the Policy in Section (IV)(H)(1), says that "both [parties] are provided equitable opportunities, including the opportunity to ... review and present information and evidence." Id. Mr. Doe was not provided with access to any evidence from the written determination date until November 27, 2023.

In an email on July 16, 2025, Ms. Laura Buchs, the then-interim Title IX Coordinator, stated that the period was between the issuance of the written determination and November 29, 2023. In that email, she did not respond to the fact that access to evidence was not available from the determination date until November 27, 2023, effectively denying Mr. Doe an opportunity to appeal due to not having access to the evidence. See Ex. 15 at 1-2. Mr. Doe responded 32 minutes later to her email, asking point blank, "if it is the University's opinion that between [date of determination] and November 27, 2023, that [the University] had shared all the evidence in the Box with [Plaintiff]." Id at 1. She has yet to respond to that email.

10

Ms. Annexstein's real time communication with Mr. Doe and his then-attorney, Mr. Chris Muha, show that she repeatedly denied Mr. Doe access to evidence during that period. On November 16, 2023, Mr. Doe requested that his advisor, Mr. Muha, be given access to the Box and evidence. Ms. Annexstein denied this since she said "[o]nce the sanctions have been issued, you will have the opportunity to appeal. Should you decide to appeal, you may request the materials at that time." Ex. 16 at 1. She did not acknowledge that there was an ongoing appeal period. After another email exchange, she again denied access to the evidence, saying "[f]ollowing the issuance of the sanctions as determined by the Dean of Students or designee, you will have the opportunity to appeal the finding and the sanctions and may review documents at that point to prepare your appeal." Ex. 17 at 3. She again denied access to the documents during the sanctioning period, as well as during the first appeal period.

At this point, Mr. Muha began corresponding directly to Ms. Annexstein, also looping in the General Counsel's office. He stated plainly that

> Title IX regulations require schools to share the evidence with the
> parties during the pendency of the case, and in almost a decade of
> doing these cases, [he] [had] never heard of a school—including
> American—suddenly withdrawing that right in the middle of the
> process.

Ex. 17 at 2.

After receiving that message, Ms. Annexstein waited a week and then allowed access to the Box, roughly 48 hours before an appeal was due, and less than a week before the sanctioning panel was going to meet. At that point, it was no longer reasonably viable to submit an appeal and sanctioning statement, while also carrying out normal responsibilities. See Ex. 1 at ¶12.

11

Strangely, Ms. Annexstein responded only to Mr. Muha, and not Mr. Doe, stating that she "believe[d] confusion [had] arisen based on a change of advisors, which is an atypical situation following the live hearing." Ex. 17 at 1. This is nonsensical since providing access to evidence for Mr. Doe has nothing to do with his choice of advisor and that meant that he should have had access to the evidence before he attempted to switch to Mr. Muha, which he did not. See Ex. 1 at ¶12. When Mr. Doe checked for during his second appeal period, he did not have access to the Box again, but by this point, he had sufficient notes that the time and expense of arguing with Ms. Annexstein was not worth it.

### F. Conduct Charges Stemming from His Complaint

In March 2024, a full four months after closing the case against Ms. Roe, the University accused Mr. Doe of submitting a false and frivolous complaint. This was outside the University's 30-day reporting period in their Conduct Code. Mr. Doe attempted to get this lifted so he could transfer because the University had violated his rights in the original proceeding and therefore this proceeding would effectively be fruit of the poisonous tree. See Ex. 15 at 2. The University would not respond to those claims and therefore they would not drop the allegations.

### LEGAL STANDARD

The Court is allowed to issue a preliminary injunction to noticed parties under Fed. R. Civ. P. 65. "A party seeking a preliminary injunction must make 'a clear showing that four factors, taken together, warrant relief: likely success on the merits, likely irreparable harm in the absence of preliminary relief, a balance of the equities in its favor, and accord with the public interest.'" League of Women Voters of United States v. Newby, 838 F.3d 1, 6 (D.C. Cir. 2016) (citing Pursuing Am.'s Greatness v. FEC, 831 F.3d 500, 505 (D.C. Cir. 2016)). Generally, in this Circuit, those "factors interrelate on a sliding scale and must be balanced against each other."

12

Serono Labs Inc v. Ferring Pharm. Inc., 158 F.3d 1313, 1318 (D.C. Cir. 1998). Regardless of whether or not the "sliding scale" is applied, Plaintiff is entitled to preliminary relief.

**ARGUMENT**

Plaintiff pleads multiple causes of action which are highly likely to be resolved in his favor. For the sake of judicial economy, Plaintiff only raises three of those issues to secure injunctive relief. Plaintiff raises the following claims: (i) breach of contract claim 1.5 to show that the Hearing Panel was biased, (ii) breach of contract claim 1.6 to show that the University proceeding further with their conduct proceedings would cause further harm from the underlying breach, and (iii) Title IX violation 4.1 to show that bias was based on sex and it was the decisive factor affecting the outcome.

### I. Plaintiff is Likely to Succeed on His Claims

### A. Breach of Contract

In D.C., "the relationship between a university and its students is contractual in nature." Chenari v. George Washington University, 172 F. Supp. 3d 38, 47 (D.D.C. 2016), quoting Manago v. District of Columbia, 934 A.2d 925, 927 (D.C. 2007). University policies, such as the one in question, the American University Title IX Sexual Harassment Policy ("the Policy," selected portions in Exhibit 14 to this motion), "'must be viewed as a whole' and 'the court should view the language of the document as would a reasonable person in the position of the parties.'" Pride v. Howard Univ., 384 A.2d 31, 34 (D.C. 1978), quoting Basch v. George Washington Univ., 370 A.2d 1364, 1367 (D.C. 1976). Furthermore, a previous version of the Policy was found by this Court to be a contract, stating that "a contractual relationship exists between the University and Doe, and that the Student Code of Conduct and the Discrimination

13

and Sexual Harassment Policy form a part of that relationship." Doe v. American University, 1:19-cv-03097, (D.D.C. Sep 18, 2020) ECF No. 30 at 24.

### i. The Hearing Panel was Biased

In the Section (IV)(I)(6) of the Policy, it states that "[t]he Hearing Panel must be impartial and free from bias or conflict of interest." Ex. 14 at 1. To be impartial is to treat all equally. Using the Pride standard of taking each part of the document separately, the Policy clearly imposed on the University a responsibility to be impartial in decision-making by using the word "must." However, they made false statements in the written determination. One of them was that "[Ms. Roe] gave consistent statements regarding the events of [the Night], and were credible." Ex. 2 at 1.

Ms. Roe's statements were neither consistent nor credible. For starters, Ms. Roe could not decide if she did not remember anything due to blacking out or if she did and therefore could contest Plaintiff's claim that he was raped. See Ex. 1 at ¶8-9. Originally, she was explicitly saying that she blacked out. Later, she said affirmatively that; she did not say words that Plaintiff heard, that Plaintiff did not hesitate when she was attempting to engage in intercourse with him, or that she did not force Plaintiff's penis inside of her. Her two parallel stories, one with memory of events and one without, are plainly contradictory and therefore inconsistent.

In addition to the inconsistencies, Ms. Roe's claims were also not credible. Her alleged timeline and symptoms of intoxication or incapacitation do not reconcile with the reality of inhaled THC. Ms. Roe's claims that she was blacking out are not credible since "there are no reports of anterograde amnesia ("blacking out") from THC intoxication." See Ex. 3 at 6.

Ms. Roe also alleged in her original allegation that she was incapacitated when sexual penetration occurred. In her original testimony to the Investigator, Ms. Roe said that she was not

14

incapacitated when she got into bed with Plaintiff. See Ex. 1 at ¶8. The University credited this as true not just in the aforementioned reasoning but also further along saying that "[Ms. Roe] was mentally and physically impaired and was in a state of intermittent consciousness when [Mr. Doe] penetrated [Ms. Roe]'s vagina with his fingers and penis." Ex. 2 at 1. That is simply not possible as "[o]nce intoxication starts to subside, it declines steadily until baseline is reached 4-6 hours after the last inhalation." Ex. 3 at 6. Put more simply, "THC effects are not intermittent; they do not fluctuate." Id. That means that Ms. Roe's alleged recollections of her memory are not credible.

The Hearing Panel also ruled that "[Mr. Doe] gave conflicting accounts of the events on [the night]." Ex. 2 at 1. The Hearing Panel said Mr. Doe was inconsistent while Ms. Roe was consistent. Regardless of whether Plaintiff was consistent, the declaration that Ms. Roe was consistent when she was not, demonstrates partiality since they applied a different standard of consistency in a way that was preferential to Ms. Roe. Additionally, Ms. Roe's claims could not have possibly occurred, yet her claims were credited as credible. Should the Decisionmakers have used an impartial standard for consistency, Ms. Roe's claims would not have been seen as credible or consistent. By not upholding their responsibilities as laid out in the Policy, the University came to an erroneous outcome.

Mr. Doe is likely to succeed because Ms. Roe's original statements, specifically those detailing what she alleged to remember or not remember, to the Investigator were directly contradicted by her statements made to the Investigator in response to Mr. Doe's allegations against her. Since the decision that "[Ms. Roe] gave consistent statements" is contrary to objective fact, that means that the Hearing Panel was not "impartial." Ex. 2 at 1, Ex. 14 at 1. There should be little, if any, genuine dispute that (a) Ms. Roe's statements were inconsistent, (b)

that the Hearing Panel ruled that her statements were consistent, (c) that impartial means fair and objective and therefore failing to be impartial means to fail to be fair and objective, and (d) that the Hearing Panel relied on those determinations to make their determination of responsibility.

### ii. Failure to Provide Access to Evidence for an Appeal

The two most relevant sections of the Policy here, Sections (IV)(H)(1) and (IV)(K)(7), are both contracts under the Pride framework as they state that "both [parties] are provided equitable opportunities, including the opportunity to ... review and present information and evidence," and that "[a]ll written materials considered by the appropriate university administrator will be subject to inspection by the appealing party/parties," respectively. Ex. 14 at 1. The phrases "are provided" and "will be subject to" show mandatory intent and that it is the responsibility of the University to fulfill those requirements.

That being said, the University did not fulfill those requirements during the first appellate period, as stated by Ms. Annexstein in her emails. See Exs. 16 and 17 (repeatedly denying access to evidence during the time period which the first appeal took place). The University did not allow access to evidence during the majority of the first appeal period. Id. Since access to that evidence is a foundational requirement, it meant that Mr. Doe effectively did not get an appeal period. If there is no access to evidence, then there is no plausible possibility of an appeal.

That being said, the University originally did not have a good excuse for their violation, blaming Mr. Doe for changing advisors. See Ex. 17 at 1. Two years later, when Mr. Doe contacted the University about it, hoping to end their effective global ban of him getting a collegiate education, Ms. Buchs acted like nothing abnormal had happened, saying that Mr. Doe had a chance to appeal and did not. She would not, despite being asked twice, address the fact that Mr. Doe did not have access to the evidence the entire time. See Ex. 15 at 1-2.

16

Mr. Doe never got the opportunity to appeal the outcome of Ms. Roe being found not responsible. The University is now saying he lied about his complaint, despite the fact that he was not allowed to have the procedural irregularities and biases remedied through the usual appellate process.

Mr. Doe is likely to succeed on this matter because Ms. Annexstein documented her wrongdoing in email form. As such, there is no genuine dispute that the University did not provide Mr. Doe with "all written materials considered by the [appeal reviewer]" during the first appellate phase. Ex. 14 at 1.

### B. Title IX, Erroneous Outcome

Under 20 U.S.C. § 1681(a), educational institutions receiving federal financial assistance may not exclude a person from participating in any education program on the basis of sex. In this case, Plaintiff is pleading sex discrimination through the "erroneous outcome" theory, as outlined in Yusuf v. Vassar College, 35 F.3d 709 (2d Cir. 1994). Yusuf requires two factors to succeed: Plaintiff must show (a) "particular facts sufficient to cast some articulable doubt on the accuracy of the outcome of the disciplinary proceeding," and he must show that "gender bias was a motivating factor behind the erroneous finding." Id at 715.

Plaintiff addressed the first factor in the preceding section. The University made a plainly false statement that Ms. Roe's claims were "consistent" and "credible." See Ex. 2 at 1. That erroneous conclusion was directly cited as fact in support of the University's decision to find Plaintiff responsible for rape, and Ms. Roe not responsible for rape. That is a direct causal link. The conclusion is erroneous because Ms. Roe originally told the investigator that she was "blacking out" during intercourse and had no memory of the event, but then upon being asked to respond to Plaintiff's allegations, Ms. Roe claimed memory of all of her speech, actions, and the

17

ability to judge Plaintiff's demeanor. See Ex. 1 at ¶9. The Hearing Panel used a false statement in the written determination to justify their outcomes.

The second factor, showing that gender bias was a motivating factor, is more than satisfied by the public pressure campaign that was fueled, in part, by individuals with private interests in the outcome of this case. A previous ruling, in a different case, against the University, shows why Plaintiff is likely to succeed.

In Doe v. American University, 1:19-cv-03097, (D.D.C. Sep 18, 2020) ECF No. 30 [ruling on Defendant's motion to dismiss and Plaintiff's motion for partial summary judgement], the Court held that evidence of "various near-in-time events that AU was facing when the University investigated and punished Doe" were substantial facts that plausibly alleged bias because "[c]ourts uniformly have recognized that such evidence may be relevant to a claim of sex discrimination." Id At 17. Of the cases that the Court cited to support its conclusion, Doe v. Columbia University, 831 F.3d 46, 57 (2d Cir. 2016), had the most direct link to the facts at hand today, where "substantial criticism…both in the student body and in the public media, accusing the University of not taking seriously complaints of female students alleging sexual assault by male students" made a Title IX claim plausible. See Doe v. American Univ., 1:19-cv-03097, ECF No. 30 at 17 (quoting Columbia Univ., 831 F.3d at 57). While the standards to survive a motion to dismiss are far lower, the same pre-discovery situation applies where Plaintiff has yet to depose Decisionmakers on their rulings. Plaintiff here uses the "near-in-time events" framework to show that the University had significant pressure against it to rule in favor of a female party.

As laid out in the facts of this memorandum, there were ongoing protests from just before Mr. Doe filed his complaint, continued throughout the proceedings, with exceptional intensity of

three events in the six weeks surrounding decision day, and have been sporadic since then. Ms. Roe confirmed that behaviors of the Office and its employees were more favorable to her during the process that occurred under public pressure.

The student publications and private actions of the University were also anti-men as well. Some publications said that men were apathetic to the cause of anti-sexual violence. See Ex. 5 at 1, 5-6 and Ex. 8 at 9. One publication detailed that a male complainant had originally been told by the Office that his claims did meet the standard for sexual assault, only for Ms. Annexstein to reverse that decision. See Ex. 13 at 6. Others framed this as a topic that only affects women and gender nonconforming people. See Ex. 12 at 3. Even simple pictures, which reflected scenes that panel members could have seen for themselves just by walking to work, show that this issue was dominated by women. See Ex. 5 at 1. All that pressure directed at securing women a favorable outcome was specifically targeted at the Title IX process at the University, with one protest leader saying, "[w]e want a restructuring of what Title IX looks like on campus." See Ex. 7 at 2.

Put simply, if the Decisionmakers had any contact with the University community, campus, or media, they would have been bombarded with images, stories, and events showing women detailing grievances with the University's handling of the Title IX complaint process, ripening their implicit biases of what someone who gets raped looks like.

When dealing with public pressures, certain actions showing that a University was "cognizant of, and sensitive to, [] criticisms" can be used to infer that "the University's decision-makers and its investigator were motivated to favor the accusing female over the accused male, so as to protect themselves and the University from accusations that they had failed to protect female students from sexual assault." Columbia Univ., 831 F. 3d 46, 57. The University's Working Group and town hall by Ms. Annexstein both show that the University was "cognizant

of, and sensitive to" the suggestions that stemmed from criticism that "[t]he AU administration has both a moral and pragmatic obligation to take the necessary steps implored to protect those students." Id, Ex. 12 at 3 (referencing statistics that 59% of undergraduate women and 23% undergraduate gender nonconforming individuals are victims of sexual violence).

The pressure also came in a financial form as protests at the University caused a prospective parent to "feel[] 'reluctant' to enroll any of her children in the University after hearing the concerns voiced by students." Ex. 5 at 10. In Doe v. Purdue University, 928 F.3d 652 (7th Cir. 2019), the 7th Circuit Court cited the 6th Circuit Court in ruling that "pressure from the government to combat vigorously sexual assault on college campuses and the severe potential punishment-loss of all federal funds," when combined with other allegations "support[ed] a reasonable inference of gender discrimination." Purdue Univ., 928 F.3d 652, 668 (quoting Doe v. Miami Univ., 882 F.3d 579, 594 (6th Cir. 2018). The University in this case shares that same pressure and an additional one from the loss of student tuition since the protests explicitly deterred enrollment.

The overwhelming evidence of pressure against the University, along with clear evidence that they were cognizant of that pressure creates the context for the University's procedural irregularities in handling the formal complaint process. The University demonstrated their reaction to this public pressure in numerous ways, including "procedural flaws in the investigatory and adjudicative processes [and] [] inconsistencies or errors in the adjudicator's oral or written findings." Doe v. Marymount Univ., 297 F. Supp 3d 573, 584 (E.D. Va 2018). Briefly, the investigator did not interview all witnesses that Mr. Doe presented and the investigator failed to thoroughly question by not asking Ms. Roe: (a) how Ms. Roe alleged to become more intoxicated later in the evening, (b) when Ms. Roe alleged to be incapacitated, (c)

20

who Ms. Roe alleged inserted the penis into her vagina, (d) how Ms. Roe claimed to both not remember certain events and declare that Mr. Doe was lying, and (e) why Ms. Roe deleted messages to Mr. Doe, or at least let them expired. See Ex. 1 at ¶8-10. Additionally, the investigator attempted to alter statements made by Mr. Doe while also denying Mr. Doe appropriate access to hear the alleged audio recordings before or after the investigative interviews. See Ex. 1 at ¶5-6. Plaintiff will show how there were also errors in the adjudicator's written findings in a couple of paragraphs' time.

A preliminary injunction is not just about claims surviving but also succeeding. In this case, there is a notable lack of alternatives to sex bias. Usually, Title IX complaints are one way, with a complainant and a respondent, making it difficult for Courts to differentiate pro-complainant bias from anti-male bias. See Doe v. Princeton University, 3:24-cv-07125, (D.N.J. Apr 28, 2025) ECF No. 24 at 10-11 (dismissing Title IX claim in which facts suggest pro-complainant bias, not gender bias). In this case, both the male and female individuals are complainant-respondents. See Ex. 1 at ¶2. Since both parties shared the same complainant-respondent identity, there are no other plausible biases for the University to fall back on which are not on the basis of sex.

Plaintiff shows this through the use of his similarly situated opposing party in the underlying Title IX complaint. To discriminate against a person "mean[s] treating that individual worse than others who are similarly situated." Bostock v. Clayton County, 590 U.S. 644, 140 S. Ct. 1731, 1740, 207 L. Ed. 2d 218 (defining sex discrimination in a Title VII sex discrimination case).

The facts of this case mean that the Court does not need to look any further than the written determination to have an understanding of how a female would have been treated in

21

Plaintiff's case. Both Ms. Roe and Mr. Doe were accused of rape and accused the other of rape. See Ex. 2 at 1. In this analysis, it does not matter if Mr. Doe's claims are accurate because the argument here is that decision-makers erred in the judgement finding Ms. Roe credible and consistent, not in finding Mr. Doe not credible and inconsistent. Perhaps, there is some way in which the University can explain how it found Ms. Roe's contradictory claims of both not remembering sexual contact and remembering everything Plaintiff said in order to say he lied, credible, but the statement which they attached to their credibility assessment, that Ms. Roe was "consistent" is indefensible. See Ex. 2 at 1. Merriam-Webster defines "consistent" as "marked by harmony, regularity, or steady continuity : free from variation or contradiction."[1] The definition of consistent is explicitly contrary to what the University defined as "consistent." It does not matter if Mr. Doe's statements were consistent or not because the University did not declare them consistent. See Ex. 2 at 1. What the decision-makers did was put a false statement in the written determination to benefit the female party, and took no such action to benefit the male party. Now, Plaintiff is not suggesting that two lies make a truth, but there should be no genuine dispute that the decision-makers made a false statement to support Ms. Roe's claim, and took no action to benefit the similarly situated Plaintiff's claim.

The decision-makers should not have found Ms. Roe consistent, and due to their own weighing of the claims, could not have found her credible. By doing so, they substantiated claims that would not have otherwise succeeded. If they found her contradictory and not credible, then, at a minimum, they would have been far more amenable to Plaintiff's claims and defenses.

---

[1] https://www.merriam-webster.com/dictionary/consistent

The Court can be certain that Plaintiff will succeed in this matter because he can already prove both halves necessary to show a violation of Title IX. The outcome of credibility and consistency was a false statement, and therefore the outcome, which was based on those findings, was erroneous. Plaintiff also showed that he was treated worse than the female opposing party who was similarly situated.

## II. Plaintiff Will Suffer Irreparable Harm

In seeking a preliminary injunction, the moving party "must make two showings to demonstrate irreparable harm. First, the harm must be "certain and great,' 'actual and not theoretical,' and so 'imminent that there is a clear and present need for equitable relief to prevent irreparable harm." Newby, 838 F.3d at 7-8 (quoting Chaplaincy of Fill Gospel Churches v. England, 454 F.3d 290, 297 (D.C. Cir. 2006)). For the second factor, the moving party must demonstrate that "the harm 'must be beyond remediation." Id.

In seeking this preliminary injunction, there are two significant harms that the Court should address. The first is reputational harm. The University has effectively branded Plaintiff a sex offender and accused him of an egregious crime that, according to an expert analysis of the University's findings, he could not have possibly committed. See Ex. 3 at 6. Furthermore, the University also accused Plaintiff of lying about being raped, due to, ironically, the University lying to protect Ms. Roe by declaring her credible and consistent. See Ex. 1 at ¶13, Ex. 2 at 1. Both of these are accusations of the most harmful order. Mr. Doe struggles to find an example of allegations more damaging then being found responsible for rape and accused of lying about being raped.

Since the University has created a noticeable effect on Mr. Doe's life he suffers greatly and continuously. He is now uncomfortable around anyone besides his mother, father, sister, and

23

closest friends because they might ask what he is doing, how his college experience was or is, or when he plans to go back to college. Even worse, they could ask why he left college. See Ex. 1 at ¶15. Put simply, the University has forced Plaintiff to lie or avoid people he loves because how can he possibly explain that an institution lied about him being a rapist, accused him of lying about being raped, and are instituting an effective global ban on finishing his bachelor's degree? Furthermore, Plaintiff is clearly a victim of sexual violence given that Ms. Roe effectively conceded that point in her statements to the investigator, where she did not deny Plaintiff's allegation that she put his penis inside of her or that he did not consent. See Ex. 1 at ¶8-9.  Courts recognized the students who are "found responsible for sexual misconduct will likely face substantial social and personal repercussions." Brandeis Univ., 177 F. Supp. 3d at 602. Simply put, the "social and personal" harm is irreparable because people move on, move away, get old, and die, and Plaintiff is forced to lie or avoid them due to the University's discrimination, which harms relationships and opportunities and connections with other people.

The reputational harm also affects Plaintiff's ability to enroll at a new university. Plaintiff is effectively seeking to enter a business transaction with a new university, by transferring, and in order to reap the benefits of that transaction, he needs to be admitted. In university admissions processes, disciplinary factors have weight. See Ex. 1 at ¶14. In fact, if an individual is not in good standing with their previous university after a suspension, they will seemingly not even be considered for an application at the university of Plaintiff's choosing. Id. The University's notation of a suspension and ongoing accusations of lying have blocked him from even considering entering into a contract with another university, and reputational damage that affects business contracts is irreparable. See Alf v. Donley, 666 F. Supp. 2d 60, 70 (D.D.C. 2009).

24

The second set of irreparable damages are in lost opportunity, the loss of educational opportunity which impacts future income. Irreparable harm occurs "when monetary damages are difficult to ascertain or inadequate." CSX Transp., Inc v. Williams, 406 F.3d 667, 674 (D.C. Cir. 2005) (quoting Danielson v. Local 275, 479 F.2d 1033, 1037 (2d Cir. 1973)). The ban on university education began affecting Plaintiff in Spring 2024, it has now been five (5) normal semesters, not including summer and winter sessions, or more than half of a typical four (4)-year university education. There is no way of knowing what the past and future delay will cost Plaintiff, potentially; the opportunity to get a better, higher paying job, or allow him to have the funds on hand to invest in financial instruments or businesses at a more opportune time in the future. Those losses are hard to calculate or foresee, but it is totally foreseeable that the lost time now will have the greatest effect on the end of his working life, not the beginning. The University publishes average wages over the first two years after graduation, but they way of knowing at what age Plaintiff will have to retire or how much money Plaintiff will be making at the end of his life. There are many known unknowns in this matter and therefore the damage is irreparable.

Plaintiff shows that the harm is great and real, through his suffering, and the application process of his college of choice. Plaintiff's harm is irreparable because the damages in the far future are "difficult to ascertain." CSX, 406 F.3d at 674.

### III. The Balance of Equities Favors Preliminary Relief

This preliminary injunction motion is taking place at a unique time. Since Plaintiff opted to pursue other paths, like the ongoing federal civil rights investigation, before litigation, the suspension from the sanctions has been finished. As such, the University has fulfilled their requirements under Title IX. Plaintiff is simply asking that the Court restrain them from telling

25

anyone else about the outcome since he is likely to succeed on his claims. Schools like Rutgers remove a suspension notation after the suspension is completed. See Ex. 18 at 2. Removing the notation from Plaintiff's transcript would allow him to continue his education and greatly reduce his suffering while not exposing the University to further federal liability.

The second half of the relief, prohibiting the University from bringing conduct charges against Plaintiff, specifically the allegation that he submitted "False or Frivolous Charges." The University does have to seriously deter false and frivolous charges under federal statutes, but their application of such a provision is premature. As Mr. Doe has shown, he did not have an adequate opportunity to appeal the findings that his claims were not true. Given that the University incorrectly stated that Ms. Roe was consistent and credible, and that Ms. Roe did not deny Plaintiff's statements that she inserted his penis into her vagina or that he did not consent to it, it is likely that he would have succeeded in getting at least a rehearing, if not an overturning of the finding. See Ex. 2 at 1, Ex. 1 at ¶8-9. However, the University did not afford him the opportunity to appeal. See Ex. 16 at 1. Therefore, they cannot conclude that Mr. Doe's claims are false in order to bring that charge. The University has an "institutional interest in [a] speedy resolution of disciplinary charges an in maintaining public confidence in the integrity of its process." Jones v. Board of Governors of University of North Carolina, 704 F.2d 713, 717 (4th Cir. 1983). However, given the overwhelming evidence that the University was instead the one who lied and that Mr. Doe was treated unfairly, allowing the University to continue the conduct process would in fact harm the "public confidence in the integrity of its process" when it brings such blatantly false charges. See Ex. 1 at ¶8-9, Ex. 2 at 1, Jones, 704 F.2d at 717. Contrastingly, in the previous section, Plaintiff has demonstrated real concrete harm that will befall him if the injunction is not granted. The balance of equities weighs heavily in Plaintiff's favor.

26

### IV. The Public Interest Favors Relief

Public interest plainly favors the truth in all instances. Hence, "leaving in place a wrongfully imposed sanction and the record of such is plainly contrary to the public interest." Doe v. The Rector and Visitors of George Mason Univ., 179 F. Supp. 3d 583, 588 (E.D. Va 2016). Freeing Mr. Doe serves the public interest.

I declare under penalty of perjury that the foregoing is true and correct. Executed on March 29, 2026.

*John Doe*
John Doe, Plaintiff Pro Per

27