**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

JOHN DOE,

              *Plaintiff,*

     v.

AMERICAN UNIVERSITY,

              *Defendant.*

Civil Action No. 25-cv-03866-ACR

**DEFENDANT AMERICAN UNIVERSITY'S MEMORANDUM OF POINTS AND
AUTHORITIES IN OPPOSITION TO PLAINTIFF'S MOTION FOR A PRELIMINARY
INJUNCTION**

**TABLE OF CONTENTS**

**TABLE OF AUTHORITIES** ...................................................................................................... iii

**INTRODUCTION** ...................................................................................................................... 1

**RELEVANT FACTUAL AND PROCEDURAL HISTORY** ................................................... 1

    I.    Plaintiff's Title IX Complaint and the Attendant Allegations. ....................................... 1

        a.    Plaintiff Enrolls at American University and Meets Jane Roe. ................................... 1

        b.    Two Incidents of Alleged Sexual Misconduct .............................................................. 2

    II.    The University's Title IX Sexual Harassment Policy ....................................................... 3

        i.    Investigatory Stage ......................................................................................................... 4

        ii.    Live Hearing .................................................................................................................. 5

        iii.    Sanctioning and Appeals Processes ............................................................................. 5

    III.    Issuance of the Investigative Report and the Hearing Panel .......................................... 7

    IV.    Sanctioning Panel and the Appellate Phase. ................................................................. 8

    V.    Student Conduct Investigation ...................................................................................... 9

    VI.    Procedural History ........................................................................................................ 9

**LEGAL STANDARD** ............................................................................................................. 10

    I.    PLAINTIFF'S CLAIMS ARE UNLIKELY TO SUCCEED ON THE MERITS. ........ 10

        a.    Plaintiff's Three Cited Claims Each Lack Merit. ....................................................... 11

        b.    Plaintiff Is Not Likely to Succeed on Count 1.5: Breach of Contract Based on the Conduct of the Hearing Panel ................................................................................... 11

        i.    Breach of Contract Under District of Columbia Law. ............................................... 11

        ii.    Count 1.5 is Likely Subject to Dismissal, and, therefore, Plaintiff is Unlikely to Succeed on the Merits. ............................................................................................... 12

        iii.    Count 1.6 is Unlikely to Succeed on the Merits. ....................................................... 15

        c.    Count 4.1: The Title IX Erroneous Outcome Claim .................................................. 17

        i.    Title IX Erroneous Outcome Claim. ......................................................................... 17

        ii.    Plaintiff's Erroneous Outcome Claim is Threadbare. ............................................... 17

    II.    PLAINTIFF HAS NOT AND WILL NOT SUFFER IRREPARABLE HARM. ......... 20

i

a.   The Definition of Irreparable Harm. ............................................................................. 20

b.   Plaintiff Cannot Establish Irreparable Harm. ............................................................... 21

c.   Plaintiff's Invocation of Reputational Harm is Unavailing. ........................................ 22

   iii.   Plaintiff's Reputational Harm and Alleged Related Emotional Suffering Does Not
       Constitute Irreparable Harm. ...................................................................................... 22

   iv.   Plaintiff Speculates that Pending Student Conduct Charges Could Harm His Ability
       to Enroll at Another Institution. ................................................................................. 23

d.   The Loss of Educational Opportunities Is Compensable as Well, and Therefore Cannot
    be Considered Irreparable. .......................................................................................... 24

e.   Plaintiff's Substantial Delay in Seeking Injunctive Relief Demonstrates that There is
    Not an Imminent Need for the Court to Provide a Remedy. ....................................... 26

III.   THE BALANCE OF EQUITIES FAVOR DENIAL OF PLAINTIFF'S MOTION FOR
     A PRELIMINARY INJUNCTION. ............................................................................ 28

IV.   THE PUBLIC INTEREST FAVORS DENIAL OF INJUNCTIVE RELIEF. .............. 28

**CONCLUSION** ........................................................................................................................ **29**

# TABLE OF AUTHORITIES

*All. for Retired Americans v. Bessent*,
770 F. Supp. 3d 79 (D.D.C. 2025)......................................................................................22

*Am. Fed'n of Lab. & Cong. of Indus. Organizations v. Dep't of Lab.*,
No. 25-cv-00339, 2025 WL 1783899 (D.D.C. June 27, 2025)..............................20, 21, 22, 27

*Arkansas Dairy Co-op Ass'n, Inc. v. U.S. Dep't of Agr.*,
573 F.3d 815 (D.C. Cir. 2009).....................................................................................10, 11

*Campbell-Crane & Assocs., Inc. v. Stamenkovic*,
44 A.3d 924 (D.C. 2012) ................................................................................................23

*Cannon v. Allied Universal Sec. Servs.*,
No. 25-cv-01794, 2025 WL 3516157 (D.D.C. July 28, 2025) .........................................20, 23

*Chaplaincy of Full Gospel Churches v. England*,
454 F.3d 290 (D.C. Cir. 2006)..................................................................................20, 21, 25

*Clevinger v. Advoc. Holdings, Inc.*,
134 F.4th 1230 (D.C. Cir. 2025)......................................................................................21

*Cobell v. Norton*,
391 F.3d 251 (D.C. Cir. 2004)........................................................................................10

*Conserve Sw. Utah v. U.S. Dep't of the Interior*,
No. 26-cv-00317, 2026 WL 569034 (D.D.C. Mar. 1, 2026) ....................................................10

*Doe #1 v. Syracuse Univ.*,
No. 18-cv-00496, 2018 WL 3193199 (N.D.N.Y. June 28, 2018) ...................................24, 25

*Doe v. Am. Univ.*,
No. 19-cv-03097, 2020 WL 5593909 (D.D.C. Sept. 18, 2020)................................................17

*Doe v. Brown Univ.*,
166 F. Supp. 3d 177 (D.R.I. 2016)....................................................................................16

*Doe v. California Inst. of Tech.*,
No. 19-cv-01005, 2019 WL 8645652 (C.D. Cal. Aug. 13, 2019)\ ....................................12, 13

*Roe v. University of Cincinnati*,
18-cv-00312, 2018 WL 9944938 (S.D. Ohio Aug. 21, 2018) .........................................28, 29

*Doe v. Coastal Carolina Univ.*,
522 F. Supp. 3d 173 (D.S.C. 2021)....................................................................................19

iii

*Doe v. Coll. of Wooster*,
    243 F. Supp. 3d 875 (N.D. Ohio 2017)....................................................................................19

*Doe v. Columbia*,
    151 F.4th 435 (D.C. Cir. 2025)...............................................................................................17

*Doe v. DiStefano*,
    No. 18-cv-1462, 2019 WL 1254943 (D. Colo. Mar. 19, 2019)................................................13

*Doe v. George Washington Univ.*,
    366 F. Supp. 3d 1 (D.D.C. 2018)........................................................................................17, 18

*Doe v. Marymount Univ.*,
    297 F. Supp. 3d 573 (E.D. Va. 2018) .......................................................................................18

*Doe v. Oregon State Univ.*,
    614 F. Supp. 3d 847 (D. Or. 2022) ..........................................................................................14

*Doe v. Princeton Univ.*,
    No. 20-cv-04352, 2020 WL 2097991 (D.N.J. May 1, 2020)....................................................26

*Doe v. Texas A&M Univ.*,
    No. 20-cv-04332, 2021 WL 257059 (S.D. Tex. Jan. 26, 2021)...........................................25, 26

*Doe v. Trs. of Bos. Coll.*,
    892 F.3d 67 (1st Cir. 2018)......................................................................................................19

*Doe v. Trs. of Indiana Univ.*,
    No. 20-cv-02006, 2020 WL 7028030 (S.D. Ind. Nov. 30, 2020)............................................25

*Doe v. The Trs. of the Univ. of Pennsylvania*,
    270 F. Supp. 3d 799 (E.D. Pa. 2017) ......................................................................................14

*Doe v. Univ. of Dayton*,
    No. 17-cv-00134, 2018 WL 1393894 (S.D. Ohio Mar. 20, 2018)...........................................13

*Doe v. Univ. of Illinois*,
    No. 23-cv-2280, 2024 WL 1117076 (C.D. Ill. Mar. 13, 2024)................................................25

*Duffy v. Duffy*,
    881 A.2d 630 (D.C. 2005) .......................................................................................................12

*Eastbanc, Inc. v. Georgetown Park Assocs. II, L.P.*,
    940 A.2d 996 (D.C. 2008) .......................................................................................................12

*Fund for Animals v. Frizzell,*
  530 F.2d 982 (D.C. Cir. 1975) ......................................................................................27

*GEO Specialty Chemicals, Inc. v. Husisian,*
  923 F. Supp. 2d 143 (D.D.C. 2013) ..............................................................................26

*Gischel v. Univ. of Cincinnati,*
  302 F. Supp. 3d 961 (S.D. Ohio 2018) .........................................................................19

*Goddard v. City Univ. of Seattle,*
  No. 25-cv-1881, 2026 WL 632484 (D.D.C. Mar. 6, 2026) ..........................................11

*Gomes v. Univ. of Maine Sys.,*
  365 F. Supp. 2d 6 (D. Me. 2005) ..................................................................................14

*Gordon v. Holder,*
  632 F.3d 722 (D.C. Cir. 2011) ......................................................................................26

*Greater New Orleans Fair Hous. Action Ctr. v. U.S. Dep't of Hous. & Urb. Dev.,*
  639 F.3d 1078 (D.C. Cir. 2011).....................................................................................10

*Hodges v. Bd. of Supervisors of Louisiana State Univ. & Agric. & Mech. Coll.,*
  No. 20-cv-01456, 2020 WL 5017665 (E.D. La. Aug. 25, 2020).............................26

*Jack Baker, Inc. v. Off. Space Dev. Corp.,*
  664 A.2d 1236 (D.C. 1995) ...........................................................................................12

*Kashmiri v. Regents of Univ. of California,*
  67 Cal. Rptr. 3d 635 (Cal. Ct. App. 2007)....................................................................13

*Kocsis v. Fla. State Univ. Bd. of Trs.,*
  788 F. App'x 680 (11th Cir. 2019) ................................................................................24

*League of Women Voters of United States v. Newby,*
  838 F.3d 1 (D.C. Cir. 2016)...........................................................................................20

*Maldonado v. D.C.*, No.
  10-cv-01511, 2019 WL 6877913 (D.D.C. Dec. 16, 2019) ...............................26, 27

*Mylan Pharmaceuticals v. Shalala,*
  81 F. Supp. 2d 30, 44 (D.D.C. 2000) ............................................................................27

*Nat'l Tr. for Historic Pres. in the United States v. Nat'l Park Serv.,*
  No. 25-cv-04316, 2026 WL 533420 (D.D.C. Feb. 26, 2026)........................................11

*Naumov v. McDaniel Coll., Inc.*,
  No. 15-cv-0482, 2017 WL 1214406 (D. Md. Mar. 31, 2017) ..................................................16

*Newdow v. Bush*,
  355 F. Supp. 2d 265 (D.D.C. 2005) ..................................................................................27

*Pierre v. Univ. of Dayton*,
  143 F. Supp. 3d 703 (S.D. Ohio 2015) ..............................................................................28

*Plummer v. Univ. of Houston*,
  860 F.3d 767 (5th Cir. 2017) ............................................................................................14

*Robinson v. Howard University,*
  335 F. Supp. 3d 13 (D.D.C. 2018) ....................................................................................18

*Safex Found., Inc. v. SafeLaunch Ventures Ltd.*,
  No. 22-cv-00572, 2025 WL 2377972 (D.D.C. Aug. 15, 2025) ..........................................28

*Santos v. Collins*,
  No. 24-cv-01759, 2025 WL 1823471 (D.D.C. Feb. 26, 2025) ....................................23, 27

*Sierra Club v. United States Army Corps of Eng'rs*,
  990 F. Supp. 2d 9 (D.D.C. 2013) ......................................................................................22

*Tsintolas Realty Co. v. Mendez*,
  984 A.2d 181 (D.C. 2009) ............................................................................................11, 12

*United States v. Raplinger*,
  No. 5-cr-00049, 2006 WL 3455266 (N.D. Iowa Nov. 29, 2006) ........................................1

*Univ. of Texas v. Camenisch*,
  451 U.S. 390 (1981) ..........................................................................................................10

*Verdu v. Trs. of Princeton Univ.*,
  No. 19-cv-012484, 2020 WL 1502849 (D.N.J. Mar. 30, 2020) ....................................18, 19

*Virginia Petroleum Jobbers Ass'n v. Fed. Power Comm'n*,
  259 F.2d 921 (D.C. Cir. 1958) ..........................................................................................22

*Williams v. Cap. One Bank, N.A.*,
  No. 24-cv-02032, 2025 WL 843285 (D.D.C. Mar. 18, 2025) ............................................12

*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008) ..............................................................................................................24

*Yusuf v. Vassar Coll.*,
    35 F.3d 709 (2d Cir. 1994)......................................................................................19

## FEDERAL STATUTES

20 U.S.C. § 1681(a) ................................................................................................17

**INTRODUCTION**

In March 2024, student conduct charges were filed against Plaintiff John Doe ("Plaintiff") for bringing false or frivolous charges during internal Title IX proceedings at American University ("American" or the "University").  Over two years later, Plaintiff seeks to "enjoin" the University "from bringing any student conduct charges stemming from either of the underlying Title IX complaints in this matter" and to "stop all other disciplinary proceedings against Plaintiff that stem from the underlying Title IX complaints."  (ECF Nos. 18, 18-2).  In other words, after waiting two years, Plaintiff seeks to "enjoin" something that has already occurred. There is no basis for immediate injunctive relief, and Plaintiff's Motion for a Preliminary Injunction (ECF No. 18) should be denied.

**RELEVANT FACTUAL AND PROCEDURAL HISTORY**

**I.**      **Plaintiff's Title IX Complaint and the Attendant Allegations.**

      **a.**      **Plaintiff Enrolls at American University and Meets Jane Roe.**

Plaintiff met Jane Roe ("Roe") during the fall of his freshman year, when they both lived on the same floor of Letts Hall.[1]  During September of 2021, Plaintiff and Roe agreed to be "Friends with Benefits."[2] (Exhibit A, at 4.)  Plaintiff and Roe engaged in a range of sexual activities, including but not limited to sexual intercourse.  (*Id.*)

---

[1]      The facts discussed herein are based on the Final Investigative Report (the "Final Report") issued by the University Investigator unless otherwise noted.  The Final Report is attached hereto as Exhibit A.

[2]      "A 'friends with benefits' relationship is a relationship in which only sex is expected." *United States v. Raplinger*, No. 5-cr-00049, 2006 WL 3455266, at *4 n.6 (N.D. Iowa Nov. 29, 2006).

**b.      Two Incidents of Alleged Sexual Misconduct**

Two sexual episodes between Plaintiff and Roe are at the core of this case.  The first incident allegedly occurred in November of 2021.  Specifically, in his Complaint, Plaintiff claims that on November 2, 2021, he and Roe were hanging out in his dorm room watching a movie. (Compl. ¶ 15.)  At one point in the evening, Plaintiff avers that Roe left his room, went back to her own dorm, consumed marijuana, and then returned to his room to initiate sexual contact.  (*Id.*)  In Plaintiff's telling, Roe made sexual advances towards him, which he rebuffed because she was under the influence of drugs.  (*Id.*)  However, Plaintiff claims that Roe "rejected" his concerns about her marijuana use, and, because he was "pinned down" and "worn down," he eventually gave in and had sexual intercourse with Roe.  (*Id.*)

More than one month later, on December 7, 2021, Plaintiff and Roe had another sexual encounter.  This time, Plaintiff and Roe purportedly met in Roe's dorm room to discuss their relationship status.  (Exhibit A, at 7.)  Plaintiff told the University Investigator that the encounter quickly turned sexual.  After he hugged Roe from behind, Roe allegedly began rubbing her buttock against his crotch.  (*Id.*)  They then began to make out.  (*Id.*)

What happened next on December 7, 2021 is a matter of dispute.  Plaintiff informed the University Investigator that, just after 9:30 pm, Roe ingested marijuana.  (*Id.*)  Roe allegedly ingested marijuana on two other occasions that night, before Plaintiff attempted to initiate oral sex. (*Id.* at 7-8.)  When Roe rejected his entreaty, he proposed that they cuddle.  (*Id.* at 8.)  The two began to cuddle in the dormitory room's loft bed, with each engaged in petting behavior.  (*Id.*) Around 11:40 pm, Plaintiff maintains that Roe told him to assume a plank position on top of her, and, once he had removed his belt and pants, instructed him to engage in sexual intercourse with her.  (*Id.*)  Plaintiff informed the Investigator that he was not comfortable with this request.  (*Id.*)

2

However, Roe then allegedly grabbed his penis and put it inside her vagina twice, before they engaged in sexual intercourse for several minutes. (*Id.*) Plaintiff states that Roe requested more sex from him, but he rejected her and returned to his own room shortly before midnight. (*Id.*)

Roe recalls the events of December 7, 2021 differently. In Roe's iteration, Plaintiff arrived at her dorm room in an agitated state. (*Id.* at 11.) After the two spoke for a while, she took approximately ten (10) hits of her dab pen, which had marijuana in it. (*Id.* at 12.) Roe asserts that only a few minutes passed between her ingesting of marijuana and Plaintiff's attempt to initiate oral sex. (*Id.*) She states that she told Plaintiff she did not want to perform any sex acts on him, and, shortly thereafter, she blacked out. (*Id.*)

On January 30, 2023, the Office of Equity and Title IX ("ETIX"), commenced an investigation into a complaint filed by Plaintiff. (*Id.* at 2.) Specifically, Plaintiff alleged that Roe subjected him to dating violence and sexually assaulted him on December 7, 2021. (*Id.*) The next month, Roe initiated a counterclaim against Plaintiff, asserting that he sexually assaulted her on December 7, 2021, when he had sex with her while she was incapacitated and unable to consent. (*Id.*) ETIX subsequently consolidated and investigated the complaints in accordance with the University's Title IX Sexual Harassment Policy. (*Id.*)

## II. The University's Title IX Sexual Harassment Policy[3]

The University's Title IX Sexual Harassment Policy (the "Policy") is relevant to nearly all the claims in Plaintiff's Complaint and Motion for Preliminary Injunction. The Policy governs all University faculty, staff, and students. (Exhibit B, at 2.) It also "supersedes any conflicting information in any other University policy with respect to . . . the procedures relating to Title IX Sexual Harassment." (*Id.* at 3.) The Policy sets forth pertinent definitions, outlines which

---

[3]      The complete Policy is attached hereto as Exhibit B.

University employees have a duty to report harassment, and details counseling and medical resources for victims. (*Id.* at 4-8.) Relevant to the above-captioned case, the Policy outlines the process for initiating, investigating, and adjudicating formal complaints. (*Id.* at 11-13.)

Regarding the Formal Complaint process, the Policy explains that the Title IX Coordinator, or any designee, "has the discretion to consolidate multiple Formal Complaints, or allegations related to those complaints." (*Id.* at 14.) Upon the initiation of a Formal Complaint, both the Complainant and Respondent receive written notice of the allegations. (*Id.*) The notice includes details about the University's grievance process, party identification information, as well as the date and location of the alleged incident. (*Id.*) The notice also explains that each party may "have an advisor of their choice" assist them during the process. (*Id.* at 15.)

### i.    Investigatory Stage

The next step in the process is the investigatory stage. The Policy provides that "[d]uring formal resolution proceedings, both the Complainant and Respondent are provided equitable opportunities," to, among other things, "review and present information and evidence." (*Id.*) A University Investigator is accordingly tasked with conducting a "prompt, thorough, fair and impartial investigation." (*Id.*) The University Investigator "will have the burden of proof," insofar as they must gather evidence sufficient to "reach a determination regarding responsibility." (*Id.* at 16.) It is the University Investigator who will "review all information," and "determine the appropriateness, relevance, and probative value of the information developed or received during the investigation." (*Id.*) Throughout the investigation, all parties "will be given equal opportunity to be heard, to present *relevant* inculpatory and exculpatory evidence, and to identify *relevant* fact and expert witnesses." (*Id.* at 17) (emphasis added). The Investigator then submits a Preliminary Investigative Report to the parties, who can review it and submit feedback or additional

4

information.  (*Id.*)  Finally, the Investigator submits a Final Investigative Report prior to any live hearing.  (*Id.* at 18.)

### ii.    Live Hearing

Next, a live hearing is held to determine responsibility.  (*Id.*)  Both the Complainant and Respondent have "equal opportunities to reasonably access the final investigative report and evidence prior to and during the hearing."  (*Id.* at 19.)  A panel presides over the live hearing.  (*Id.*)  Each panelist is a faculty or staff member, and all are trained on the University's policies and procedures, how to conduct a hearing, issues of relevance ("including when questions and evidence about the Complainant's sexual predisposition or prior sexual behavior are not relevant"), as well as how to avoid potential biases.  (*Id.*)

Regarding the Standard of Evidence, to determine responsibility, the allegations against the Respondent must be established "by a Preponderance of the Evidence."  (*Id.* at 20.)  The Policy provides that "[f]ormal rules of evidence will not be applicable in the hearing," and the Hearing chair "may exclude evidence that is not relevant."  (*Id.*)   Parties may submit questions either to the opposing party, or any of the witnesses.  (*Id.* at 21.)  After the hearing, the Hearing Panel will decide, utilizing the preponderance of the evidence standard, whether the Respondent has violated the University's Title IX Sexual Harassment Policy.  (*Id.*)  The Hearing Panel will issue a Written Determination, which includes, among other things, a description of the procedural steps preceding the hearing, as well as findings of fact.  (*Id.*)

### iii.    Sanctioning and Appeals Processes

The Policy explains that, if the Hearing Panel determines that the Respondent is responsible for a policy violation, the sanctioning process then begins.  (*Id.* at 22.)  The sanctioning process is

meant to afford to the Complainant remedies which "restore or preserve equal access to the University's education program or activity." (*Id.*)

The Hearing Panel submits a copy of the Written Determination to the Title IX Coordinator (or designee) so that the Coordinator can then facilitate a Sanctioning Panel. (*Id.*) A three (3) person Sanctioning Panel then reviews the Hearing Panel's Written Determination. (*Id.* at 22-23.) The parties are permitted to submit statements for the Sanctioning Panel's consideration. (*Id.* at 23.) The Sanctioning Panel may question both parties "in order to determine information relevant to a sanction recommendation." (*Id.*) During deliberations, the Sanctioning Panel may consider, among other things, the "nature of the conduct at issue" as well as "protection of the University community." (*Id.* at 24.) The Sanctioning Panel provides a recommendation to the appropriate University Administrator. The University Administrator then issues the sanctioning determination via written outcome letter. (*Id.*)

The Policy also provides for an appeal process. In relevant part, the parties may appeal a responsibility determination and any sanction imposed. (*Id.* at 25.) Appeals must be filed within seven (7) days after a party receives notice of the particular outcome they are challenging. (*Id.*) This means that, if a Respondent is found not responsible, there is only one appellate period for the Complainant to challenge that outcome: the seven days following issuance of a Written Determination. *See* (*id.*). When a Respondent is found to have violated the Policy, the Respondent may only file an appeal after issuance of the sanctions. The Respondent may choose to appeal the responsibility finding, the sanctions imposed, or both. In any event, after an appeal is filed, the party opposing the appeal is afforded the chance to respond. (*Id.*) The appropriate University administrator then reviews the appeal, and issues a decision based on "a review of the underlying

6

record of the investigation and hearing, the appealing party's written appeal statement, [and] any response to that statement by the other party." (*Id.* at 26.)  There are no further appeals.

### III.    Issuance of the Investigative Report and the Hearing Panel.

From January through October of 2023, University Investigator Nicole Fauster conducted a thorough investigation, interviewing both Plaintiff and Roe numerous times, while also conducting several witness interviews. *See* (Panel's Written Determination in *Roe v. Doe*, heretofore labeled Exhibit C).  In July of 2023, Ms. Fauster issued a Preliminary Investigative Report, affording both Plaintiff and Roe nine days to review the Report and offer any objections or corrections.   During this period, both Plaintiff and Roe also had access to the evidence underlying the report.  Then on August 17, 2023, Ms. Fauster issued a Final Investigative Report. (*Id.* at 3); *see also* (Exhibit A).

On October 25, 2023, ETIX held a live hearing in the dispute between Plaintiff and Roe. (Exhibit C, at 3.)  John O'Malley served as the Panel Chair, while Katerina Kulagina and Seth Mancini served as co-panelists (hereinafter the "Hearing Panel").  (*Id.* at 2.)  Following the live hearing, on November 14, 2023, the Hearing Panel issued two Written Determinations: one in *Roe v. Doe*, and another in *Doe v. Roe*.  (*Id.* at 2-5) (*Roe v. Doe*); (Panel's Written Determination in *Doe v. Roe*, heretofore labeled Exhibit D).[4]

In *Roe v. Doe*, the Hearing Panel determined that Roe gave consistent and credible statements regarding the events of December 7, 2021.  (Exhibit C, at 3.)  The Hearing Panel further determined that based on evidence presented to the Panel: (1) Plaintiff had "admitted to being a rapist;" (2) Plaintiff acknowledged that he saw Roe ingest marijuana prior to performing any

---

[4]     Despite consolidation of the investigations, because both Plaintiff and Roe initiated Title IX complaints, the Hearing Panel issued two independent rulings.

sexual acts; and (3) Plaintiff, unlike Roe, was not under the influence of any drugs or alcohol during the disputed events. (*Id.*)   The Hearing Panel found that Plaintiff was responsible, by a preponderance of the evidence, for violating the University's Title IX Policy. (*Id.* at 2-3.)

In *Doe v. Roe*, the Hearing Panel determined that Roe, not Plaintiff, offered consistent and credible statements during the investigation. (Exhibit D, at 3.)   The Hearing Panel further held that Roe was not responsible for either dating violence or sexual assault under the Policy. (*Id.* at 4.)

## IV.    Sanctioning Panel and the Appellate Phase.

On December 1, 2023, in *Roe v. Doe*, ETIX empaneled a Sanctioning Panel. (Sanctions Outcome Letter, attached heretofore as Exhibit E.) After the Sanctioning Panel met, on December 6, 2023, Interim Assistant Vice President of Student Affairs Jeffrey T. Brown, in accordance with the Policy, issued a Sanctions Outcome Letter. (Exhibit E.)  The following sanctions were imposed against Plaintiff: (1) suspension from the University until May of 2025; (2) removal from campus housing; and (3) a no contact order regarding Roe. (*Id.* at 2-3.)  The Sanctions Outcome Letter also explained the process governing Plaintiff's eventual return to campus, as well as his appeal rights. (*Id.* at 3.)  The Sanctions Outcome Letter explained that Plaintiff could appeal both the Hearing Panel's Written Determination, as well as the sanctions decision. (*Id.*); *see also* (Exhibit C, at 5).

Plaintiff then filed his appeal in *Roe v. Doe*.  *See* ("Appeal of Outcome and Sanction" attached heretofore as Exhibit F).  In his appeal, Plaintiff challenged both the outcome (the determination that he violated the University's Policy), as well as the attendant sanctions.  *See* (*id.*).  On February 14, 2024, Dr. Raymond Ou, the Vice President of Student Affairs, reviewed Plaintiff's appeal and issued a written decision.  (Dr. Ou's Appeal Decision, attached heretofore

as <u>Exhibit G</u>.)  Dr. Ou rejected Plaintiff's appeal, and in so doing, explained why each of his arguments were unpersuasive.  (*Id.*)  Plaintiff's suspension immediately commenced.  (*Id.* at 3.)  That suspension ended in May of 2025.  *See* (ECF No. 9-1 at 5-6) (discussing the three-semester suspension).

## V.   **Student Conduct Investigation**

On March 15, 2024, ETIX referred Plaintiff to the University's Office of Student Accountability and Restorative Practices ("OSARP").  *See* (OSARP Referral, labeled heretofore as <u>Exhibit H</u>).  ETIX informed OSARP of possibly false or frivolous Title IX charges filed by Plaintiff against Roe.  (*Id.*)  On March 19, 2024, OSARP initiated a conduct charge against Plaintiff, charging him with filing a false Title IX report.  (*Id.* at 3.)  In the charge, OSARP outlined the student conduct disciplinary hearing process.  (*Id.*)  OSARP explained to Plaintiff that he could not return to the University until completion of the disciplinary hearing process.  (*Id.* at 2-3.)  Plaintiff served his full suspension through May 2025 but has not attempted to return to the University – accordingly, these student conduct charges remain pending.  Compl. ¶ 107.

This lawsuit followed.

## VI.   **Procedural History**

About six months after the end of this suspension period, on November 5, 2025, Plaintiff filed the above-captioned case in the United States District Court for the District of Columbia.  (ECF No. 1.)  That same day, Plaintiff also submitted a motion to proceed under a pseudonym.  (ECF No. 2.)  Plaintiff did not seek to effectuate service.  On March 4, 2026, Plaintiff filed a motion to seal the entire case file.  (ECF No. 5.)

On March 10, 2026, the University waived service.  (ECF No. 6.)  Then, on March 30, 2026, Plaintiff filed a Motion for a Preliminary Injunction, as well as an attendant Memorandum

and supporting exhibits.  (ECF Nos. 9 through 9-20.)  On March 31, 2026, Chief Judge Boasberg

granted in part and denied in part Plaintiff's pseudonym and sealing motions.  (ECF No. 10.)

On April 13, 2026, Plaintiff filed a Motion for Leave to file an Amended Motion for

Preliminary Injunction.  (ECF No. 17.)  He attached an Amended Motion (ECF No. 17-2), as well

as an amended Memorandum in Support of the Motion.  (ECF No. 17-6).  The Court docketed the

amended Motion ("Motion" or "Mot.") (ECF No. 18) and amended Memorandum in Support of

the Motion ("Memorandum" or "Mem.") (ECF No. 18-1) the next day.

## LEGAL STANDARD

"The purpose of a preliminary injunction is merely to preserve the relative positions of the

parties until a trial on the merits can be held."  *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395

(1981).  It "is an extraordinary remedy that should be granted only when the party seeking the

relief, by a clear showing, carries the burden of persuasion."  *Cobell v. Norton*, 391 F.3d 251, 258

(D.C. Cir. 2004).  "To prevail on a motion for a preliminary injunction, the moving party must

show (1) that [it] is likely to succeed on the merits, (2) that [it] is likely to suffer irreparable harm

in the absence of preliminary relief, (3) that the balance of equities tips in [its] favor, and (4) that

an injunction is in the public interest."  *Conserve Sw. Utah v. U.S. Dep't of the Interior*, No. 26-cv-

00317, 2026 WL 569034, at *8 (D.D.C. Mar. 1, 2026) (citation modified).

## I.    PLAINTIFF'S CLAIMS ARE UNLIKELY TO SUCCEED ON THE MERITS.

As to the first element, "a key issue—often the dispositive one—is whether the movant has

shown a substantial likelihood of success on the merits."  *Greater New Orleans Fair Hous. Action*

*Ctr. v. U.S. Dep't of Hous. & Urb. Dev.*, 639 F.3d 1078, 1083 (D.C. Cir. 2011).  The Court may

decline to consider the other three (3) factors if it determines that the Plaintiff has not demonstrated

a likelihood of success on the merits.  *See Arkansas Dairy Co-op Ass'n, Inc. v. U.S. Dep't of Agr.*,

10

573 F.3d 815, 832 (D.C. Cir. 2009) (explaining that movant was unlikely to succeed on the merits and therefore "this court need not proceed to review the other three preliminary injunction factors"). After all, "[a] preliminary injunction is an extraordinary remedy that may only be awarded upon a *clear showing* that the plaintiff is entitled to such relief." *Nat'l Tr. for Historic Pres. in the United States v. Nat'l Park Serv.*, No. 25-cv-04316, 2026 WL 533420, at *3 (D.D.C. Feb. 26, 2026) (citation omitted).

### a. Plaintiff's Three Cited Claims Each Lack Merit.

In his Memorandum, Plaintiff claims that he is likely to succeed on the merits of three of claims: (1) Count 1.5, his Breach of Contract theory based on a purported bias by the Hearing Panel; (2) Count 1.6, his Breach of Contract theory based on a supposed lack of evidentiary access during the appellate phase of the proceedings; and (3) his Title IX Erroneous Outcome claim. Plaintiff is wrong.[5]

### b. Plaintiff Is Not Likely to Succeed on Count 1.5: Breach of Contract Based on the Conduct of the Hearing Panel

#### i. Breach of Contract Under District of Columbia Law.

To plausibly allege breach of contract under District of Columbia law, a plaintiff must plead: "'(1) a valid contract between the parties; (2) an obligation or duty arising out of the contract; (3) a breach of that duty; and (4) damages caused by breach.'" *Goddard v. City Univ. of Seattle*, No. 25-cv-1881, 2026 WL 632484, at *2 (D.D.C. Mar. 6, 2026) (citing *Tsintolas Realty*

---

[5]     Plaintiff's argument is also curious on its face. Plaintiff's Motion for Preliminary Injunction seeks to enjoin the student conduct proceedings against him. However, each of the claims discussed herein deal exclusively with the underlying Title IX proceedings, for which Plaintiff was afforded appellate rights, lost, and served the accordant suspension. In Count II, Plaintiff alleges that the University violated the Student Conduct Code (which is the proceeding he is challenging in the instant motion). Interestingly, Plaintiff is not arguing that he is likely to succeed on the merits of that claim.

*Co. v. Mendez*, 984 A.2d 181, 187 (D.C. 2009)). "A valid contract exists between parties where there are both (1) agreement as to all material terms, and (2) intention of the parties to be bound." *Williams v. Cap. One Bank, N.A.*, No. 24-cv-02032, 2025 WL 843285, at *3 (D.D.C. Mar. 18, 2025) (citation omitted). "In order for a contract to be enforceable, it must be sufficiently definite as to its material terms." *Duffy v. Duffy*, 881 A.2d 630, 634 (D.C. 2005) (internal quotations omitted).

"Under D.C. law, as is generally true, '[f]or an enforceable contract to exist, there must be both (1) agreement as to all material terms; and (2) intention of the parties to be bound.'" *Jack Baker, Inc. v. Off. Space Dev. Corp.*, 664 A.2d 1236, 1238 (D.C. 1995) (citation omitted). "In addition, mutuality of obligation must exist." *Eastbanc, Inc. v. Georgetown Park Assocs. II, L.P.*, 940 A.2d 996, 1002 (D.C. 2008). "For a contract to be enforceable, each party must undertake to do something [the] party otherwise is under no legal obligation to do, or to refrain from doing something [the] party has a legal right to do." *Id.* at 1003 (citation modified).

### ii.    Count 1.5 is Likely Subject to Dismissal, and, therefore, Plaintiff is Unlikely to Succeed on the Merits.

Plaintiff's Count 1.5 is tied to the following Policy provision: "[t]he Hearing Panel must be impartial and free from bias or conflict of interest." (Policy at 19.)  Plaintiff maintains that the Hearing Panel defied this mandate because it found Roe credible and consistent.  (Memo. at 19-20.)  Plaintiff contends that Roe "changed her story" when speaking to the University Investigator, and this was an inconsistency that the Hearing Panel failed to recognize, which somehow evidences bias.  (*Id.* at 20-21.)  This argument is meritless.

As an initial matter, Plaintiff cites aspirational Policy language that is insufficiently vague and thus unenforceable as a matter of contract law.  Some examples are instructive.  In *Doe v. California Institute of Technology*, a court determined that language in Caltech's sexual

misconduct policy, promising, among other things, the use of "impartial investigators," was insufficiently definite to give rise to an enforceable contractual obligation. *See Doe v. California Inst. of Tech.*, No. 19-cv-01005, 2019 WL 8645652 at *5 (C.D. Cal. Aug. 13, 2019); *see also Kashmiri v. Regents of Univ. of California*, 67 Cal. Rptr. 3d 635, 652 (Cal. Ct. App. 2007) ("courts have not interpreted general and vague declarations or promises in university publications as creating contractual obligations"). Similarly, in *Doe v. DiStefano*, the court reviewed breach of contract allegations by John Doe, a former student at the University of Colorado-Boulder. *See Doe v. DiStefano*, No. 18-cv-1462, 2019 WL 1254943 at *1 (D. Colo. Mar. 19, 2019). In so doing, the court explained that "general commitments to fairness and other ethical aspirations are generally too vague to be legally enforceable." *Id.* at 3. And finally, in *Doe v. University of Dayton*, a court analyzed a breach of contract claim against the University of Dayton and an investigator. *Doe v. Univ. of Dayton*, No. 17-cv-00134, 2018 WL 1393894 at *6-7 (S.D. Ohio Mar. 20, 2018). The plaintiff's claim, based on the allegation that the "University failed to act in a 'fair' and 'impartial' manner," was dismissed, because "[v]ague, hortatory pronouncements in a contract are insufficient to support a breach of contract claim." *Id.* at *7 (citation omitted).

The cases cited above support the conclusion that Doe's claim is unlikely to be successful. Doe cites a meaningful but aspirational statement of impartiality and fairness, and then asserts that because he perceives the proceedings as having not been "impartial," there must have been bias, and therefore there was a breach of contract. This position is unsupportable, as evidenced by the cited cases. Count 1.5 is likely to be dismissed at the Motion to Dismiss stage, and, therefore, Plaintiff is not likely to succeed on the merits as to this claim.

There is a second reason that Count 1.5 is likely to be dismissed at the pleading stage. Courts regularly hold that "[i]t is not the role of the federal courts to set aside decisions of school

13

administrators which the court may view as lacking in wisdom or compassion." *Plummer v. Univ. of Houston*, 860 F.3d 767, 772 (5th Cir. 2017); *see also Gomes v. Univ. of Maine Sys.*, 365 F. Supp. 2d 6, 13 (D. Me. 2005) ("the law does not allow this Court to retry the University's disciplinary proceeding"); *accord Doe v. The Trs. of the Univ. of Pennsylvania*, 270 F. Supp. 3d 799, 814 (E.D. Pa. 2017) (explaining that when a policy provides for "fair" hearings, this means "hearings and investigations that complied with the more specific provisions of the Disciplinary Procedures concerning hearings and investigations" not any "additional, unspecified 'fairness' requirements"); *Doe v. Oregon State Univ.*, 614 F. Supp. 3d 847, 862 (D. Or. 2022) ("Plaintiff's arguments amount to little more than second guessing of OSU's decision and do not sufficiently state a claim for breach of contract").

At bottom, Doe's argument regarding perceived bias is merely a disagreement with the Hearing Panel's credibility determinations and conclusions.  Doe could have challenged the members of the Hearing Panel for bias prior to the live hearing, (Exhibit B, at 19-20), but he did not.  Doe could have appealed the Hearing Panel determination based on perceived bias, (Exhibit E, at 3), but he declined to do so.  Doe's belated bias argument is effectively: "I disagree with the outcome, so the only way to explain that outcome is that the Panel must have been biased."  This *ipso factor* argument is meritless on its face.

The University respectfully submits that the Court should also consider the broader ramifications of Doe's argument.  In effect, permitting Title IX respondents who are found responsible for sexual misconduct to sue under general fairness principles—simply because they disagree with the outcome—would turn courts into pseudo-school administrators.  Article III judges would be called upon to dig into the details of every single Title IX proceeding, of which

14

they had no part, to try and discern whether a process was generally "fair." Nothing in Title IX or its interpreting authorities contemplates such a role for courts and judges.

Ultimately, Doe does not argue that the Hearing Panel declined to afford him the requisite procedural protections. He simply takes issue with the investigation's outcome. Such a disagreement is not tantamount to Breach of Contract. Count 1.5 is likely to be dismissed at the pleading stage, and, therefore, Plaintiff is unlikely to prevail on the merits.

### iii.    Count 1.6 is Unlikely to Succeed on the Merits.

Plaintiff next claims that Count 1.6, his Breach of Contract claim based on an alleged denial of evidentiary access, is likely to succeed on the merits. Specifically, he writes that during the "first appellate period," the University did not provide him access to the evidence gathered during the investigation. (Memo. at 21.)[6]

Plaintiff received evidentiary access during what he calls the "first" appellate period. Plaintiff concedes as much, writing that "[t]he University did not allow access to evidence during the *majority* of the first appeal period." (Memo. at 21) (emphasis added). He further explains that "[s]ince access to that evidence is a foundational requirement, it meant that Mr. Doe *effectively* did not get an appeal period." (*Id.*) The qualifying language in Plaintiff's Memorandum reflects the fatal flaw with his argument. ETIX afforded him until November 27, 2023 to file his appeal in *Doe v. Roe*, and he concedes that on November 27, 2023, he had access to the relevant evidence. Compl. ¶ 84; *see also* (Annexstein Message Informing Plaintiff of Deadline, heretofore labeled Exhibit I). The Policy provides that "[a]ll written materials considered by the appropriate university administrator will be subject to inspection by the appealing party/parties." (Exhibit B,

---

[6]    The University interprets Doe's position to be that he did not receive access to evidence during the sole appellate period in *Doe v. Roe*.

at 26.)   It does not, however, afford unlimited evidentiary access at the Complainant or Respondent's convenience. Plaintiff does not have a right to insert terms or conditions into the Policy that do not exist.[7]  *See generally Naumov v. McDaniel Coll., Inc.*, No. 15-cv-0482, 2017 WL 1214406, at *9 n.7 (D. Md. Mar. 31, 2017) ("Plaintiff alleges that the Defendants' delivery of the results of the Grievance Committee proceeding by email and not in person violated the Title IX Policy, but points to no provision of the Title IX Policy requiring in-person delivery"); *Doe v. Brown Univ.*, 166 F. Supp. 3d 177, 191, 194-95 (D.R.I. 2016) (observing that "courts may not read terms into the contract" and rejecting plaintiff's breach of contract claim based on a-textual allegations of procedural deviations).

Plaintiff was able to view the evidence during the first appellate period.  Having reviewed that evidence, he chose not to file an appeal at that point in *Doe v. Roe*, instead focusing on his submission to the Sanctioning Panel.  (ECF No. 18-3 at 5) ("Priority was given to the sanctioning statement over writing an appeal").  Plaintiff's strategic choice does not change the facts.  He had evidentiary access.  That it was not as early as he may have liked is of no matter, and certainly not a breach of contract.

Count 1.6 is unlikely to be successful on the merits.   Rather, it is likely to be dismissed at the pleading stage.  This Court should not credit Plaintiff's allegations to the contrary.

---

[7]     It also bears noting that a party requesting access to the underlying evidence must make clear that they are doing so for the purpose of appealing an adverse ruling.  Plaintiff informed Ms. Annexstein that he wanted evidentiary access for his newly appointed advisor of choice and/or for purposes of drafting his sanctioning statement.  (ECF No. 18-18.)  Plaintiff made no reference to any appeal in *Doe v. Roe* during this correspondence.

### c.      Count 4.1: The Title IX Erroneous Outcome Claim

#### i.      Title IX Erroneous Outcome Claim.

Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."  20 U.S.C. § 1681(a). "Title IX seeks to eliminate sex-based discrimination in education programs that receive federal funds."  *Doe v. Columbia*, 151 F.4th 435, 445 (D.C. Cir. 2025).

"[F]ederal courts have recognized four theories that a plaintiff may use to attack a university disciplinary proceeding on grounds of gender bias under Title IX: (1) erroneous outcome, (2) selective enforcement, (3) deliberate indifference, and (4) archaic assumptions."  *Doe v. Am. Univ.*, No. 19-cv-03097, 2020 WL 5593909, at *6 (D.D.C. Sept. 18, 2020) (citation modified).  To establish an Erroneous Outcome claim, plaintiffs must provide (1) "particular facts sufficient to cast some articulable doubt on the outcome of the disciplinary proceeding;" and (2) "circumstances showing that gender bias was a motivating factor behind the erroneous finding." *Doe v. George Washington Univ.*, 366 F. Supp. 3d 1, 11 (D.D.C. 2018) (citations omitted).

#### ii.      Plaintiff's Erroneous Outcome Claim is Threadbare.

Plaintiff claims that the decision against him was erroneous and rooted in gender bias, which he ties to an alleged "public pressure campaign that was fueled, in part, by individuals with private interests in the outcome of this case."  (Memo. at 23.)  Plaintiff cites the contents of student publications and opines about the supposed anti-male climate on campus.  He also cites to public statements former Assistant Secretary of Education for Civil Rights Catherine Lhamon offered during the Obama Administration, years before he was even in college.  Plaintiff then writes that if members of the Hearing Panel "had any contact with the University community, campus, or

17

media, they would have been bombarded with images, stories, and events showing women detailing grievances with the University's handling of the Title IX complaint process, ripening their implicit biases of what someone who gets raped looks like." (*Id.* at 24.)  These assertions, which are purely speculative, do not plausibly allege an erroneous outcome claim.  Based on his conclusory pleadings, not only is Plaintiff's erroneous outcome unlikely to succeed on the merits, but it is unlikely to advance past the pleading stage.

A Plaintiff alleging erroneous outcome also must specifically establish that "gender bias was a motivating factor behind the erroneous finding." *George Washington Univ.*, 366 F. Supp. 3d at 11.  Other than conclusory statements, Platiniff does not and cannot do so. *See, e.g.*, *Doe v. Marymount Univ.*, 297 F. Supp. 3d 573, 585 (E.D. Va. 2018) ("Stated differently, a Title IX plaintiff successfully alleges gender bias if he or she points to statistical evidence of gender bias in the University's decision making, policies and procedures that are designed to reach gender-specific outcomes, and/or statements by university officials evidencing gender bias").

*Robinson v. Howard University* is instructive.   In *Robinson*, the Court dismissed an erroneous outcome claim when the plaintiff failed to provide "statements by members of the disciplinary tribunal, statements by pertinent university officials, or patterns of decision-making that might show the influence of gender or reflect bias by members of the tribunal." 335 F. Supp. 3d 13, 28 (D.D.C. 2018) (citation modified).  Rather, the Court dismissed the claim at the pleading stage because "[a]llegations of a procedurally or otherwise flawed proceeding that has led to an adverse and erroneous outcome combined with a conclusory allegation of gender discrimination is not sufficient to survive a motion to dismiss." *Id.* at 27 (citation omitted); *see also Verdu v. Trs. of Princeton Univ.*, No. 19-cv-012484, 2020 WL 1502849, at *4 (D.N.J. Mar. 30, 2020) ("Allegations that may support gender bias include 'statements by members of the disciplinary

18

tribunal, statements by pertinent university officials, or patterns of decision-making that also tend to show the influence of gender'") (quoting *Yusuf v. Vassar Coll.*, 35 F.3d 709, 715 (2d Cir. 1994)); *Doe v. Coastal Carolina Univ.*, 522 F. Supp. 3d 173, 178 (D.S.C. 2021) ("Bias can be shown through evidence such as statements by members of the disciplinary tribunal, statements by pertinent university officials, or patterns of decision-making that also tend to show the influence of gender") (citations omitted).

Similarly, multiple courts have rejected the premise that OCR statements,[8] or other "public pressure," is enough to support an erroneous outcome claim.  *See, e.g.*, *Gischel v. Univ. of Cincinnati*, 302 F. Supp. 3d 961, 973 (S.D. Ohio 2018) ("a conclusory allegation that the Dear Colleague Letter induced a university to discriminate against male students so as avoid the loss of federal funds is not sufficient evidence to state a plausible claim of gender bias"); *Doe v. Coll. of Wooster*, 243 F. Supp. 3d 875, 887 (N.D. Ohio 2017) ("allegations that Wooster's more stringent stance against campus sexual assault is the result of pressure exerted by the Department of Education through the issuance of the Dear Colleague Letter fail to support a plausible inference of gender discrimination"); *Doe v. Trs. of Bos. Coll.*, 892 F.3d 67, 92 (1st Cir. 2018) ("the Does' argument that B.C. administrators were influenced by outside pressure, in particular the U.S. Department of Education's April 2011 'Dear Colleague' Letter, is both conclusory and meritless"). Doe's conclusory allegations on this point in this case similarly should not be credited.

---

[8]     In his Complaint, Plaintiff writes that, while the University's Title IX investigation was ongoing, "Ms. Lhamon had reclaimed her post atop OCR and was once again in charge of pressuring universities across the country to follow her interpretation of federal laws and regulations.  She made clear her priority was that women who reported being raped were not being failed, implicitly telling universities that men were not to be treated equally, as they were not of notable concern for her."  Compl. ¶ 150.  Not only is Plaintiff asserting decision-maker gender bias based on comments made several years prior by a single Department of Education official, he is asking the Court to find that this same official's "implicit" goals somehow caused the University to discriminate against him.  This is facially implausible.

Plaintiff's only real argument in favor of gender bias is that the Hearing Panel found Roe, not him, to be credible. *See* (Memo. at 27) ("The decision-makers should not have found Ms. Roe consistent, and due to their own weighing of the claims, could not have found her credible"); ("In this analysis, it does not matter if Mr. Doe's claims are accurate because the argument here is that decision-makers erred in the judgement finding Ms. Roe credible and consistent, not in finding Mr. Doe not credible and inconsistent"). Plaintiff can repeat this threadbare conclusion dozens of times, but it will not alter the bottom line: his disagreement with the outcome of the investigation does not establish gender bias by the University or any of its officials.

None of the three claims Plaintiff relies upon to support his preliminary injunction motion is likely to succeed on the merits. In fact, all three claims are likely to be dismissed at the pleading stage. This factor weighs heavily against issuance of a preliminary injunction.

## II.    PLAINTIFF HAS NOT AND WILL NOT SUFFER IRREPARABLE HARM.

### a.    The Definition of Irreparable Harm.

On the second element, the D.C. Circuit "has set a high standard for irreparable injury." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006). "The party seeking a preliminary injunction must make two showings to demonstrate irreparable harm." *League of Women Voters of United States v. Newby*, 838 F.3d 1, 7 (D.C. Cir. 2016). First, "the injury must be both certain and great; it must be actual and not theoretical." *Cannon v. Allied Universal Sec. Servs.*, No. 25-cv-01794, 2025 WL 3516157, at *1 (D.D.C. July 28, 2025) (citation omitted). The injury must also be "of such imminence that there is a clear and present need . . . to prevent it." *Am. Fed'n of Lab. & Cong. of Indus. Organizations v. Dep't of Lab.*, No. 25-cv-00339, 2025 WL 1783899, at *10 (D.D.C. June 27, 2025) (citation modified). "Second, the harm must be beyond remediation." *Newby*, 838 F.3d at 8 (citation omitted).

"The insistence on irreparable harm follows necessarily from the purpose of a preliminary injunction. Without the possibility of such harm occurring between the motion for preliminary injunction and a disposition on the merits, a preliminary injunction would have no role to serve; the object of the controversy would remain static." *Am. Fed'n of Lab. & Cong. of Indus. Organizations*, 2025 WL 1783899, at *10 (citation modified). "[A] 'movant's failure to show any irreparable harm is . . . grounds for refusing to issue a preliminary injunction, even if the other three factors . . . merit such relief." *Clevinger v. Advoc. Holdings, Inc.*, 134 F.4th 1230, 1236 (D.C. Cir. 2025) (citing *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297).

b.      **Plaintiff Cannot Establish Irreparable Harm.**

Plaintiff has not established that he has endured or is currently suffering from irreparable harm. In his Memorandum, Plaintiff cites two "harms." First, he writes that he is currently suffering from "reputational harm," because he is forced to avoid potential social interactions where someone could ask him about the progress of his schooling. (Memo. at 28-29.) Plaintiff claims that this reputational harm has also allegedly impacted his ability to transfer to another institution of higher learning to finish his undergraduate degree. (*Id.* at 29.) Specifically, he asserts that "[t]he University's ongoing accusations of lying have blocked him from even considering entering into a contract with another university." (*Id.*) As his second "harm," Plaintiff cites "the loss of educational opportunity which impacts future income." (*Id.* at 30.) These injuries are too speculative and inadequate as a matter of law. Each will be addressed in turn.

21

      **c.**        **Plaintiff's Invocation of Reputational Harm is Unavailing.**

      **iii.**        **Plaintiff's Reputational Harm and Alleged Related Emotional**
                    **Suffering Does Not Constitute Irreparable Harm.**

Plaintiff's purported reputational harm is not irreparable.  As this Court explained, "perhaps the single most important prerequisite for the issuance of a preliminary injunction is a demonstration that if it is not granted the applicant is likely to suffer irreparable harm *before a decision on the merits can be rendered*." *Sierra Club v. United States Army Corps of Eng'rs*, 990 F. Supp. 2d 9, 38 (D.D.C. 2013) (emphasis added) (internal quotations omitted).  "The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm." *Virginia Petroleum Jobbers Ass'n v. Fed. Power Comm'n*, 259 F.2d 921, 925 (D.C. Cir. 1958).[9]  Further, "in this Circuit, emotional distress, no matter how sincere, cannot support a preliminary injunction without a showing that the feared event giving rise to that distress is likely to occur." *All. for Retired Americans v. Bessent*, 770 F. Supp. 3d 79, 110 (D.D.C. 2025).

Plaintiff's assertion of irreparable reputational harm is deficient for two reasons.

***First***, Plaintiff's argument is facially amorphous and speculative.  Plaintiff asserts that "the University has forced Plaintiff to lie or avoid people he loves because how can he possibly explain that an institution lied about him being a rapist, accused him of lying about being raped, and are instituting an effective global ban on finishing his bachelor's degree." (Mem. at 28-29.)  However,

---

[9]     As one Judge in this District explained, the Court should ask two (2) questions: (1) is the cited harm such that "absent intervention now, the court would not be able to remedy down the line?" *Am. Fed'n of Lab. & Cong. of Indus. Organizations*, 2025 WL 1783899, at *10.  "Or is it that the court's ultimate remedial powers will remain intact even if the harm—however unfortunate—continues?" *Id.*  The University submits that Plaintiff's reputational harm falls into the latter bucket.

22

the Title IX proceedings have concluded, and OSARP **has already initiated** Student Conduct Charges against him.  Therefore, the "feared event[s] giving rise to that distress," *Bessent*, 770 F. Supp. 3d at 110, are in the past.  It is unclear how Plaintiff's emotional distress from past events can be remedied or "prevented" by his motion for forward-looking preliminary injunctive relief.

**Second**, despite not discussing it in the present motion, Plaintiff has initiated a DCHRA discrimination claim.  Compl. ¶¶ 182-84 (Plaintiff's DCHRA claim).  DCHRA claimants, if they prevail, can recover emotional distress damages.  *Campbell-Crane & Assocs., Inc. v. Stamenkovic*, 44 A.3d 924, 944 (D.C. 2012) (plaintiffs may recover emotional distress damages under the DCHRA). Because Plaintiff could theoretically recover monetary damages for his emotional distress, his harm is not "irreparable."  *See, e.g., Santos v. Collins*, No. 24-cv-01759, 2025 WL 1823471 at *8 (D.D.C. Feb. 26, 2025) (plaintiff's emotional harms were not irreparable, because "money damages are available" for those harms under one of her causes of action).

### iv.    Plaintiff Speculates that Pending Student Conduct Charges Could Harm His Ability to Enroll at Another Institution.

Plaintiff also claims that "[t]he reputational harm also affects Plaintiff's ability to enroll at a new university."  (Memo. at 29.)  In support of his position, Plaintiff asserts that "[t]he University's ongoing accusations of lying have blocked him from even considering entering into a contract with another university." (*Id.*)  This injury is facially speculative and therefore inadequate as a matter of law.

To obtain a preliminary injunction, Plaintiff must prove that his cited injury is "actual and not theoretical."  *Cannon*, No. 25-cv-01794, 2025 WL 3516157, at *1.  Plaintiff cannot do so.  To the contrary, Plaintiff concedes that he has not even **considered** enrolling at another university due to the pending student conduct (OSARP) charges.  (Memo. at 29.)  Plaintiff's transcript contains no reference to the OSARP charge, nor to any student conduct proceedings.  (Plaintiff's Transcript,

heretofore labeled <u>Exhibit J</u>.)  Plaintiff has no idea whether or not a new University will accept him for admission under these conditions.  Any suggestion in that regard is theoretical, at best.

Plaintiff is not alleging that he cannot get into another university due to any action (or inaction) by the University.  Rather, he asks the Court to believe that, because he **might** not be able to earn admission to an unnamed college or university at some point in the future – even though he has not even tried to do so –  this somehow constitutes an actual imminent injury.  This argument is inadequate as a matter of law, and should be rejected out of hand.  *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) (explaining that to obtain a preliminary injunction, the movant must demonstrate more than the mere "possibility" of irreparable harm); *Kocsis v. Fla. State Univ. Bd. of Trs.*, 788 F. App'x 680, 685 n.3 (11th Cir. 2019) (rejecting request to suspend professor who harassed student from campus when the plaintiff "has not indicated any intent to return" to Florida State); *Doe #1 v. Syracuse Univ.*, No. 18-cv-00496, 2018 WL 3193199, at *3 (N.D.N.Y. June 28, 2018) (denying request for injunctive relief when plaintiffs "have not come forward with any evidence that would support a finding that, if they were to submit an annotated transcript as part of their applications to transfer to another institution, the institution would deny their application because of that notation").

### d. The Loss of Educational Opportunities Is Compensable as Well, and Therefore Cannot be Considered Irreparable.

As his second "irreparable" harm, Plaintiff cites "the loss of educational opportunity which impacts future income." (Memo. at 30.)  Put simply, such harm is not irreparable because Plaintiff seeks to remedy speculative, non-concrete relief.  And in any event, if Plaintiff prevails, any purported financial injury can be remedied by a final judgment on the merits.

As discussed *supra*, Plaintiff's Motion for Preliminary Injunction cites only speculative harms.  Plaintiff notes that it has been "five (5) normal semesters, not including summer and winter

sessions, or more than half of a typical four (4)-year university education" since the University suspended him.  (Memo. at 30.)  He then postulates that "[t]here is no way of knowing what the past and future delay will cost." (*Id.*)  Plaintiff writes that "if an individual is not in good standing with their previous university after a suspension, they will *seemingly* not even be *considered* for an application at the university of Plaintiff's choosing." (*Id.* at 29) (emphasis added).  In other words, Plaintiff speculates that he is being deprived of educational opportunities, despite not actually alleging that he has tried to apply or been denied from other schools.  Plaintiff cannot manufacture irreparable harm by declining to apply to other institutions and opining that these unnamed institutions **could** view his application negatively.  *See Syracuse Univ.*, 2018 WL 3193199, at *3; *see also Chaplaincy of Full Gospel Churches*, 454 F.3d at 298 (holding that the denial of "possible" job promotions was "an injury is far too speculative to warrant preliminary injunctive relief").

Second, educational gaps can be remedied by monetary damages.  For example, in *Doe v. Illinois*, the Court concluded that a plaintiff could not establish irreparable harm when he cited as harms his "loss of a degree, the gap in his education, or the inclusion of sexual misconduct and harassment findings on his permanent record." *Doe v. Univ. of Illinois*, No. 23-cv-2280, 2024 WL 1117076, at *6 (C.D. Ill. Mar. 13, 2024).  The Court explained that while "Plaintiff will certainly face some harm, these are precisely the types of harm that monetary damages can address." *Id.*; *see also Doe v. Trs. of Indiana Univ.*, No. 20-cv-02006, 2020 WL 7028030 at *7 (S.D. Ind. Nov. 30, 2020) (damages would be adequate remedy for educational gaps).  Additionally, in *Doe v. Texas A&M University*, the Court observed that "a delay in education is not irreparable harm," because such delays (and the deprivation of on campus leadership opportunities), are compensable by monetary damages after a trial on the merits.  *See Doe v. Texas A&M Univ.*, No. 20-cv-04332,

2021 WL 257059, at *8 (S.D. Tex. Jan. 26, 2021); *see also Hodges v. Bd. of Supervisors of Louisiana State Univ. & Agric. & Mech. Coll.*, No. 20-cv-01456, 2020 WL 5017665, at *4 (E.D. La. Aug. 25, 2020) (explaining that "[n]umerous courts have reached the same conclusion in similar cases involving delayed education and potential reputational damage, finding that the delay was compensable and the reputational damage was compensable and/or speculative"); *Doe v. Princeton Univ.*, No. 20-cv-04352, 2020 WL 2097991, at *7 (D.N.J. May 1, 2020) ("If Plaintiff prevails on the merits of his underlying claims and is reinstated to Princeton, he will have suffered a delay in his education, analogous to a suspension, which can be remedied through monetary compensation").

This case is analogous to the cases cited above. Plaintiff may endure harm due to delays in obtaining his bachelor's degree. But any such harms are compensable by monetary damages, and, therefore, do not support Plaintiff's position that he is entitled to preliminary injunctive relief. *See, e.g.*, *GEO Specialty Chemicals, Inc. v. Husisian*, 923 F. Supp. 2d 143, 148 (D.D.C. 2013) (explaining that it is "well-settled that economic loss does not, in and of itself, constitute irreparable harm because it is merely economic in character and not sufficiently grave enough to warrant emergency injunctive relief") (citation omitted).

> **e.      Plaintiff's Substantial Delay in Seeking Injunctive Relief Demonstrates that There is Not an Imminent Need for the Court to Provide a Remedy.**

Here, Plaintiff initiated this case in November of 2025. He waited nearly five months to file his initial Motion for a Preliminary Injunction. (ECF No. 9.) "[U]ntimely filings may support a conclusion that the plaintiff cannot satisfy the irreparable harm prong." *Gordon v. Holder*, 632 F.3d 722, 725 (D.C. Cir. 2011); *see also Maldonado v. D.C.*, No. 10-cv-01511, 2019 WL 6877913, at *3 (D.D.C. Dec. 16, 2019) ("plaintiffs' extensive delay in seeking a preliminary injunction

weighs heavily against a finding of irreparable harm"); *Santos*, 2025 WL 1823471 at \*8 (ninety day delay in filing motion for preliminary injunction cuts against finding of irreparable harm).[10]

This makes good sense, because if Plaintiff can wait months to seek injunctive relief, that strongly suggests that no cited injury is imminent, nor is there any "clear and present need" to prevent said injury. *Am. Fed'n of Lab. & Cong. of Indus. Organizations*, 2025 WL 1783899, at \*10. Regarding imminence, "[a]n unexcused delay in seeking extraordinary injunctive relief may be grounds for denial because such delay implies a lack of urgency and irreparable harm." *Newdow v. Bush*, 355 F. Supp. 2d 265, 292 (D.D.C. 2005). In *Fund for Animals v. Frizzell*, the D.C. Circuit, while conducting the irreparable harm inquiry, held that a forty-four (44) day delay in initiating an action and seeking injunctive relief was "inexcusable" and militated against a finding of irreparable harm. 530 F.2d 982, 987-88 (D.C. Cir. 1975). In *Mylan Pharmaceuticals v. Shalala*, the plaintiff, a pharmaceutical company, waited several months to seek a preliminary injunction. 81 F. Supp. 2d 30, 44 (D.D.C. 2000). The Court determined that delays of anywhere between two and eight months counsel against an irreparable harm finding. *See id.*

The five month delay further confirms that Plaintiff's cited harms are not imminent, nor irreparable. They are also, as explained above, speculative and theoretical. The Court should deny Plaintiff's Motion for a Preliminary Injunction.

---

[10]    Plaintiff's suspension ended in May of 2025. Plaintiff writes that there are "two windows to transfer to another college each year, including one that ends on June 1, 2026." (ECF No. 18-1 at 6.) Yet, Plaintiff disregarded the first window (which presumably closed in the early fall) and seeks an injunction because he has decided that he would like to transfer now. But just as Plaintiff cannot manufacture irreparable harm but declining to send applications in the first place, he similarly cannot wait for months and then seek preliminary injunctive relief because he has suddenly decided that this application window works better for him. This gamesmanship of the litigation process should not be countenanced. And in any event, his extensive delay sharply cuts against any finding of irreparable harm.

## III.    THE BALANCE OF EQUITIES FAVOR DENIAL OF PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION.

The Court must next consider "whether, balancing the hardships, there is harm to defendants or other interested parties." *Safex Found., Inc. v. SafeLaunch Ventures Ltd.*, No. 22-cv-00572, 2025 WL 2377972, at *4 (D.D.C. Aug. 15, 2025).

Issuance of a preliminary injunction would significantly burden the University. "Colleges and universities are afforded great latitude in administering their rules and regulations as courts recognize that those institutions' primary responsibility is to provide an atmosphere conducive to study and learning for all students." *Pierre v. Univ. of Dayton*, 143 F. Supp. 3d 703, 714 (S.D. Ohio 2015). In *Roe v. University of Cincinnati*, the plaintiff sought a preliminary injunction requesting that the court "prohibit UC from imposing any disciplinary sanctions" against her. 18-cv-00312, 2018 WL 9944938, at *1 (S.D. Ohio Aug. 21, 2018). The court denied the motion, and, in so doing, observed that "granting an injunction preventing Ms. Roe's suspension would likely disturb UC's ability to enforce its disciplinary procedures, which would not be in the public interest." *Id.* at *12. The same is true here. Should the Court issue a preliminary injunction, it would undermine the University's ability to administer its policies and procedures, while also encouraging violators to sue in court every time they disagree with the outcome of a disciplinary proceeding.[11] The balance of equities weighs strongly in the University's favor, and, therefore, this factor counsels against issuance of preliminary injunctive relief.

## IV.    THE PUBLIC INTEREST FAVORS DENIAL OF INJUNCTIVE RELIEF.

The public interest favors respect for University policies and procedures. As the court explained in *Roe v. University of Cincinnati*, granting a preliminary injunction prohibiting the

---

[11]    Granting Plaintiff the relief he seeks would also incentivize students to initiate lawsuits to avoid facing disciplinary proceedings in the first place.

imposition of sanctions would inhibit an institution's "ability to enforce its disciplinary procedures, which would not be in the public interest." *University of Cincinnati*, 2018 WL 9944938, at \*12. This Court should therefore afford deference to University officials in how they execute their own conduct processes and procedures. This fourth and final factor favors denial.

## CONCLUSION

American University respectfully requests that the Court deny Plaintiff's Motion for Preliminary Injunction.

Respectfully submitted,

**SAUL EWING LLP**

April 28, 2026

*/s/ James A. Keller*
James A. Keller
1735 Market Street, Suite 3400
Philadelphia, PA 19103-7504
Tel: (215) 972-7777
james.keller@saul.com

Timothy D. Intelisano (D.C. Bar. No. 90033254)
1919 Pennsylvania Avenue NW, Suite 550
Washington, D.C. 20006
Tel: (202) 342-3447
timothy.intelisano@saul.com

## CERTIFICATE OF SERVICE

I certify that on this 28th day of April 2026, I have electronically filed the foregoing **DEFENDANT AMERICAN UNIVERSITY'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION, AND A PROPOSED ORDER** with the Clerk of Court using the CM/ECF system which will automatically send e-mail notification of such filing to all parties registered to receive CM/ECF notifications.

I further certify that *Pro Se* Plaintiff John Doe received a copy of the foregoing via e-mail.


Dated: April 28, 2026                                      */s/ James A. Keller*
                                                              James A. Keller

                                                              *Counsel for Defendant*
                                                              *American University*

30