# EXHIBIT F

**Appeal of Outcome and Sanction in** ROE DOE **Matter**

DOE

Dec. 18, 2023

I write to appeal both the outcome and the sanction against me.  The outcome was directly affected by at least two significant procedural errors.  And even if it weren't, the sanction I was given is disproportionate to the conduct I was found to have engaged in—even if the only testimony you go by is ROE

I want to explain each of those below.  But first I want to emphasize what ROE and I ***both*** agree is the context for what happened that night.  In October and November 2021, ROE and I were friends with benefits, as we both admit.  We were being sexual together without commitment.  As ROE herself admitted, *I* was the one who wanted the relationship to become a romantic relationship and not just purely sexual.  (IR at 10).  That is not the mindset of someone who is simply interested in taking sexual advantage of ROE

deeper.  I didn't want our relationship to just be about sexual gratification.  I didn't want to take advantage of her sexually. I wanted more.  I wasn't someone who would just take unambiguous advantage of her solely for my own sexual gratification, as opposed to making an error in judgment about whether we should have sex.

When I did make an error in judgment that night—by not doing more to refuse her advances when her inhibitions were lowered, suspecting she'd regret things later—I apologized profusely.  (IR at 8-9, 11).  I even used language that I now know was inaccurate, thinking I had assaulted her simply because she had been high to some degree.  I genuinely felt bad that I had not done more to stop something that I should have known she would later regret.  And those feelings were genuine.  S-2  testified to how I was "visibly shaken" when I explained on December 14—long before this complaint was filed—that I had reservations about having sex with ROE even though she was the one pressing for it.  (IR at 14). I truly should have done more, and I genuinely felt bad about it, even just days afterwards.  ROE knew I was sincere, because, as she herself acknowledged, we continued to cuddle and be affectionate with each other, for the purpose of seeing "whether [our] relationship could develop romantically," through "mid-January 2022."  (IR at 12).  That's more than a full month after the incident.

That is the context I would ask you to please keep in mind as you consider the procedural errors I discuss below and as you weigh my sanction—that *I* was the one who wanted more than just sexual gratification out of our relationship, that I apologized profusely for not being stronger when I needed to be, and that we continued to pursue a potential relationship for an entire month afterwards.  That is not the mindset of someone who would callously or maliciously have sex with someone who was obviously incapacitated, just for the sake of their own sexual gratification.  And that is precisely what the evidence shows: that ROE would not have appeared so high as to be *incapacitated*, or anything close to it, when we had

sex on December 7.   The panel's conclusion to the contrary is the product of at least two significant procedural errors.

## I.  The Panel Misapplied the Title IX Policy's Definition of "Incapacitation."

First and most significantly, the panel misapplied the school's definition of "incapacitation."  It found that **ROE** was *incapacitated* (and that I should have known it) based *purely* on findings that she was merely *intoxicated*.   And under the Policy (not to mention common sense), those are two very different things.

The Policy gives the following definition of "incapacitation":

States of incapacitation include, but are not limited to: sleep, unconsciousness, intermittent consciousness, or any other state in which an individual is unaware that sexual contact is occurring. **Where alcohol or drug use is involved, incapacitation is a state beyond mere intoxication, or impairment of judgment.**

Policy at 4 (my emphasis).  To be responsible for sexual misconduct, it can't be that a complainant simply was *in* that extreme state; it must be that the respondent *knew*, or reasonably *should have known*, that the complainant was in that state.  In the words of the Policy, it is a violation when a person engages in sexual activity with someone who is "unconscious or who otherwise ***reasonably appears*** to be without the mental or physical capacity to consent."  (Policy at 4).  That is just common sense.

So, to find me responsible, it had to be reasonably clear to someone in my shoes that **ROE** wasn't just intoxicated from her "drug use," but was in "a state beyond mere intoxication, or impairment of judgment."  (Policy at 4).  But the evidence—even just the evidence that comes from **ROE** own mouth—repeatedly showed **the exact opposite**.  My own testimony shows it even more, but I'm not asking you to focus on that here since the panel found I was not credible.  (Below I will explain how a separate procedural error wrongly led them to conclude that.)  Based purely on **ROE** own testimony, it is clear that to anyone in my shoes, she would not have seemed so high as to be *incapacitated*, or anything close to it.  **ROE** didn't testify to exhibiting a single common outward sign of incapacity—no stumbling around, or slurring her words, or being unable to understand what was happening to her.  Instead, she testified to several things that would have made it seem, to anyone in my shoes, that she was in control of herself physically and mentally:

- **ROE** testified that when I "coax[ed]" her to perform oral sex, she "resisted and kept kissing [me] instead" (IR at 11), showing she was aware of what was going on and could respond accordingly.

- **ROE** testified that when I coaxed her a second time she said no again, by simply resting her head on my knee and refusing to perform oral sex.  (IR at 11).  To anyone in my shoes

2

she would have seemed like she could make decisions for herself about the kinds of sexual activity she wanted to engage in.

- **ROE** testified that "[t]he next thing she recalls is that she was on top of her lofted bed, but she could not recall how she got up there." (IR at 11). **ROE** was more honest about this part when she told the story to her roommate, **S-5** **S-5**; she told **S-5** that we both went up to the bed because she (**ROE** wanted to cuddle. (IR at 17: **S-5** saying **ROE** told her that "**ROE** wanted to cuddle, so they went to her bed to do so."). **ROE** had the mental capacity to say what she wanted us to do, and the physical capacity to get into her lofted bed. No one in my shoes would have looked at **ROE** and thought, "She is obviously so high as to be incapacitated."

- **ROE** claimed she was unable to verbalize that she didn't want to do more than kiss (IR at 11)—but she says she later *was* able to verbalize that she wanted me to take her necklace off (IR at 11). To anyone in my shoes, **ROE** being able to verbalize that, after we had already climbed up to her lofted bed, would create serious doubt that she was so high as to be *incapacitated*. **ROE** claims the reason she asked me to do that was that she couldn't command her fingers to do it (IR at 11), but the real answer is that it was far more natural for me to do it given how we were laying: We were spooning and I was laying behind her. Even in **ROE** description of our positioning (she says she was laying on her back and we were making out with me on top of her, IR at 11), it would have been more natural for me to be the one to do it. But the bottom line is that **ROE** by her own testimony, was able to ask me to take the necklace off.

- **ROE** said that she remembered when I "took off [my] pants" (IR at 11), which obviously would have been close to when we started having sex.

- **ROE** said that she pushed my penis to the side as we were having sex, to make it less painful because of a pre-existing cut she had. (IR at 11). That, too, would mean she was aware of what was going on, aware that she didn't like it, aware of precisely what to do to fix it, and able to then take the necessary steps.

Given all of the above, it is no surprise at all that the Outcome letter was able to identify *zero* outward signs that it says should have told me **ROE** was not just high, but so high as to be *incapacitated*. Please read the Outcome letter closely. It makes only *three* findings of fact in that regard. It finds:

- That I "acknowledge[d] that **ROE** was *high*" (Outcome at 2, 3, my emphasis);
- That I "witnessed **ROE** *ingest* THC" (Outcome at 2, 3, my emphasis); and
- That **ROE** was "in a state of intermittent consciousness" (Outcome at 2, 3).

Put aside the third one for a moment—I address it in detail below. The first two say *only* that I saw **ROE** ingest THC and that she "was high." **That is not enough under the Policy**. Having sex

3

with someone who is "intoxicated" from "drug use" is not a Policy violation. (Policy at 4). It is only a violation when intoxication reaches beyond mere impairment of judgment. Is it any surprise that someone who, by her own admission, twice resisted oral sex, then asked me to cuddle, then climbed to her lofted bed, then asked me to take off her necklace, exhibited *none* of the classic outward signs of incapacity? It is any surprise that the main evidence the panel had to rely on was that fact that I saw **ROE** ingest THC and knew she was merely *high*?

That leaves just the panel's finding that **ROE** "was in a state of intermittent consciousness." Literally the only evidence supporting that claim is **ROE** own testimony. And **ROE** herself points to just one reason she thinks she lost consciousness: the fact that she supposedly has memory gaps during the incident. (IR at 11-12). She seems to be assuming (as a lot of people do) that at the times when she was having a memory blackout, she must have been *unconscious*. Put aside that in at least one clear instance, **ROE** remembers more (as told to **S-5** than what she reported to the investigator, as explained above. Also put aside that **ROE** "denied making any of the alleged comments [that I said she made] during intercourse" (IR at 11), something she couldn't deny if she were actually unconscious or in a blackout. Even presuming **ROE** *did* have genuine memory blackouts as she says, it wouldn't mean she was incapacitated, let alone that she would appear incapacitated to an outsider in those moments. Memory blackouts from intoxication don't work that way. "[B]lackouts can occur at BrACs well below the level of incapacitation."[1] During memory blackouts caused by marijuana, "other cognitive functions than memory [are] usually normal," allowing blacked-out people to "drive, cook, play music, and perform other complex tasks," meaning they can seem fully functional while in the midst of a memory blackout.[2] A blacked-out person acts normally, they just can't remember it later:

> **During a blackout, a person is able to actively engage and respond to their environment; however, the brain is not creating memories for the events. . . . [S]hort-term memory remains intact . . . and as such, an intoxicated person is able to engage in a variety of behaviors,** including having detailed conversations and other more complex behaviors like driving a vehicle, **but information about these behaviors is not transferred from short-term to long-term memory,**

---

[1] Reagan R. Wetherill and     Fromme, "Alcohol-Induced Blackouts: A Review of Recent Clinical Research with Practical Implications and Recommendations for Future Studies," *Alcohol Clin. Exp. Res.*, May 2016, 922-35, at 922, *available from* National Institute of Health *at* https://pubmed.ncbi.nlm.nih.gov/27060868/.

[2] George Mansou, et al., "Marijuana Induced Transient Global Amnesia," JSM Clinical Case Reports 2(4): 1043, *available at* https://www.jscimedcentral.com/jounal-article-info/JSM-Clinical-Case-Reports/Marijuana-Induced-Transient-Global-Amnesia-4327.

**which leads to memory deficits and memory loss for these events** (White, 2003).[3]

Basically, short-term memory still works, so a person can remember what people say/do and respond to it in real time. They can have a goal in mind and take steps to make it happen. They can socialize normally. "[P]lanning, attention, and social skills, [a]re not affected" by a blackout.[4] There's just no memory of it the next day because the info never makes it out of short-term memory. "Anything a person can do while they are drunk and not blacked out they can do while they are blacked out—they just won't remember it the next day."[5] But during the blackout "[o]utside observers typically are unaware that an individual is in a blackout."[6] A blackout is like "a headache; the experience is happening inside that person's brain," so it's "difficult or impossible to know" whether a person is experiencing one.[7]

So, even if **ROE** is telling the truth about her memory, it wouldn't mean she exhibited any outwards signs of mental or physical incapacity during those times. It would be perfectly consistent with her being able to say no to oral sex, telling me she wanted to cuddle, climbing into her lofted bed, and asking me to remove her necklace.

If **ROE** had actual memory blackouts that night, I could see why she thought she intermittently lost consciousness. When we fall asleep, we don't remember things. When we wake up, we start remembering things again. Our normal experience is that, for times we don't form memories, it's because we're asleep. And 99.9% of the time, that's exactly why. So it makes perfect sense that, if **ROE** actually had memory blackouts, she would honestly think she'd lost consciousness for those periods where she doesn't have memories. ***Having no memories for a certain period is going to feel exactly the same whether the lack of memories is caused by being unconscious or whether it's caused by having a memory blackout.*** In both situations there are periods of memory, followed by periods of no memories, followed by periods where memory resumes. Exactly like going to sleep and waking up.

**ROE** **only** basis, in **any** of her testimony, for thinking she was unconscious is her lack of memory. If lack of memory could only be caused by that one thing, then it would indeed prove it. But that's provably not the case. It's scientific fact that THC causes memory blackouts and

---

[3] Wetherill and Fromme at 931.

[4] *Id*.

[5] "Shining a Light on Alcohol Blackouts," *NIAAA Spectrum* (June 2014), *available at* (https://www.spectrum.niaaa.nih.gov/archives/V6I2Jun2014/features/light.html.

[6] *Id.*

[7] Wetherill and Fromme at 922.

that people often look completely in control of themselves on the outside when they're having a memory blackout.

What other evidence is there, then, on whether **ROE** was at most having memory blackouts or was instead unconscious had a memory blackout?  Two things.  (Three if you include my own testimony, but like I said, I'm excluding that for now.)  The first is all of the evidence I've recounted above showing **ROE** physical and mental capacity in the minutes before we had sex.  That is **strong** evidence that **ROE** was nowhere close to a state where she was about to literally lose consciousness.  The second is **S-5** testimony from the hearing about **ROE** seemed when **S-5** saw her afterwards: **S-5** admitted at the hearing that when she first saw **ROE** it didn't necessarily seem to her that **ROE** must be incapacitated, but instead that she mainly just seemed really sad.  If **ROE** had literally just repeatedly lost consciousness not much earlier, she would have immediately and unambiguously seemed incapacitated to **S-5** when **S-5** saw her.

In short, there is a lot of evidence showing that, to anyone in my shoes, there were lots of reasons to think that **ROE** was not so high as to be obviously incapacitated.  Was she high?  Yes.  Was she in a place where she might make decisions she would later regret?  Yes.  Should that have been enough for me to firmly have stopped us from doing anything sexual?  Yes.  That would have been the truly good thing to do in that moment, and I have felt terrible for not being the kind of person I needed to be in that moment.  But letting someone make a poor decision while their inhibitions are lowered is not the same thing as doing something when they lack the mental or physical capacity to make decisions for themselves.  And the evidence shows that **ROE** truly wasn't in that latter state—or, at the very least, that she wasn't clearly and obviously in that kind of state to someone in my shoes who saw her make out with me, say no to certain requests, climb in her bed, and ask me to take her necklace off.

As I have testified, **ROE** in fact did a lot more than that.  But the above things are just the ones that she herself confirmed, either to the investigator or to **S-5**  And they show, by themselves, that my wrongdoing here was not of someone taking obvious advantage of a clearly incapacitated person.  I liked **ROE**  I wanted to be in an actual relationship with her.  I wouldn't have had sex with her if she'd been in anything close to that state.

*        *        *

In finding me responsible, the panel misapplied the Policy's definition of incapacitation. It found that I should have known **ROE** was *incapacitated* based purely on (1) my knowledge that she was *high*, and (2) her alleged memory gaps.  But the former is plainly insufficient, and the latter (if they actually happened) would feel exactly the same to her whether caused by unconsciousness or by intoxication-induced memory blackouts.  The blackout itself isn't evidence of what caused it.  And the **admitted** evidence—that **ROE** twice resisted oral sex, asked me to cuddle, climbed to her lofted bed, and asked me to remove her necklace—leave no doubt that, to anyone in my shoes, **ROE** would have appeared nowhere close to incapacitated.

The panel clearly misapplied the definition of incapacitation in finding me responsible when the evidence showed *only* that I knew she was high.

I never would have had sex with **ROE** if she'd literally been passing out while we were together.  I wanted to be in a relationship with her.  I would not have had sex if she had been clearly and unambiguously incapacitated.  I was the one who wanted more than just sexual gratification from our relationship.  Taking sexual advantage of her was not my mindset with **ROE** at all; she herself admits I was the one to push for something deeper.  That's why she tried to work things out with me for another month afterwards.  That's why the panel could cite no evidence showing why I should have known **ROE** was *incapacitated*, and not just high.

**II.  The Investigator Omitted Evidence That Directly Affected the Panel's View of My Credibility.**

The second procedural error that affected the outcome was the omission of significant evidence of my sexual encounter with **ROE** on November 2, 2021.  I gave the investigator extensive testimony about that incident when I was interviewed.  It was a time when **ROE** repeatedly pressured me to have sex in a situation where I didn't want to.  It was relevant to explaining why, on December 7, I similarly gave in to **ROE** wishes to have sex, even though I felt like the better thing to do was to say "no" because she was high.

My testimony about November 2 was left out of the preliminary investigation report.  In my response to the preliminary report, I explained in several places why that evidence was important (see, e.g., Ex. 14 at 9), including that it explained my actions on December 7 (Ex. 14 at 16).  Despite that, the investigator did not go back and add my testimony about November 2 into the report.

This had a direct effect on my credibility.  As the Outcome makes clear, one of the main reasons the panel found me "not credible" is that witnesses said my testimony about December 7 repeatedly changed.  (Outcome at 2: "**DOE** gave conflicting accounts of the events on December 7, 2021.").  And at the hearing, it became painfully clear that the reason at least *two* witnesses thought that was because ***they were confusing what I'd told them about the Nov. 2 and Dec. 7 incidents.***  When **S-1** was cross-examined, I asked him if the story he'd testified that I'd told him was the story about Nov. 2 or Dec. 7, and he said ***he didn't know***.  And **S-5** in testifying to what I had supposedly said about Dec. 7, in fact described the Nov. 2 incident.

If my November 2 testimony had been included in the report, it would have been clear that I had not told these wildly conflicting stories about Dec. 7, but instead that witnesses were mixing up two different incidents that I'd discussed—two incidents that the panel would have been familiar with because both would have been in the report.  Instead I was forced to try to address that on cross-examination, to a panel that had zero background about the separate incident that was muddying the witnesses' testimony.

7

It won't do to say that the panel also cited other things in finding me not credible. Nowhere does the Outcome say, "Even if Reason 1 didn't apply, we'd still find **DOE** not credible based on Reason 2." It could have been written that way, but it's not. It simply lists several things and says that, based on all of those things, it found me not credible. The panel may very well have found me credible—or even *partially* credible—if one or more of those things were taken out. And in a case that, in the panel's view, ultimately came down to our credibility, that is absolutely huge. Especially in light of all of the evidence *from* **ROE** *own mouth* showing her physical and mental capacity. If the panel had credited even just ***a little bit*** of my testimony about **ROE** capacity, the evidence on that critical question would have been even more overwhelming, and even less consistent with the Policy's definition of incapacitation.

### III.  My Sanction Is Disproportionately Harsh.

Finally, if you do not agree that the evidence above shows that no one in my shoes would have reasonably thought **ROE** was incapacitated, I hope you will at least agree that it would have seemed like a very close call to me. I hope you will agree that the fact that **ROE** could tell me "no" to oral sex; the fact that she would ask to cuddle; the fact that she could climb to her lofted bed; and the fact that she could ask me to take her necklace off all show that I wasn't taking advantage of someone who was unambiguously incapacitated for my own sexual gratification, as opposed to making an error in judgment about whether we should have sex. I hope you will agree that the context of the incident shows I was not someone with a mindset to look at her as just a source of my sexual gratification.

But those are the kinds of things that a suspension as harsh as 1.5 years wrongly suggests I did. A 1.5-year suspension signals to anyone in my future—grad schools, employers, future friends/romantic partners—that my conduct was unambiguously terrible. It will leave permanent effects on my life. It will drastically affect my ability to get the best jobs I'm capable of getting, or admission to the grad schools I'm qualified for. It will create a large gap in my education that I will have to explain any time I apply for a job or if I ever apply to graduate school. Because it will come at a time—very close to graduation—when no one takes gaps like that, as they often do in earlier years for things like internships. It will stand out to anyone who sees it and raise all kinds of questions that will inevitably lead me to having to explain this finding. Those are harms I would not have suffered as severely if **ROE** had brought this complaint earlier, or if the investigation hadn't taken as long as it did. That is additional punishment that, respectfully, should factor into things as you weigh my sanction.

Please also consider the ways I have already been punished for this. As several people testified to, pictures of me were publicly posted on campus calling me a rapist. I was branded a rapist with <u>no</u> way to respond to it. That would have been bad enough by itself, but that wasn't all—students literally started asking people if they were my friends and who I was. (IR at 13).

I can't adequately express the anxiety and fear that all of this created in me. That kind of public branding, with no way to explain myself or defend myself or present any of the context of anything has created an incredible amount of emotional and psychological suffering. The

anxiousness I have from the posters doesn't just affect me during the day, it keeps me up at night, it even wakes me up at night. I wake up to myself begging an empty room to stop. The worst by far was the night that I did not wake up. I woke the next morning, vividly remembering those same pleas but in my nightmares, my entire body clenched in fear. I spent the next weeks not just afraid to go to sleep, but afraid of sleep. I don't go to bed unless I am so tired that I know I will pass out because I am terrified that I might have the energy to have another nightmare.

In the days following the posters being put up, my last days of freshman year, I lost 12 pounds in 3 days because I barely ate. I went from 165 pounds to 152 pounds and have never recovered because the anxiety and panic that I feel keep coming back. I walk around campus in fear, always looking out over my shoulder and always looking out for someone who may harass or hurt me again.

As far as I know, that is something that most people accused of this kind of thing don't end up going through.  It's extra punishment that isn't normally factored in when weighing the kind of sanction is appropriate to a given violation.  It would be wrong to give me the same sanction you would give to someone who had also been found responsible for this but had not been publicly shamed and branded the way that I have been.  I would ask you to please factor this in when determining my sanction.

I have also lost several friends because of this.  As multiple people testified to, I also lost the living situation I was supposed to lave earlier this year.  That not only caused me further emotional suffering, it also hurt financially.  Having to go through this process and hire advisors has, too.  In the wake of this outcome I also had to give up my position as a Resident Assistant, enduring even more financial hardship and losing the place I called home. I lost the community I helped build and the people who I got to help as well.  These are all ways that I and my family have already been punished because of this.  I would ask you to please factor these things in as you weigh my sanction.

I've been living under the stress and fear of **ROE** allegations for more than a year and a half, and have been living under the cloud of her formal complaint for more than nine months. That is far longer than the process is supposed to take.  The stress, worry and pressure that anyone experiences going through one of these, I have experienced for that much longer.  It is again a reason to please be lenient on me; to consider the suffering I've already gone through as part of my total sanction.

For all of these reasons I humbly beg that, if you're not to undo the finding, you please reduce my suspension to one semester.  The reason is that I am able to graduate with one just more semester's worth of classes.  If I were suspended for the Spring 2024 semester, I could finish my classes up this summer, and then I would be gone forever.  Finishing just one semester later, in the same calendar year, would avoid the permanent effect that a 1.5-year suspension will have on my future.

9

I beg you to see that I did not take advantage of **ROE** someone I wanted more than just sexual relations with, while she was unambiguously incapacitated.  If the outcome is to stand, I humbly ask you to please reduce it, to reflect that at a minimum this would have been a close call for me that night and to account for what I've already gone through.

**Conclusion**

Ultimately, though, I hope you will agree that if **ROE** truly were incapacitated that night, I truly had no way of reasonably knowing it.  And that the panel, in finding me responsible, misapplied the Policy's definition of incapacitation.  It rested that finding only on my knowledge that **ROE** was *high*, and on her claim to have memory gaps.  The former is manifestly insufficient, and the latter (even if true) isn't evidence **ROE** had memory gaps from being unconscious, as opposed to simply being in a memory blackout.  And if she were in a memory blackout, I would have had no way of knowing it.  What anyone in my shoes would have known—according solely to **ROE** own testimony—is that **ROE** twice said no to oral sex, asked me to cuddle, climbed to her bed, asked me to remove her necklace, and then (according to **S-5** appeared sad, not necessarily incapacitated, right afterwards.  All of which meshes perfectly with the fact that *I* was the one who wanted more than just sexual gratification from **ROE** and was not in a mindset to simply take unambiguous advantage of her while she was literally passed out.

Please, I beg you, please reverse this finding.  I will be gone after just one more semester's worth of classes.  I will be away from **ROE** forever.  Please give me my future and my life back and please reverse this finding.

Thank you for taking the time to read this.

10