John Doe
Address Withheld
Phone Number Withheld
Email Withheld
Plaintiff <u>Pro Se</u>

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**DISTRICT OF COLUMBIA**

| | |
|---|---|
| John Doe,<br><br>             Plaintiff,<br><br>vs.<br><br>American University,<br><br>             Defendant | Case No.: 1:25-cv-03866-ACR<br><br>PLAINTIFF'S REPLY TO DEFENDANT'S OPPOSITION TO A PRELIMINARY INJUNCTION |

Defendant Address
4400 Massachusetts Ave NW
Washington, D.C. 20016

**PLAINTIFF'S REPLY TO DEFENDANT'S OPPOSITION TO A PRELIMINARY**

**INJUNCTION – ECF No. 20**

RECEIVED

MAY 04 2026

Clerk, U.S. District & Bankruptcy
Court for the District of Columbia

**Table of Contents**

A More Thorough Procedural History………………………………………………………………1

The Explicit Inconsistency in the Consistency Determination……………………………………2

Defendant does not Contest Plaintiff's Claim 1.6 …......………………………………………3

Defendant does not Contest Plaintiff's Claim 1.5 …..…………………………………………4

Specific Instances of Impartiality are Enforceable …………………………………………4

    a.  Defendant's Persuasive Authorities Juxtapose Plaintiff's Claim…………………………4

    b.  Federal Regulations and the Policy both Operationalize this Provision …………………6

Defendant Fails to Address Plaintiff's Title IX Claim……………………………………………7

    a.  Erroneous Outcome as a Unique Claim………………………………………………...7

    b.  Plaintiff's Situation is One-of-a-Kind…………………………………………………8

Defendant's Opposition is Focused on the Past when the Damages are in the Future……………9

    i.   Defendant's Opposition to Irreparability………………………………….……..………9

    ii.  Harm is Certain…………………………………………………………….………10

    iii. The Loss of Educational Opportunities is Not Compensable…………………………11

    iv. Defendant Fails to Grasp the Nature of the Damages and Plaintiff's Pro Se Status…….12

The Final Report Swings the Balance of Equities and Public Interest in Plaintiff's Favor………13

Conclusion………………………………………………………………………………………14

**Table of Authorities**

Allied for Retired Americans v. Bessent, 770 F. Supp. 3d 79 (D.D.C. 2025) ................................9

*Alf v. Donley, 666 F. Supp. 2d 60 (D.D.C. 2009) .....................................................10–11

*CSX Transportation, Inc. v. Williams, 406 F.3d 667 (D.C. Cir. 2005) ....................................11

Doe v. Brown Univ., 166 F. Supp. 3d 177, 191 (D.R.I. 2016) ……………………………….3

Doe v. California Institute of Technology, No. 19-cv-01005, 2019 WL 8645652

(C.D. Cal. Aug. 13, 2019) ...…………………………….....................................................4

Doe v. DiStefano, No. 18-cv-1462, 2019 WL 1254943 (D. Colo. Mar. 19, 2019) .......................5

Doe v. George Washington University, 366 F. Supp. 3d 1 (D.D.C. 2018) ...................................7

*Doe v. Purdue University, 928 F.3d 657 (7th Cir. 2019) .................................................8

Doe v. University of Cincinnati, No. 18-cv-00312 (S.D. Ohio Aug. 21, 2018) ...........................13

Doe v. University of Dayton, No. 17-cv-00134, 2018 WL 1393894

(S.D. Ohio Mar. 20, 2018) ...…………………………………………………………….5

Kashmiri v. Regents of the University of California, 67 Cal. Rptr. 3d 635

(Cal. Ct. App. 2007) ……………………………………………………………………4–5

*Robinson v. Howard University, 335 F. Supp. 3d 13 (D.D.C. 2018) ....................................7–8

**Statutes**

20 U.S.C. § 1681(a) (Title IX) ........................................................................8

**Federal Regulations**

34 C.F.R. § 106.45(b)(1)(ii) (2023) ………………………………………………………6

**A More Thorough Procedural History**

Defendant, in their opposition ("Def. Opp'n."), left a few gaps in their history between their bringing of conduct charges against Plaintiff and the waiver of service.  About a month after Defendant brought the conduct charges, Plaintiff filed a complaint with the U.S. Education Department's Office of Civil Rights ("OCR").  Plaintiff elected to take that course of action because he lacked the funds for sustained litigation.  OCR facilitated mediation, which was ultimately unsuccessful, and at the end of June 2024, OCR began an investigation.  In November 2024, the investigators in that matter gave a last call for evidence before they made their determination. In January 2025, the change in presidential administrations and policies effectively brought that process to a halt, but OCR did not notify Plaintiff of this.

Plaintiff continued to wait for their determination, but in May 2025, when he was attempting to transfer, he began another round of negotiations with Defendant hoping to get the pending investigation stopped, since the underlying facts in that complaint were based off of a discriminatory process.  These negotiations proved fruitless when the Defendant refused to meaningfully engage or explain their actions, eventually ignoring Plaintiff altogether.  Plaintiff, knowing that he is far out of his depth litigating *pro se* in federal court, waited until the last possible opportunity, when the statute of limitations was running out on his DCHRA claim, to file this lawsuit.  No preliminary injunction was sought at the end of last semester because a summons had not been issued due to the pending pseudonym motion and Plaintiff was informed by the court clerk that **nothing** could be served without a Summons in the underlying case.

Plaintiff brought the original version of this motion at the end of March 2026, to give the Court and Defendant adequate time to conduct their respective due diligences. Defendant benefited from Plaintiff's careful watch of the calendar and his own deadlines, which

1

allowed for Defendant to have multiple weeks to construct their opposition.  Plaintiff brought these three specific claims because they demonstrate that the conduct charge was a result of procedural issues and that it will likely not be reinstated if Defendant were to amend their Student Conduct Code to drop the statute of limitations because the underlying claim would be false.

### The Explicit Inconsistency in the Consistency Determination

Defendant left another notable gap in their history.  Defendant has provided, as Exhibit A to Def. Opp'n, the Final Investigative Report.[1]  That report contains the actual evidence of inconsistency the Plaintiff had plead specifically.

> Roe remembered Doe['s] penis was entering her vagina but has no memory thereafter because she experienced tunnel vision and blacked out.

> Roe['s] Response to Doe['s] Allegation of Sexual Assault

> Roe categorically denied forcing Doe's penis into her vagina; denied hearing Doe hesitate; and denied making any of the alleged comments during intercourse.

Exhibit A to Def. Opp'n at 12 (Page 11 of Final Report)

In Plaintiff's supporting declarations and supporting memorandum for a preliminary injunction he references direct contradictions in Ms. Roe's testimony.  That specific example is found in the last three paragraphs on Page 11 of the Final Report.  In Defendant's history of the underlying Title IX process, they state that "[Ms. Roe] told Plaintiff [that] she did not want to perform any

---

[1] Plaintiff means to imply no bad faith of any kind on the part of Defendant here; however, it should be noted that this is not the full range of evidence used by the Hearing Panel. The written determination cites a recording, which would necessarily need to be sealed.  See Ex. C to Def. Opp'n.  The presented final report is adequate for the purposes of this motion.

sex acts on him, and, shortly thereafter, she blacked out." Def. Opp'n. at 11. The aforementioned sentences from the Final Report show that that statement is only one of her recollections. It would be more accurate to say that "Ms. Roe claimed to have blacked out shortly after inhaling THC but also claimed to be able state Plaintiff's memories of that time were 100% false."

## Defendant does not Contest Plaintiff's Claim 1.6

Defendant admits that they did not provide material when Mr. Doe and his advisor requested to view them. See Def. Opp'n at 15, ECF. No 18-18. Defendant instead claims discretion over when to share evidence with appealing parties. Defendant and Plaintiff agree that "courts may not read terms into the contract." Doe v. Brown Univ., 166 F. Supp. 3d 177, 191 (D.R.I. 2016). In this case, the contract does not include any elements that require an indication that the evidence will be used for an appeal or that the University has discretion over which day of the appeal period that they provide it on. In effect, the University is reading terms into their own contract. Furthermore, the Policy strongly suggests that evidence should be shared the entire time, as the appeal can be submitted anytime between the decision and the deadline. See Ex. B. to Def. Opp'n. at 25 ("Appeals must be submitted, in writing, to the appropriate university administrator, as defined in Section IV (K)(5), within seven (7) calendar days after the notice of the case outcome.") The usage of "within" means that if the University does not provide the evidence immediately, they risk not having allowed a review of evidence before an appeal is submitted. Additionally, Ms. Annexstein did not raise this argument when denying access to evidence. See ECF. No. 18-18, (Ex. 16 to Memorandum in Support). The question before the Court here is whether the Defendant (a) had discretion in the timing of providing access to evidence and (b) if the contract required notice to the Defendant that the

3

materials were going to be used for an appeal.  As there is no contract language allowing discretion or requiring disclosure of intent to appeal to become an appealing party, there is no genuine dispute of Defendant's breach.

### Defendant does not Contest Claim 1.5

Defendant did not address whether the underlying factual record reflected a procedural deviation from their requirement to be impartial.  The record, as mentioned in the beginning, clearly shows that Ms. Roe had two competing recollections of no memory and total memory.  See Ex. A to Def. Opp'n. at 12.  Defendant has not offered a competing explanation for this procedural deviation.  Defendant has not offered an alternative definition of impartial that conflicts with Plaintiff's supporting memorandum (Pl. Supp. Mem.). Plaintiff contends that this contract provision requires the Hearing Panel to be objective in their work.  See Pl. Supp. Mem. At 16.  Otherwise, their actions would be pre-judgmental, partial, and the result of bias, not the factual record.

### Specific Instances of Impartiality are Enforceable

Defendant contends that the contract provision itself is unenforceable, citing cases from various districts in California, Colorado, and Ohio, as a reason for this specific provision being unenforceable.  Plaintiff will address those all at once.  Then Plaintiff will explain how the Policy operationalizes fairness and impartiality, making the contract enforceable.

a. **Defendant's Persuasive Authorities Juxtapose Plaintiff's Claim**

The California cases, Doe v. California Inst. Of Tech., No. 19-cv-01005, 2019 WL 8645652 at 9 (C.D. Cal. Aug. 13, 2019) and Kashmiri v. Regents of Univ. of California, 67 Cal. Rptr. 3d 635, 652 (Cal. Ct. App. 2007), can be addressed together as Doe v. Cal. Tech. builds off of Kashmiri, where they both interpret "general and vague declarations" as not specific

4

enough to create contractual obligations.  See Kashmiri 67 Cal. Rptr. 3d 635, 652.  Those examples involved aspirational statements which could not be **reasonably measured**, as the case from Colorado lays out.

Doe v. DiStefano, No. 18-cv-1462, 2019 WL 1254943 at 1 (D. Colo. Mar. 19, 2019) states, and Defendant quotes verbatim, that "general commitments to fairness and other ethical aspirations are **generally too vague** to be legally enforceable."  See Def. Opp'n. at 21; quoting Doe v. DiStefano, at 7; emphasis added.  Defendant's argument here falls apart here because the facts do not match.  In Doe v. DiStefano and the California cases, the plaintiff cites a university aspiration to be generally fair, but in this case, Plaintiff cites a specific provision that the Defendant's policy says is mandatory (Exhibit B to Def. Opp'n at 18: "Hearing Panel **must be** impartial." emphasis added), and the harm that Plaintiff cites is not general, but specific, as Plaintiff cited the false statements in the Hearing Panel's decision.  This is where the omitted words between the Defendant's quotes of Doe v. Univ. of Dayton, No 17-cv-00134, 2018 WL 1393894 at 12 (S.D. Ohio Mar. 20, 2018) puts the final nail in the Defendant's argument.  See Def. Opp'n. at 21.

The full quote from Doe v. Univ. of Dayton is as follows:

Other than claiming the University failed to act in a "fair" and "impartial" manner, Doe has not identified a provision of the University's Student Handbook that the University failed to follow during his disciplinary matter. "Vague, hortatory pronouncements in a contract are insufficient to support a breach of contract claim."

Doe v. Univ. of Dayton. At 12.

5

The key ingredient that is missing from the plaintiffs' arguments in all these cases cited by the Defendant is a specific contract provision which operationalizes these general claims of fairness.

### b. Federal Regulations and the Policy Both Operationalize this Provision

The belief that the provision is unenforceable defeats the Policy's purpose. The Policy provisions are "intended to be consistent with the University's compliance obligations under the Title IX regulations issued by the U.S. Department of Education." In this case, the relevant regulation is 34 C.F.R. § 106.45(b)(1)(ii) (2023), which "Require[s] an objective evaluation of all relevant evidence—including both inculpatory and exculpatory evidence—and provide that credibility determinations may not be based on a person's status as a complainant, respondent, or witness." Alongside that, at least three contract provisions in the Title IX Policy allow this provision to be objectively judged:

    a. § (IV)(I)(12) requiring a preponderance of evidence

    b. § (IV)(I)(21)(c) requiring the inclusion of "[f]indings of fact support the determination.

    c. § (IV)(K)(6)(c) allowing for bias to be considered as a ground for appeal

Ex. B to Def. Opp'n. at 20, 21, and 26.

All four of those provisions in the federal regulations and the Policy show that the Defendant must objectively consider the evidence. These are the specific provisions which Defendant's cited cases were missing. The federal regulation and sections implicitly requiring objectivity means that the Court can examine whether or not Defendant deviate from the process which they "must" follow. The ability to appeal an outcome based on bias also shows that Defendant believes a factfinder can judge whether bias was a deciding factor, and therefore correct any deviation from the standard of impartiality. The Defendant and Plaintiff both agree that it is not

the role of the Court to simply rejudge disciplinary matters that are within the bounds of the law. See Def. Opp'n. at 13-14.  This situation is simply a procedural deviation, not "merely a disagreement with the Hearing Panel's credibility determination."  Def. Opp'n. at 14.

### Defendant Fails to Address the Title IX Claim

The basis of this particular Title IX claim is that the University made a false statement on consistency, which they used as a key piece of evidence in their outcome.  Under the backdrop of intense public pressure and numerous procedural deviations, the Hearing Panel made a false statement which benefited the female party, a direct comparator in this case, which greatly and plausibly turned the outcome in her favor.  Defendant does not deny, or even address, that the Hearing Panel made a false statement in support of the female party, which is indicative of sex bias.

### a. Erroneous Outcome as a Unique Claim

Erroneous Outcome claims have for a long time followed a stringent, two-prong test to establish (1) "particular facts sufficient to cast some articulable doubt on the outcome of the disciplinary proceeding' and (2) 'circumstances showing that gender bias was a motivating factor behind the erroneous finding."  Def. Opp'n. at 25 (quoting Doe v. George Washington Univ., 366 F. Supp. 3d 1, 11 (D.D.C. 2018)).  This claim requires a certain degree of discovery to have been done beforehand, like looking at statements made by involved faculty and staff without having access to their emails or bringing comparator statistics without having access to all the case files of other students.  Due to the need for pre-pleading discovery, many claims fail.

Defendant would like the Court to look at Robinson v. Howard Univ., 335 F. Supp. 3d 13, 28 (D.D.C. 2018), as a guidance on this matter. Specifically, Defendant asks the Court to look for "statements by members of the disciplinary tribunal, statements by pertinent

7

university officials, or patterns of decision-making that might show the influence of gender or reflect bias by members of the tribunal." Robinson 335 F. Supp. 3d 13, 28.  Defendant alleges Plaintiff does not bring any evidence of that kind.

Defendant is wrong because Plaintiff brought, and Defendant supplied, statements in the Findings of Fact Supporting the Determination section of the written determination.  Those statements were, by definition, "statements by members of the disciplinary tribunal…that might show the influence of gender or reflect bias…" Id.  In the written determination it says that "The hearing panel finds the following facts: … Roe gave consistent statements regarding the events of December 7, 2021, and were credible." Exhibit D to Def. Opp'n. at 4.  The record, as stated in the beginning of this reply, makes that conclusion factually inaccurate.  Under Title IX, Plaintiff does not need to show generalized animus towards a sex, but rather that sex was a motivating factor which contributed to this outcome.  This was a simple procedural deviation, as stated previously, that greatly benefited the female party and hurt the male party.

In addition to that procedural deviation, Plaintiff has also already pleaded claim 1.6 in this motion.  Denying Plaintiff access to evidence to appeal is a decision which only serves to help the female complainant-respondent and hurt the male one.  Ms. Roe had no interest in having the finding of not responsible against her overturned, whereas Plaintiff did.

**b. Plaintiff's Situation is One-of-a-Kind**

Courts, recently, have begun moving away from the rigid test that has been the norm of the past 30 years.  In this case, it may be more accurate and fitting for the Court to ask, "do the…facts…raise a plausible inference that the university discriminated against John 'on the basis of sex"? Doe v. Purdue Univ., 928 F. 3d 657, 667-668 (7th Cir. 2019).  They reasoned that such a question sufficiently encompassed the rigid tests because "[a]ll of [those] categories

simply describe ways in which a plaintiff might show that sex was a motivating factor in a university's decision to discipline a student." Id. at 667.

When applying the "erroneous outcome" test, the goal is to just show "circumstances," however, in this case, in addition to circumstances, there is a direct comparator. Since the University included the Final Report in its opposition filing, the Court can identify with significant certainty that (a) the outcome was not accurate and (b) that sex discrimination was the plausible cause. In Exhibit D to Def. Opp'n., it states that credibility analysis was applied to both parties. Combining the backdrop of cognizable public pressure against the University and two separate standards of consistency being applied, along with other procedural deviations, which supported the female party, sex discrimination can be demonstrated.

**Defendant's Opposition is Focused on the Past when the Damages are in the Future**

Defendant opposition has complicated and misattributed the ongoing harms. The ongoing harm is in not being able to transfer to another undergraduate institution due to the lying allegation brought by Defendant against Plaintiff, "since the University's pending conduct charge against Plaintiff makes him ineligible to transfer to many institutions, including the one of his choice, since he is not in good standing with the University." Pl. Supp. Mem. at 6. Stemming from the inability to transfer is reputational and emotional harm, and harm from the loss of educational opportunity which impacts future earnings.

**i. Defendant's Opposition to Irreparability**

Untangling the confusion defeat Defendant's first opposition. Defendant states that since the allegation has already been brough and the Title IX sanctions already served, all the "feared events giving rise to distress" have already occurred. All. For Retired Americans v. Bessent, 770 F. Supp. 3d 79, 110 (D.D.C. 2025). While Defendant is correct that those events

were harmful, they are not the harm being addressed here. It is because of those events that Plaintiff will suffer the harm of not being able to complete his education, unless this Court orders otherwise.

Defendant also alleges that the DCHRA would make Plaintiff's emotional damage eligible for compensation upon success on the merits. The DCHRA claim is focused on discrimination in real property in the District of Columbia. It is unclear how Defendant is linking the harm caused by not being able to transfer to compensation stemming from lost housing.

### ii. The Harm is Certain

Defendant's objection is focused on competing interpretations of the word "considered" in this legal context. They cite Plaintiff's memorandum which states that "[t]he University's ongoing accusations of lying have blocked him from even considering entering into a contract with another university." Pl. Supp. Mem. at 29. They, however, omit the second half of that sentence which is a paraphrasing of Alf v. Donley, 666 F. Supp 2d 60, 70 (D.D.C. 2009). In that case, a debarred government contractor is looking to lift his debarment from competing for government contracts prior to an outcome on the merits. In this context, it becomes clear that Plaintiff cannot "consider" in the sense of seriously attempt to engage in business with another organization.

Mr. Alf could theoretically evaluate and desire to do business with the government, but he could not consider, as it is used in this context, actually doing business because he was forbidden from doing so. In that same line of thought, Plaintiff wishes to complete his education, identified what he must do to achieve it at the specific institution that he desires, and seriously contemplated all other required matters, but he cannot "consider" entering

10

into a contract with that institution because he, like Mr. Alf was with the government, is forbidden from doing so.

Defendant continues to run with their erroneous interpretation to suggest that Plaintiff has no plan to even transfer.  That statement is plainly false, as ¶14 of Plaintiff's Declaration in support of his motion for preliminary injunction, clearly states that "[t]he university that I wish to transfer to requires people with disciplinary notations on their transcripts submit letters of good standing…" ECF No. 18-3.  Defendant furthermore consented to an amendment of the original motion when Plaintiff, who was continuing to go through the application, identified that his previous understanding of the application process was incorrect. See ECF No. 17.  This argument is half-serious at best since Defendant has been aware that Plaintiff has been seeking this relief since at least May of 2025.

**iii. This Loss of Educational Opportunities is Not Compensable**

For this specific aspect, Plaintiff relied heavily on CSX Transp., Inc v. Williams, 406 F.3d 667, 674 (D.C. Cir. 2005), common sense, and the implied understanding that he is the only party who is not a near-billion-dollar institution.  The Defendant avoided all three.  The CSX case laid the framework that certain but incalculable economic loss is irreparable because the damages could not precisely compensate and risked greatly undercompensating the plaintiff. See CSX, 406 F. 3d 667, 674.

Using common sense, a reasonable person understands that people are compensated more for their experience and skills, which are developed through **work experience**.  By not being able to continue his education, that causes Plaintiff to lose his ability to gain work experience as well.  Plaintiff will therefore logically always be making less than his peers, which will compound throughout his life.  Defendant has not elaborated on the exact

11

difference in Plaintiff's lifetime cumulative earnings between the injunction and no injunction scenario or how they intend to calculate it.

Another commonsense aspect is that if Plaintiff does not submit the required letter of good standing, a person can be reasonably certain that he will be denied.

Defendant also complains that Plaintiff is "declining to apply to other institutions." Def. Opp'n at 33. By Plaintiff's discretion, it is too expensive and impractical to go to any other institution besides the one that allows him to live at home, charges substantially lower fees than others, allows him to afford an attorney in the near future, and is reputable. The Defendant may not like it, but their unlawful actions have had a serious effect on Plaintiff's life.

**iv. The Infliction of Damage is Discrete and Plaintiff's Pro Se Status**

Defendant cites multiple cases where plaintiff waited to seek a preliminary injunction too long after their initial filing. None of the cases cited, to Plaintiff's understanding, involved matters similar in nature to this one. In this matter, Plaintiff only suffers more if the future deadline is missed.

As to why Plaintiff did not seek a preliminary injunction last semester, that comes down to Plaintiff's recognition of his lack of knowledge on how to litigate at all, not to mention complex discrimination issues. Plaintiff waited until the last possible moment to file, before the DCHRA claim's statute of limitations expired, since there was an ongoing federal civil rights investigation ongoing into the University based on the same claims. Those investigators, presumably, did know what they were doing and their findings would cause a just outcome, rendering most of this case moot. However, Plaintiff was not aware that, despite giving a last call for evidence in late 2024, that there would be no decision under the current administration. The application deadline closed on November 15, 2025, which even on shortened timelines,

12

would have been too long for a full preliminary injunction proceeding. Additionally, since Plaintiff was awaiting approval on his pseudonym motion, he could not serve anything due to the summons not being issued until after that ruling, according to the court clerk's office. As such, it would have been impossible to serve a motion for a preliminary injunction.

**The Final Report Swings the Balance of Equities and Public Interest in Plaintiff's Favor**

Defendant cites <u>Roe v. University of Cincinnati</u>, 18-cv-00312, at 24 (S.D. Ohio Aug. 21, 2018) ECF No. 25, saying that granting an injunction "would likely disturb UC's ability to enforce its disciplinary procedures, which would not be in the public interest." Ordinarily, Plaintiff would agree. However, in this case, Defendant has provided the Final Report, which substantiates Plaintiff's core allegations concerning partiality. <u>See</u> Exhibit A to Def. Opp'n. at 12. The public can clearly see that the manner in which Defendant interprets, and therefore enforces, their "disciplinary procedures." That manner is not in the public interest, as stated in Plaintiff's original memorandum.

## Conclusion

In bringing this motion, Plaintiff seeks to remove the last roadblock to getting a letter of good standing so he can transfer to a nearby institution. Plaintiff's claims do not ask the Court to consider the assessment of credibility, only to look at whether the Defendant deviated from their contractual obligations in the areas document access and objectivity. Additionally, Plaintiff asks the Court to consider the intense public pressure, the University's cognizance of it, and the multiple and consistent procedural deviations in favor of the female party to assess whether sex discrimination was a deciding factor. Plaintiff does this to avoid the harm of not being able to get work experience in a field that requires a bachelor's degree, which will

necessarily always leave him earning less than peers his age who were able to start earlier. Those damages are foreseeable and certain but incalculable.

       I declare under penalty of perjury that the foregoing is true and correct. Executed on May 4, 2026.

*John Doe*
John Doe, Plaintiff Pro Per

14

**Certificate of Service**

I hereby certify that on May 4, 2026, a copy of this Reply to Defendant's Opposition to Plaintiff's Motion for a Preliminary Injunction served by email upon the following counsel who have been retained to represent American University in this matter:

James A. Keller

1735 Market Street, 36th Floor

Philadelphia, PA 19103

James.keller@saul.com

Timothy Intelisano

1919 Pennsylvania Ave., NW, Suite 550

Washington, DC 20006

Timothy.intelisano@saul.com

*John Doe*

John Doe, Plaintiff Pro Per